# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## BANKRUPTCY DIVISION
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| IN RE | |
| JEFFREY J. PROSSER, | Bankruptcy No. 06-30009 |
| Debtor. | Chapter 7 |
| | |
| IN RE | |
| INNOVATIVE COMMUNICATION CORPORATION, | Bankruptcy No. 07-30012 |
| | Chapter 11 |
| Debtor. | |
| | |
| STAN SPRINGEL, CHAPTER 11 TRUSTEE OF THE ESTATE OF INNOVATIVE COMMUNICATION CORPORATION, AND JAMES P. CARROLL, AS CHAPTER 7 TRUSTEE OF THE ESTATE OF JEFFREY J. PROSSER, | Adv. No. 07-3010 |
| | Related to Doc. Nos. 71, 79, 704 |
| Plaintiffs | |
| v. | |
| JEFFREY J. PROSSER, DAWN PROSSER, JUSTIN PROSSER, MICHAEL PROSSER, SYBIL G. PROSSER, MICHELLE LABENNETT, AND LYNDON A. PROSSER, | |
| Defendants | |

1

## MEMORANDUM OPINION[1]

Before the court are two matters: resolution of the issues tried regarding turnover and resolution, to the extent applicable to the turnover complaint, of a motion to stay proceedings. The First Amended Verified Complaint to Compel Turnover of Property of the Estates and Impose a Constructive Trust and Application For Injunctive Relief, Including Temporary Restraining Order and Preliminary and Permanent Injunctions[2] ("Amended Complaint"), Adv. Doc. No. 71, was filed by Stan Springel, the Chapter 11 Trustee of the bankruptcy estate of Innovative Communication Corporation (hereinafter "New ICC") and James P. Carroll, the Chapter 7 Trustee of the bankruptcy estate of Jeffrey Prosser.[3]  The Trustees seek turnover of certain property currently in the possession, custody and/or control of Jeffrey Prosser, Dawn

---

[1]This Memorandum Opinion constitutes the court's findings of fact and conclusions of law. All Doc. Nos. provided herein are docketed in Adv. No. 07-3010 unless otherwise noted. The headings throughout this Memorandum Opinion are for guidance only. Thus, whether a conclusion of law or finding of fact appear under either or both headings, the location of the finding or conclusion within the Opinion is not determinative. Where the court makes a finding of fact or comes to a conclusion of law, each shall have the intended effect  regardless of the headings of the subsections herein.

[2] On October 30, 2007, the court entered a Temporary Restraining Order. *See* Adv. Doc. No. 18. Then, on December 11, 2007, this court entered an Order Granting Application for Preliminary Injunction. *See* Adv. Doc. No. 79.

[3] The Amended Complaint names Trustee Carroll as a plaintiff and encompasses the claims of Jeffrey Prosser's bankruptcy estate. The Trustees entered into a stipulation by which they agreed to "jointly seek the turnover and recovery of Property of Innovative Communication Corporation...and Jeff Prosser, on behalf of their bankruptcy estates" with the understanding that the "Property will be held in trust by one Trustee or the other, or by a third party of their choosing, for the benefit of the Estates pending its allocation between the Estates...." *See* Stipulation, Adv. Doc. No. 350, at ¶1. The court is not bound by this stipulation and determines the respective rights of the estates herein.

2

Prosser (Jeffrey Prosser's wife), Michael Prosser[4] (Jeffrey Prosser's brother), and the "Adult

Prosser Children": Sybil Prosser, Michelle LaBennett, Lyndon Adrian Prosser ("Adrian

Prosser"), and Justin Prosser (collectively, "Defendants").  Trial in this Adversary Proceeding

(hereinafter the "Turnover Trial") was held on November 17-20, 2008, December 8-10, 2008,

February 9, 2009,[5]  March 10, 2009, and March 23-26, 2009, with closing arguments held on

July 23, 2009.

     This adversary proceeding was consolidated for the purposes of discovery and trial with

the Chapter 11 Trustee's fraudulent conveyance adversary action (Adv. No. 08-3004) against the

Adult Prosser Children. *See* Adv. No. 07-3010, Adv. Doc. No.  390.[6] This Memorandum Opinion

does not in any way constitute a finding of whether the Trustees may successfully avoid transfers

and recover property through the fraudulent conveyance action pending against the Adult Prosser

Children in this court (Adv. No. 08-3004) or in the District Court actions against Dawn Prosser

(Case Nos. 3:08-cv-00146 and 3:08-cv-00147). That is, we decide only the turnover action

pursuant to §542. While much of the same property is at issue in these various adversary

proceedings, in which the respective estates assert different theories for recovery, this court will

_____

     [4] Michael Prosser, although duly served, did not appear in person or through counsel at
the trial. His answer to the Amended Complaint is docketed at Adv. Doc. No. 536.

     [5] Trial was scheduled to proceed on February 10 and 11, 2009, but was continued to
provide Mrs. Prosser with an opportunity to retain new counsel.

     [6] Per the Scheduling Order and Discovery Plan, Adv. Doc. No. 390, two other adversary
proceedings (Adv. Nos. 08-3003 and 08-3006) were to be consolidated with the turnover action
for the purposes of discovery and trial. However, those actions are now proceeding in the District
Court as Case Nos. 3:08-cv-00146 and 3:08-cv-00147. The District Court granted motions to
withdraw the reference in each.
     A motion to withdraw the reference was filed and denied by the District Court as to this
Adversary Proceeding. Adv. Doc. No. 582.

3

address the Chapter 11 Trustee's fraudulent conveyance complaint against the Adult Prosser

Children in a separate memorandum opinion as both the relevant facts and the elements for

turnover and fraudulent conveyance differ.[7] Thus, the rulings here may differ from the rulings in

the fraudulent conveyance actions.

For the reasons that follow, we find that the Chapter 11 Trustee has not met his burden to

prove that turnover is appropriate. To the extent provided herein, the Chapter 7 Trustee has met

his burden of proving the Chapter 7 estate's interest in certain items of property currently in the

possession of one or more Defendants such that turnover is appropriate. As to other items, the

Chapter 7 Trustee has not met his burden of proof and turnover will be denied.

Background

New ICC is a management and holding company that owned, at the times relevant to this

Adversary Proceeding,[8] directly or indirectly, 100% of the common stock of various operating

---

[7] Counsel for the Chapter 11 Trustee stated that the fraudulent conveyance action was brought in the alternative to turnover: "I think that one of the things that I must highlight here to begin with is that the trustee is seeking this relief in the alternative to turnover. Because of the way the case has ended up procedurally we tried them together. And the court knows that, obviously, to the extent there is a finding that some of the items that are actually still in the possession of these defendants and are property of this estate should be turned over, but especially with respect to services, in particular, where there's nothing left, those are clearly the subject of the fraudulent transfer. But, by bringing this [fraudulent conveyance] action, we in no way intend to exclude any of the claims that we have asserted in turnover." Transcript of 07/23/2009, Adv. Doc. No. 680, at 9.

[8] On August 17, 2010, this court entered its Final Order (A) Approving Sale of Group 1 Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief, Case No. 07-30012, Doc. No. 1883. The Group 1 Assets consisted primarily of New ICC's interests in the direct and indirect subsidiaries that own telecom and non-
(continued...)

4

subsidiaries that provide telephone, newspaper, and other services to the citizens of the USVI and

surrounding areas. New ICC is a wholly-owned subsidiary of Emerging Communications, Inc.

("Emerging"or "EmCom"), which, in turn, is directly and indirectly owned by Innovative

Communication Company, LLC ("ICC-LLC", collectively, the "Parent Debtors"). Jeffrey Prosser

was Chairman of the Board, President, and CEO of New ICC and sole member of its ultimate

parent company, ICC-LLC.

Although there were prior filed involuntary bankruptcy cases then pending, on July 31,

2006, Emerging, ICC-LLC, and Jeffrey Prosser each filed voluntary petitions seeking relief under

chapter 11 of the Bankruptcy Code, commencing Case Nos. 06-30007, 06-30008[9], and 06-30009,

respectively. Subsequently, Jeffrey Prosser's case was converted to a chapter 7, and John Ellis

was appointed as trustee. *See* Case No. 06-30009, Doc. No. 865. Mr. Ellis later resigned, and

James Carroll was appointed and continues to serve as Chapter 7 Trustee. Case No. 06-30009,

Doc. No. 948. With the conversion of Jeffrey Prosser's case to chapter 7, all authority to act on

behalf of his individual bankruptcy estate transferred to the Chapter 7 Trustee.[10]

---

[8](...continued)
French cable operations. Sales of other major assets have also been approved.

[9] The Parent Debtors' cases are being jointly administered. *See In re Innovative Communication Company, LLC*, Case No. 06-30008, Doc. No. 661.

[10] *See* §521(a)(4) (requiring debtor to surrender all property of the estate to the trustee); §704 (defining the duties of the trustee); Fed.R.Bankr.P. 1019(4) (providing for turnover of records and property to the trustee). *See In re Mushroom Transp. Co.*, 366 B.R. 414, 453 (Bankr. E.D. Pa. 2007) (Among his responsibilities, the bankruptcy trustee is held 'accountable for all property received during the course of the administration of an estate.' 6 Collier on Bankruptcy, P 704.05, at 704-12 (15th ed. rev. 2006). Bankruptcy trustees, like state court executors and administrators, are bound to use reasonable diligence in the discharge of their duty to 'collect and reduce to money the property of the estates for which they are trustees' and to secure possession

(continued...)

On July 5, 2007, the Greenlight Entities[11] filed an Involuntary Petition against New ICC, commencing Case No. 07-30012. An Order for Relief was entered on September 21, 2007. *See* Case No. 07-30012, Doc. No. 60. Stan Springel was appointed Trustee in the Chapter 11 cases. Case No. 06-30007, Doc. No. 543; Case No. 06-30008, Doc. No. 523; Case No. 07-30012, Doc. No. 125.  Jeffrey Prosser's control of the Parent Debtors was severed when the trustee was appointed in these bankruptcy cases. Thereafter, he was removed from the Board of Directors of New ICC.

Now, through this adversary proceeding, the Trustees jointly seek turnover of the value of certain services and turnover of certain Property[12] that is currently in the possession of one or more of the Defendants on the basis that the funds used to purchase, maintain, and/or insure the Property were provided by New ICC and/or Jeffrey Prosser. *See* Trustees' Trial Brief Regarding Turnover Adversary Proceeding, Adv. Doc. No. 291, at 9.[13] The Trustees contend that these payments give rise to both legal and equitable interests in the Property and, accordingly, turnover

---

[10](...continued)
of all the property and collect debts due. 6 Collier on Bankruptcy, P 704.04[1]; see also *In re Johnson*, 518 F.2d 246, 251 (10th Cir. 1975). Section 704(2) renders a bankruptcy trustee accountable for all property received by him or his agents. See 6 Collier on Bankruptcy, at P 704.05. Among the chapter 7 trustee's duties, 'the trustee must carefully preserve the estate's assets from deterioration or dissipation.' Id., f 704.04[2] at 704-10.")

[11] The Greenlight Entities include Greenlight Capital Qualified, L.P., Greenlight Capital, L.P., and Greenlight Capital Offshore, Ltd.

[12] The Property consists of various jewelry, furnishings, works of art, vehicles, wines, real property and other personal property as identified throughout this Memorandum Opinion.

[13] Counsel for the Chapter 11 Trustee represented that the Chapter 11 Trustee is not seeking recovery for transfers prior to January of 1999. *See* Transcript of 11/17/2008, Adv. Doc. No. 589, at 226.

pursuant to §542 is appropriate.[14] *Id*.  The Defendants argue that the Property was gifted to them

by Jeffrey Prosser[15], regardless of whether the source of funds was New ICC.  *See* Dawn

---

[14] 11 U.S.C. §542(a)-(c) provides as follows:

(a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

(b) Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

(c) Except as provided in section 362(a)(7) of this title, an entity that has neither actual notice nor actual knowledge of the commencement of the case concerning the debtor may transfer property of the estate, or pay a debt owing to the debtor, in good faith and other than in the manner specified in subsection (d) of this section, to an entity other than the trustee, with the same effect as to the entity making such transfer or payment as if the case under this title concerning the debtor had not been commenced.

[15] In the Chapter 11 Trustee's Brief in Support of Proposed Findings of Fact and Conclusions of Law, he renewed his objection, which was first made at trial on March 24, 2009, to Jeffrey Prosser's standing to make the argument that the Trustees cannot use turnover to demand an asset where title is in dispute. Adv. Doc. No. 657, at 6 n.7. *See also* Jeffrey J. Prosser's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 655, at ¶¶2,6 of Conclusions of Law. The Chapter 11 Trustee contends that, as Jeffrey Prosser has not claimed an interest in the property at issue and has claimed that he gifted the property in which he did have an interest, he "lacks any interest in the property in question and consequently lacks standing to argue that there is no basis for the turnover action[.]" Adv. Doc. No. 657, at 6 n.7. Jeffrey Prosser is named as a Defendant in this Adversary Proceeding. Furthermore, to the extent the Trustees contend that the funds transferred out of New ICC to Jeffrey Prosser were not his but rather corporate property or to the extent the Trustees contend that the property which Jeffrey Prosser alleges has been gifted to the other Defendants has, in fact, not been gifted pursuant to applicable law, Jeffrey Prosser has standing to defend against the turnover claims made by the Trustees.

The court has considered the arguments of Jeffrey Prosser's counsel to determine whether the Trustees have carried their burden and whether turnover is appropriate, i.e. whether either New ICC or Jeffrey Prosser has a legal or equitable interest in the property pursuant to §541. When the finding is made that Jeffery Prosser has an interest, that interest is property of his Chapter 7 bankruptcy estate. When the property has been proven to be in the possession, custody or control of a defendant post-petition and the other elements of §542 are met, turnover is established.

Prosser's Trial Brief, Adv. Doc. No. 294, at 12.[16] They assert that, even when New ICC made

payments, those payments were income to Jeffrey Prosser and were accounted for as such

through an account maintained on the books and records of the company, known by various

names: "Due From [Shareholder] Account", "Receivables LLC", "contra equity account"

(hereinafter "contra equity account").[17] *See* Jeffrey Prosser's Trial Brief, Adv. Doc. No. 303, at 7;

Dawn Prosser's Trial Brief, Adv. Doc. No. 294, at 12. Therefore, for the purpose of determining

whether turnover is appropriate, it is significant how New ICC recorded and dealt with these

transactions and the assets or services acquired thereby.[18]

---

[16] Jeffrey Prosser testified that he did not have an interest in any personal property acquired after his marriage to Dawn as all personal property went directly to Dawn for estate planning purposes. Transcript of 12/09/2008, Adv. Doc. No. 615, at 162-63; *See* Jeffrey J. Prosser's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 655, at ¶60. On December 9, 2008, Jeffrey Prosser identified the date of his marriage as August 4, 1994. Adv. Doc. No. 615, at 161-62. However, in his December 8, 2008, testimony he identified the date of the marriage as August 4, 1990. Adv. Doc. No. 606, at 219. We note that the date of the Prossers' marriage was August 4, 1990. TT157, at TT4 1081.

The Adult Prosser Children, who are named as Defendants in this Adversary Proceeding, adopted the arguments of Jeffrey Prosser and Dawn Prosser as set forth in their respective trial briefs and offered no additional arguments in their trial brief. *See* Adult Prosser Children's Trial Brief, Adv. Doc. No. 286.

[17] The "due from" account has been referred to by various labels, such as "receivables LLC". *See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 80 ("I guess the reason there's such confusion is there's several accounts that are mapped, if you will, into that one category. But generally the activity ran through an account called receivables LLC."); *Id.* at 102 ("There was [*sic*] probably eight to ten accounts that get mapped into that [contra equity] category....For convenience we tried to isolate all the transactions into the receivables LLC account."). The "due from accounts" later were labeled as contra equity accounts for purposes of the audited financial statements. *See* discussion *infra.*

[18] When the company did not treat the assets or services acquired with the transferred funds as corporate property or for corporate purposes, the Chapter 11 estate has no ability, absent first recovering the property or its value through some other action, such as fraudulent conveyance, veil-piercing, etc., to use, lease or sell the property. *See* §541(a)(3) (defining as

(continued...)

8

On February 4, 2010, Jeffrey Prosser filed his Emergency Motion for Stay of Proceedings, Adv. Doc. No. 704, asserting a stay of this adversary proceeding was appropriate on the basis of allegations made in a separate adversary proceeding in which he filed his Motion for Evidentiary Hearing to Determine Whether an Order Should be Entered Imposing Sanctions, Disqualification and/or Referral for Further Disciplinary Proceedings Against Plaintiffs and/or Certain Attorneys, Adv. No. 10-3001, Adv. Doc. No. 29.[19]  Both Trustees filed Responses to the Motion for Stay of Proceedings. Adv. Doc. Nos. 708 and 709. At the March 24, 2010 omnibus hearing, the Motion to Stay was carried to the May 7, 2010, omnibus hearing to determine the status and later continued to the June omnibus and included in that agenda, as the evidentiary hearing in Adv. No. 10-3001 would have taken place by that time. Transcript of 05/07/10 hearing, Case No. 07-30012, Doc. No. 1698, at 204. The evidentiary hearing took place on May 24, 2010, as scheduled, but the Motion for Stay of Proceedings was not listed on the June agenda or any agendas since that time. A hearing was held on January 25, 2011, to determine the status of the Motion for Stay, and the court heard argument on the motion at that time. Adv. Doc. No. 727. Although the court has not yet ruled on the allegations in Adv. No. 10-3001, and without

---

[18](...continued)
property of the estate "[a]ny interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title"). Thus, the provisions of §542(a) cannot be satisfied as to those items. Again, this determination in no way represents any finding of fact or conclusion of law in the fraudulent conveyance actions.

[19] Adv. No. 10-3001 was commenced as a result of a motion filed by Jeffrey Prosser, initially in the District Court, which made a number of allegations against the Chapter 11 Trustee and his counsel, among others. We note that the action against the Chapter 7 Trustee's counsel, Fox Rothschild LLP, was dismissed by this court's order dated March 10, 2010 (Adv. No. 10-3001, Adv. Doc. No. 63) and Jeffrey Prosser filed a notice of voluntary dismissal as to the Chapter 7 Trustee (Adv. No. 10-3001, Adv. Doc. No. 78).

9

making any findings as to the merits of the allegations therein, the court finds that it was not

presented in Adv. No. 10-3001 with any evidence that affects the Turnover Trial. Thus, the

Motion to Stay will be denied, and the court will address the merits of the Amended Complaint

filed in this Adversary Proceeding.

<u>Subject Matter Jurisdiction</u>[20]

Dawn Prosser contends that this court lacks subject matter jurisdiction on the basis that

ownership is directly disputed in this turnover action. *See* Dawn Prosser's Trial Brief, Adv. Doc.

No. 294, at 3-10. However, even then the court has jurisdiction. The true question is whether it

exercises core or non-core jurisdiction.

"An action for turnover is a core proceeding because it is a substantive right created under

federal bankruptcy law. However, where title to the property sought to be turned over to the

bankruptcy estate is in dispute, such an action can only constitute, at the most, non-core rather

than core proceedings, given that such actions are not true turnover actions." *See In re DHP

Holdings II Corp.,* Case No. 08-13422, 2010 Bankr. LEXIS 2455, 2010 WL 3218385 (Bankr. D.

Del. Aug. 13, 2010), at *21 (quoting 5 Collier on Bankruptcy SI 542.01 (Alan N. Resnick &

---

[20] The court previously addressed its jurisdiction in its May 7, 2008, Memorandum
Opinion with Respect to Right to Jury Trial: "Determination of whether or not property is estate
property is clearly subject to the bankruptcy court's jurisdiction in the first instance and subject to
a jury trial right unless Congress has 'permissibly withdrawn jurisdiction . . . and assigned it
exclusively to non-Article III tribunals sitting without juries,' 914 F.2d at 438, quoting
*Granfinanciera*, 492 U.S. at 49, as long as the claim asserts a public right. 492 U.S. at 34. Here,
the action is to recover bankruptcy estate property, for the benefit of creditors of New ICC's
estate, and is not one to collect a money judgment. This bankruptcy court has jurisdiction over
estate property, wherever located, and the subject matter jurisdiction to effectuate its return to the
estate."Adv. Doc. No. 251, at 9.

Henry J. Sommer eds., 16th ed.)).

In the Third Circuit, there is a two-pronged test to determine whether a proceeding is core or non-core. *See In re Valley Media, Inc.*, 289 B.R. 27, 31 (Bankr. D. Del. 2003). First, a court is directed to consult the language of 28 U.S.C. §157(b), which provides an illustrative list of core proceedings. *Id.* (citing to *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999). The next step is to determine whether the proceeding invokes a substantive right provided by title 11 or whether it is a proceeding that could arise only in the context of a bankruptcy case. *Id.* Although complaints for turnover are considered "core" under 28 U.S.C. §157(b)(2)(E), the proceedings must satisfy both prongs of the Third Circuit test.

The court in *Valley Media* addressed the issue of core versus non-core matters in the context of whether abstention was appropriate. In doing so, the court focused on the "substance over form of an asserted 'core' proceeding" and found that "[t]he substance of the claim at issue in Plaintiff's turnover count [was] a pre-petition state law contract claim[21] and could arise under any context, not just in bankruptcy." 289 B.R. at 31. Here, the Trustees are purely seeking relief under the provisions of the Bankruptcy Code for turnover on the basis of the broad and inclusive definition of property of the estate and payments made by one or both debtors[22] (i.e., New ICC

---

[21] "At issue in [*Valley Media, Inc.* was] roughly $10 million. Defendant assert[ed] the right to setoff credits and receive a reduction for undelivered goods. Plaintiff contend[ed] that any applicable credits [had] been deducted and that all goods [had] been delivered." 289 B.R. at 31. The court found that "[t]he substance of the claim at issue in Plaintiff's turnover count [was] a pre-petition state law contract claim and could arise under any context, not just in bankruptcy. Because that claim is not a right exclusively conferred by the Bankruptcy Code, this factor favors abstention." *Id*.

[22] New ICC made payments to or for the benefit of one or more of the Defendants between February 10, 2006 (the date of the involuntary action filed against Jeffrey Prosser and

(continued...)

11

and Jeffrey Prosser) which the Trustees assert create equitable interests in the property regardless

of title or possession. In Count I[23] of the Amended Complaint, seeking turnover of property

pursuant to §542, the Trustees do not attempt to recover the property under any disputed contract

or other state law cause of action. *See* Amended Complaint, Adv. Doc. No. 71, at ¶¶20-25.

Here, the issue is not a state law contract dispute. Rather, payments were made out of a

debtor corporation to or for the benefit of the ultimate shareholder, also a debtor, and certain of

his family members. The court must determine whether the debtors' respective estates retained

legal or equitable interests in the property purchased, insured, and/or maintained with those funds

thereby requiring turnover to the estates pursuant to §542. "Various courts have concluded that

matters requiring a declaration of whether certain property comes within the definition of

'property of the estate' as set forth in Bankruptcy Code §541 are core proceedings." *Touch Am.*

*Holdings, Inc.*, 401 B.R. 107, 117 (Bankr. D. Del. 2009). Thus, the determination to be made by

the court here is more similar to that presented in *In re PSA, Inc.*, Case No. 00-3570, 2003 Bankr.

LEXIS 1660 (Bankr. D. Del. Dec. 8, 2003). In *PSA*, "Debtors [sought] turnover of property of the

estates pursuant to 11 U.S.C. sections 541 and 542, that Defendants allegedly acquired with

funds provided by Debtors." *Id.* at *5. The turnover claim was determined to be a core claim.

---

[22](...continued)
the Parent Debtors) and July 31, 2006 (the voluntary petition date for Jeff Prosser and the Parent
Debtors) totaling in excess of $6 million. Testimony of Ingrid Christian, Transcript of
11/18/2008, Adv. Doc. No. 639, at 181-182. Between July 31, 2006 and September 21, 2007 (the
date of the Order for Relief in the New ICC case), New ICC transferred approximately $5
million, with about $400,000 of that amount being transferred after July 5, 2007, the date the
involuntary petition was filed against New ICC. *Id.* at 182-83.

[23] The other counts seek a permanent injunction, imposition of a constructive trust, and
disallowance of claims.

*Id.* at *7.[24] Therefore, the allegations in this case asserting turnover pursuant to §542 of the

Bankruptcy Code make this a core proceeding and this court has core subject matter jurisdiction.


**FINDINGS OF FACT**

    We address the contentions of the parties and find as follows:

1. New ICC transferred funds through the contra equity account to or for the benefit of the

Defendants.[25]

    The contra equity account, although an entry on the debt/networth side of the balance

sheet, developed from (and is a term used interchangeably with) several receivables accounts that

appear on the assets side of the balance sheet. *See supra* note 17 and accompanying text.

According to the Chief Financial Officer of New ICC, Dennis Kanai, the receivables account

maintained by New ICC represented "anything that was deemed a distribution not for the benefit

of ICC. In other words,...[a distribution to] any of the holding companies *or Mr. Prosser*

*personally*." Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 8, 13, 81

---

[24] To the extent the Trustees assert that property of the estate is in the possession of the
Defendants, the court will make the determination of what is estate property based upon, *inter
alia*, how New ICC recorded the transactions and treated the property at issue and whether the
evidence establishes that Jeffrey Prosser has given up his interest in the property which he and
Dawn Prosser continue to possess jointly.

[25] The parties acknowledge that funds were transferred out of New ICC to or for the
benefit of Jeffrey Prosser and his family members through the contra equity account. However,
their arguments diverge as to the consequences of this fact and the appropriate characterization
or label for these funds. *See* Trustee Springel's Proposed Findings of Fact and Conclusions of Law,
Adv. Doc. No. 656, at ¶¶58-60; Chapter 7 Trustee's Proposed Findings of Fact and Conclusions
of Law, Adv. Doc. No. 658, at ¶78; Jeffrey J. Prosser's Proposed Findings of Fact and
Conclusions of Law, Adv. Doc. No. 655, at ¶32; Dawn Prosser's Proposed Findings of Fact,
Conclusions of Law and Brief, Adv. Doc. No. 674, at ¶64-67.

(emphasis added). Anything booked into the accounts was not a true capital expenditure of the corporation but rather an expenditure outside the ordinary course of business operations. Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 28.

The use of the term "contra equity account" arose as a result of the Grant Thornton audited financial statements of the companies on a consolidated basis for the years 1999 and 2000. *See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 17; TT190. The auditors opined that what New ICC booked as an account receivable due from shareholder should not be reflected as an asset on the balance sheet of New ICC because it was not being serviced. TT190, at TT4 1613-14. That is, principal and interest were not being paid back to New ICC by the shareholder (ultimately, Jeffrey Prosser) to or for whom loans and advances were made and no collection action was contemplated. Subsequently, the financial statements were changed so that the balance sheet no longer reflected the receivables from parent, LLC, or Jeffrey Prosser personally as assets. *See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 17-18. Instead, these debts were reclassified into a new category referred to as the "contra equity account" in the equity section of the balance sheet. *See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 17-18, 21; Grant Thornton Audit Report, Exhibit TT90. Thereafter, (from 2001 forward) on the audited financial statements, payments made by the companies that benefitted the Prossers "were classified in the equity section as a reduction to the capital of the company." Testimony of Barbee, Transcript of 03/23/2009, Adv. Doc. No. 642, at 175. Internally, however, New ICC continued to capture these transfers in a receivables account, that is, as an asset of the company and as loans to Jeffrey Prosser.

Ingrid Christian, the Custodian of Records of New ICC, testified that she reviewed

14

transfers made to or for the benefit of Jeffrey Prosser in the books and records of New ICC, and

that the majority of these transfers were posted to what the company termed the "due from

shareholder account", also known on the financial statements after 2001 as the "contra equity

account." *See* Transcript of 11/17/2008, Adv. Doc. No. 589, at 25, 32; Transcript of 11/18/2008,

Adv. Doc. No. 639, at 186-87, 310.

Therefore, we find, based upon the credible testimony of the CFO of New ICC and the

Custodian of Records of New ICC, that for purposes of its audited financial statements, New ICC

characterized and treated these personal transactions as distributions that reduced equity to the

point where there was no value to equity, as will be addressed, *infra*, and reflected them as such

in their audited financial statements.[26] Internally, however, the same transactions were treated as

loans (accounts receivable) to Jeffrey Prosser.

2. New ICC recorded the funds posted to the contra equity account as distributions to its ultimate

shareholder, Jeffrey Prosser.

The Chapter 7 Trustee proposes that the court accept "Mr. Barbee's expert testimony that

the amounts reflected in contraequity to or for the benefit of Jeffrey Prosser were distributions to

Mr. Prosser." Chapter 7 Trustee's Proposed Findings of Fact and Conclusions of Law, Adv. Doc.

No. 658, at ¶61.[27] As stated below, we do accept Mr. Barbee's testimony as credible on this

---

[26] Internally, New ICC treated these transactions differently. *See* note 48 and
accompanying text.

[27] Dawn Prosser and Jeffrey Prosser assert the same. *See* Jeffrey J. Prosser's Proposed
Findings of Fact and Conclusions of Law, Adv. Doc. No. 655, at ¶48; Dawn Prosser's Proposed
Findings of Fact, Conclusions of Law and Brief, Adv. Doc. No. 674, at ¶64.

point. According to Mr. Barbee, the Chapter 7 Trustee's expert witness in the field of accounting,

there are two main ways to reduce capital: experiencing a loss or distributing property.

*See* Transcript of 11/17/2008, Adv. Doc. No. 589, at 171, 175. Mr. Barbee was not asked about

losses. In this case, Mr. Barbee identified the majority of the funds posted to the contra equity

account as distributions.[28] *Id.* at 174-76. Mr. Barbee testified that "[t]he majority of payments to

or for the benefit of Mr. Prosser were distributions to him as a stockholder." Transcript of

---

[28] Mr. Barbee also testified that payments which merely confer an "incidental" benefit to a shareholder are not considered to be distributions. Transcript of 03/23/2009, Adv. Doc. No. 642, at 254. The Chapter 11 Trustee asserts that payments for property possessed by Dawn Prosser, Michael Prosser, or any of the Adult Children, cannot, therefore, constitute distributions. *See* Trustee Springel's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 656, at 26. However, this conclusion is not necessarily reached from Mr. Barbee's testimony as the Chapter 11 Trustee suggests. Mr. Barbee did not testify that funds distributed to purchase the items possessed by Dawn and the Adult Prosser Children did not constitute distributions which benefitted Mr. Prosser. In fact, according to the Defendants, the property constituted gifts from Mr. Prosser. The Chapter 11 Trustee did not examine Mr. Barbee any further on this point. The testimony provided is as follows:

Q. Now, a payment that merely confers an incidental benefit to a shareholder doesn't constitute a distribution, correct?
A. That's consistent with -- that's contained in the research that I performed.
Q. In other words, the distribution must be primarily for the benefit of the shareholder, correct?
A. Yes.

Transcript of 03/23/2009, Adv. Doc. No. 642, at 254.

We find that Mr. Prosser controlled the funds and issued all instructions regarding the use of corporate funds, recorded as a reduction of equity, to pay for items purchased for his family. *See* item 6 *infra*. We find that the transfers benefit Mr. Prosser, as well as the recipients of the property. The court notes that payments through the contra equity account often went directly to vendors to purchase items for Jeffrey Prosser and/or his family members; therefore, the funds never passed through his personal account or even passed through his hands. At times, the property purchased went directly to Dawn Prosser or one of the Adult Prosser Children. However, the funds were distributed based upon Jeffrey Prosser's status as the ultimate, sole shareholder and at his direction.

16

03/23/2009, Adv. Doc. No. 642, at 174.[29] According to Mr. Barbee, whose testimony we credit,

the amount in the capital deficit column[30] generally increased from 2000 through 2007 without

_____

[29] As stated, Mr. Barbee opined that the "majority" of the payments were distributions.
The biweekly payments of $71,000 which were posted to the contra equity account were an
exception, which he viewed to be more like compensation even though the company did not treat
the biweekly payments in that manner. *See* Transcript of 03/23/2009, Adv. Doc. No. 642, at 234-
35.

He also distinguished distributions from dividends: "Dividends generally are
limited....[T]hey need to be declared, and they also need to be out of earnings and profits."
*See* Transcript of 03/24/2009, Adv. Doc. No. 642-1, at 205. Distributions do not have these
restrictions. *Id.* at 205-06.

In fact, the record supports that New ICC did not declare dividends in the relevant time
period because it could not do so. A dividend declaration would have violated loan agreements.
"The RTFC agreements...limits [sic] the payment of dividends by the Company [New ICC] to
40% of the Company's consolidated net income, contingent upon the Company's ability to meet
certain financial ratios. Under the above restrictions, at December 31, 1998, the Company had no
retained earnings available for dividends. The ability of the Company to service its debt is
dependent on funds from its subsidiaries. Settlement agreements made in 1989 and 1991 with the
U.S. Virgin Islands Public Service Commission (PSC) contain restrictions on dividends by
Vitelco. Dividends by Vitelco are generally limited to 60% of its net income if the equity ratio as
defined is below 40%, although additional amounts are permitted to be paid for the sole purpose
of servicing the Company's debt to the RTFC." Consolidated Financial Statements for the Years
Ended December 31, 1998 and 1997, TT189, at TT4 1603. The Consolidated Financial
Statements state specifically that New ICC did not have retained earnings available for dividends
for the year ended December 31, 2000, *see* at TT190, at TT4 1632, and the year ended December
31, 2001, TT191, at TT4 1666.

By the terms of the PSC settlement order dated November 4, 1991, Jeffrey Prosser was
prohibited from taking advances out of Vitelco, the wholly owned subsidiary of New ICC from
which most of its cash flows were derived. *See* TT59; Testimony of Jeffrey Prosser, Transcript of
12/10/2008, Adv. Doc. No. 604, at 116-119. Rather than the prohibited "advances" (i.e., monies
"due from shareholder" that would be repaid) Mr. Prosser took "distributions" that continually
reduced his equity even though the companies were insolvent, on a balance sheet basis, by 2005,
if not earlier. *See* notes 30 and 43 and accompanying text.

[30] In Grant Thornton's report with respect to the audit of New ICC's consolidated
financial statements for the years ended December 31, 2000 and 1999, Grant Thornton audited
the "consolidated balance sheets of [New ICC] and its subsidiaries as of December 31, 2000 and
1999, and the related consolidated statements of operations, stockholder's (deficit) equity, and
cash flows for the years then ended." TT190, at TT4 1613. The auditors concluded that the
amounts reflected as assets of New ICC due from ICC-LLC and the president of the company,

(continued...)

17

any significant repayment, indicating there was no intention to repay and that these funds were in

the nature of distributions. *Id.* at 176-177. Moreover, based upon his review of Mr. Prosser's

personal income tax returns, Mr. Barbee testified that "Mr. Prosser was reporting the change in

the receivables LLC, or the change in the contra equity as gross receipts on the Schedule C of his

tax returns - not for every year, but for several of the years, some of the years.[31] And therefore,

---

[30](...continued)
"should be reflected as contra-equity which would increase the stockholder's deficit of the Company...." *Id.* Thereafter, the "notes and accounts receivable from stockholder" became a column on the Consolidated Statement of Capital Deficit and Comprehensive Loss section of the audited financial statements. TT191, at TT4 1655; TT192, at TT4 1688; TT193, at TT4 1731; TT194, at TT4 1780. Jeffrey Prosser recalled that the stockholders' deficit grew from year to year. *See* Transcript of 12/10/2008, Adv. Doc. No. 604, at 125. Moreover, there was a capital deficit. The total capital deficit reported in New ICC's consolidated financial statements as of December 31, 2001, was $182,441,000, *see* TT191, at TT4 1655, which increased to $292,679,000 by December 31, 2005, *see* TT194, at TT4 1780, generally increasing from year to year.

[31] However, Mr. Barbee was not asked about the exceptions, i.e., the "not for every year" portion of his statement. The testimony and documents in evidence shed some light on this matter.
        Jeffrey Prosser contends that the Palm Beach house, which was purchased by New ICC for $5,650,000 and transferred to him and his wife by New ICC in 2000, was reported in his income in 2001. Specifically, in a recently filed document, he contends that "[w]hen the New ICC due from shareholder account was reclassified as a distribution to shareholder through charge to New ICC's contra-equity account as of December 31, 2001, the amount previously due from shareholder, including, but not limited to, the amount due from Mr. Prosser for the Palm Beach residence purchase funds was in effect 'paid'; it was charged up through stockholder revenue and is ultimately reflected on Mr. & Mrs. Prosser's 2001 tax return." Jeffrey J. Prosser's Limited Prehearing Memorandum in Opposition to the Chapter 7 Trustee's Expedited Motion for Order Approving Bidding Procedures and Setting Certain Dates in Connection with the Sale of Residential Real Property Located at 252 El Bravo Way, Palm Beach, Fl 33480, Case No. 06-30009, Doc. No. 3098, at ¶12. That is not so. While it is true that the audited financial statement for 2000 notes the transfer of the property and for purposes of the audited financial statements the note was reclassified as contra equity in 2001, (1) there is no evidence that the note was cancelled and (2) the internal ledger of the company did not reclassify receivables as contra equity. *See* TT190; TT191; Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 86, 111-12 The reclassification as contra equity only appeared on the audited financial statements as the

(continued...)

the fact that he appears to have attempted to report it, this money, as gross income, also supports

the fact that it's not a loan. If he's already reported it as income, there's not an intent to repay."

---

[31](...continued)

auditors opined that showing them as receivables was misleading due the fact they were not being serviced. TT190, at TT4 1613-14. Thus, internally the receivables remained assets. This obligation of Jeffrey Prosser's is, still, a corporate asset.

    Furthermore, there is no evidence to support Jeffrey Prosser's assertion that the purchase price of the Palm Beach home was reported as income on his and Dawn's tax returns. Prior to 2001, Mr. Prosser reported wages of $1,800,000 in 1999 and $2,100,000 in 2000 and $0 in 2001. JP126; JP127; JP128. He reported non-employee compensation of $5,500 in 1999, $5,000 in 2000, and $1,225,998 in 2001. JP126; JP127; JP128. He reported $850,000 in unspecified dividends in 1999, $1,210,000 in 2000, and $785,000 in 2001. JP126; JP127; JP128. He claimed business losses as follows: none in 1999, $3,374,000 in 2000, and $3,018,000 in 2001. JP126; JP127; JP128. His total compensation reported in those years was $2,671,081 in 1999, negative $49,536 in 2000, and negative $1,004,836 in 2001. JP126; JP127; JP128. Examination of the tax returns establishes that Jeffrey Prosser did not report the $5,650,000 in income.

    The financial statements show a book value for the house of $5,200,000 in 2000 although the purchase price in 1999 was $5,650,000. TT190, at TT4 1619, 1629. Jeffrey Prosser signed a note promising to repay $5,650,000 at 8% interest for the house in May of 2001. *Id.* at TT4 1629. Despite the date the note was signed, the financial statement in 2000 shows the transfer of the home to Jeffrey Prosser. TT190, at TT4 1619. Then, in 2001, Jeffrey Prosser's payments due were reflected on the financial statements (but not on New ICC's books and records) in the capital deficit section. TT191, at TT4 1664. Nothing he reported in the way of income in 2001 (or in 2000, for that matter) comes close to the $5,650,000 loan that he signed.

    We note that we have no evidence that the note was ever cancelled by the company. Moreover, Jeffrey Prosser's tax returns establish that Jeffrey Prosser did not report cancellation of indebtedness (COD) income. JP126; JP127; JP128. The reclassification of the note on the audited financial statements as contra equity is not a cancellation of the loan, which is now matured and past due. *See* Memorandum Opinion, Report and Recommendation to the District Court and Certification Pursuant to District Court Order, which addressed the fraudulent conveyance of the Palm Beach property ("Palm Beach Opinion"), wherein we found that "[t]he obligation reflected in the note was due, in full, on April 10, 2007, a date more than eight months postpetition and, therefore, is required to have been [but was not] listed as an unsecured claim." Palm Beach Opinion, Adv. No. 08-3002, Adv. Doc. No. 212, at 34-35 (internal citations omitted).

    A second omission from income on the tax returns is the $591,941.81 in AON builders risk premium payments that were used to insure construction on the Estate Shoys residence titled solely in Dawn Prosser's name. These payments were expensed by New ICC and were never booked into contra equity. *See* item 11 in text, *infra*.

19

Transcript of 03/23/2009, Adv. Doc. No. 642, at 185.[32] All of these facts support the conclusion

that New ICC viewed these payments as distributions to Jeffrey Prosser.

According to Dennis Kanai, the CFO of New ICC, the company did not characterize these

payments as compensation to Jeffrey Prosser. Transcript of 03/10/2009, Adv. Doc. No. 637, at

43. If the company had considered these payments to be compensation to Jeffrey Prosser (even

the $71,000 biweekly payments, *see* note 29, *supra*), then it would have had an obligation to

provide documentation such as a 1099 or W2 form.[33]  *Id.* at 45. However, it provided no such

documentation to Jeffrey Prosser. *Id.*  Because the items were not expensed by New ICC,[34] they

were distributions.[35] Testimony of Barbee, Transcript of 03/23/2009, Adv. Doc. No. 642, at 176.

---

[32] Despite labeling the contra equity transactions, Mr. Barbee made it clear that he was not offering an opinion on whether the distributions were authorized or as to ownership of the property at issue.  Transcript of 03/23/2009, Adv. Doc. No. 642, at 249-50. Mr. Barbee agreed with the proposition that "Direct receipt by a shareholder of cash or assets that rightly belong to the corporation...also constitute[s] a distribution." *Id.* at 250.

[33] A form 1099-C is required to report COD income. None was submitted.

[34] Compensation to an officer is generally treated by a company as a business expense. Testimony of Kanai, 03/23/2009, Adv. Doc. No. 642, at 234. The items in the receivables account for the benefit of Jeffrey Prosser and his family were not treated as business expenses. *Id.*

[35] Mr. Barbee, however, never saw any evidence that New ICC reported any distributions for tax purposes to the IRS or IRB. Testimony of Barbee, Transcript of 03/24/2009, Adv. Doc. No. 642-1, at 61-62. In fact, Mr. Kanai testified as follows:
Q...Do you know whether or not ICC ever filed such a form [i.e., an IRS Form 5452] with respect to any distributions that were made to Jeffrey Prosser?
A. No, I believe they wouldn't because these transactions were accounted for in the books as a receivable, not a distribution.
Transcript of 03/10/2009, Adv. Doc. No. 637, at 40.
Thus, the internal treatment of the distributions as a "receivable" had a markedly different effect than it would if the transactions had been treated as distributions internally: i.e, the company thus avoided reporting the distributions to the taxing authorities.

However, Mr. Kanai pointed to a discrepancy in how the company reported the distributions internally versus in the financial statements. The company continued to consider the distributions to be receivables for its internal books and records even though its audited financial statements recognized that the distributions would never be repaid and were not assets in the form of receivables. Moreover, as of 2001, the company stopped recording interest due, thereby further indicating that the company no longer viewed the on-going distributions as currently collectible loans to shareholder.

The audited financial statements reflect the change in reporting from a "due from shareholder account" in the asset section of the statements to a reduction in equity. In the Audited Consolidated Financial Statements for the Years Ended December 31, 2000 and 1999, (i.e., those of New ICC and its subsidiaries) TT190, at TT4 1613, the auditors noted that "the Company [New ICC] has reflected as assets of the Company amounts due from...the president of the Company of $21,631,000 for 2000 and 1999....In our opinion to conform with accounting principles generally accepted in the United States of America...[it] should be reflected as contra-equity...." In the audited financial statement for years 1999 and 2000, Note G specifically refers to the amount as "Due from Stockholder/President".  *Id*. at TT4 1628-29.

The Audited Consolidated Financial Statements for the Year Ended December 31, 2001 notes the reclassification of "the notes and accounts receivables from stockholder to the capital deficit section of the consolidated balance sheet." TT191, at TT4 1664. The same categorization was applied in subsequent audited financial statements.  TT192, at TT4 1699; TT193, at TT4 1742; TT194, at TT4 1791. This confirms, regardless of how the company treated these payments internally, that after the reclassification for fair reporting purposes, amounts booked by

21

the company internally as "due from shareholder" were, in fact, recorded on the audited financial statements as distributions to the ultimate shareholder, Jeffrey Prosser.

Jeffrey Prosser has testified that he does not believe he owes anything to New ICC. Transcript of 12/09/2008, Adv. Doc. No. 615, at 150. He has testified that he received income, compensation, and distributions through the contra equity account.[36] However, at other times, Jeffrey Prosser indicates that the amounts posted to the contra equity account would be repaid, although, apparently, not by him personally (i.e., the so-called "repayment" would, in actuality, consist of wiping out these amounts by "collapsing" the corporations).[37]  These are inconsistent

---

[36] *See* Transcript of 12/08/2008, Adv. Doc. No. 606, at 89 ("[T]he salary that was being paid to me by ICC New or EmCom was stopped, was eliminated. And then the Contra-Equity Account was used as the income, the vehicle that paid income up through ICC, LLC for the services and so forth provided by me, as well as distributions.") *See also* Transcript of 12/09/2008, Adv. Doc. No. 615, at 150:

> Q. And you don't think you owe anything back to New ICC or to ICC, LLC at all; do you?
> A. No, I don't.
> Q. But nonetheless, you've never paid a dime or a penny or a dollar or whatever term you want to use from you personally, Jeffrey J. Prosser, back to New ICC; isn't that true?
> A. Well, the reality of it was that the contra equity was run through as I have said, LLC as my compensation and put on the tax return of Dawn and myself. And so it was taken through our tax return as compensation.

[37] *See* Transcript of 12/08/2008, Adv. Doc. No. 606, at 77 ("What happened, the classification of it remained the same. Now, of course, it was again removed from a due from account on the balance sheet to a contra equity because under a gap's [*sic*] [GAAP's] term it was not going to be paid off in the time period, not that it wasn't going to be paid off but it wasn't going to paid off in the time period that would have allowed it to remain as an asset on the balance sheets, and therefore it was run through equity."). *See also id.* at 98-99:

> Q....My question is whether or not there was a determination made, whether or not the amounts in the Contra-Equity Account would be repaid by the shareholder. Are you aware of such a determination?
> A. Yes, I am.
> Q. And what was that determination?

(continued...)

positions. Thus, the testimony of Jeffrey Prosser does not provide any clarification on this issue.[38]

We find that the reliable, credible testimony is that of Barbee, the accounting expert, and Kanai, the CFO of New ICC. Moreover, the audited financial statements, insofar as they characterize these payments as contra equity, are likewise reliable. As for the Prossers' joint tax returns, they do not resolve how Jeffrey Prosser viewed the contra equity transactions but do indicate, in some years, an attempt to report funds taken out of the company as income, as Mr. Barbee testified. We do not have accountant's workpapers or any evidence that resolves discrepancies between the corporate books, the financial statements, and the tax returns.[39]

Despite the fact that these distributions occurred, there is no indication that they were

---

[37](...continued)
A. The determination that ultimately it would be repaid as the original transaction from the very beginning with RTFC, the Rural Telephone Finance Cooperative lender, that the loans would be repaid with the collapsing of ICC, LLC, and EmCom into ICC New, and so that the vehicle for repayment was the collapsing of these companies.
We note that this "collapsing" into New ICC did not occur. Rather, the corporations are in bankruptcy.

[38] He essentially made the same point when testifying at trial:
Q. And ICC, LLC also bought assets such as Pissarro paintings; didn't it?
A. I believe, again, that funds came out of LLC to pay for paintings that were ultimately run through the income account on Dawn and my tax return.
Q. And it's your position that Dawn Prosser owns all of those Pissarro paintings?
A. That's correct.
Q. But Dawn didn't provide anything back to ICC, LLC or to New ICC for those paintings, right? Dawn in particular?
A. Again, it was run through as income on our Schedule Cs and so it would have -- there was no reason to have paid anything back.
Transcript of 12/09/2008, Adv. Doc. No. 615, at 216.

[39] However, we need not resolve the discrepancies. It is sufficient for turnover to understand what, if any, interests in the assets exist in either bankruptcy estate.

approved by the Board.[40] Mr. Barbee testified that he was not offering an opinion on the

ownership of property or as to whether distributions were or were not authorized.[41] Transcript of

03/23/2009, Adv. Doc. No. 642, at 249-50. The court recognizes that accountants must record

these transactions in some manner and that the CFO (1) considered them to be distributions, (2)

agreed with the classification of the account as a contra equity account for fair reporting purposes

on the financial statements, and (3) believed that the characterization comported with the

guidelines of Generally Accepted Accounting Principles (GAAP). Transcript of 03/10/2009,

Adv. Doc. No. 637, at 85. The court finds that New ICC treated the payments through the contra

equity account as distributions. However, this label, in and of itself, is not a determination of

propriety of the transfer or ownership of the assets.


3. New ICC did not anticipate repayment of transactions posted to the contra equity account.

    The Chapter 7 Trustee cites to the testimony of his expert, Alan Barbee, for the assertion

that the transfers out of New ICC were distributions, not loans, as there was "no consistent

---

[40] Mr. Barbee did review board meeting minutes but did not recall seeing either a
dividend or distribution ever being authorized by the board. Transcript of 03/23/2009, Adv. Doc.
No. 642, at 231, 243-245. Jeffrey Prosser's control of the board, by his own testimony, should
also be noted: "It is true that I could – I certainly through the ownership of LLC who controlled
EmCom, we – we had the authority to appoint the board of directors of ICC." Transcript of
12/09/2008, Adv. Doc. No. 615, at 223, 225. *See also* discussion of Jeffrey Prosser's
determination and control of contra equity distributions, *infra* at item 6.

[41] The authority to make these distributions is an issue repeatedly raised by the Chapter 11
Trustee. However, this adversary proceeding is not to determine whether property was
fraudulently conveyed or whether Mr. Prosser breached his fiduciary duty to the company,
ignored corporate formalities or treated the company's funds as his own. This is a turnover
proceeding limited simply to the issue of whether property of any bankruptcy estate can be
recovered by either trustee pursuant to §542.

repayment effort or effort by the company to enforce the obligation...." *See* Chapter 7 Trustee's

Post Trial Brief Regarding Turnover Adversary, Adv. Doc. No. 659, at 14. We agree. When the

auditors suggested that the receivables should be characterized as contra equity, the concern was

that the receivables were not being serviced, and even the CFO, Mr. Kanai, was not aware of any

schedule for payment.  Transcript of 03/10/2009, Adv. Doc. No. 637, at 18. It would have been

misleading to reflect the receivables as assets. *Id.* Jeffrey Prosser did not make any significant

payments or reimbursements to offset the funds he received through the contra equity account,

and, according to Mr. Kanai, there was no expectation for Jeffrey Prosser to make any payments

as it was never discussed or suggested and there simply was no precedent for it. Testimony of

Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 44. How the contra equity was ultimately

to be satisfied was never discussed with Mr. Kanai. Transcript of 03/10/2009, Adv. Doc. No.

637, at 113-14. There is no testimony other than the inconsistent testimony of Jeffrey Prosser to

suggest that, at one time, repayment was contemplated. Therefore, we find New ICC did not

anticipate repayment of transactions posted to the contra equity account, and Jeffrey Prosser did

not repay and the merger contemplated did not occur.


4. Distributions from New ICC continued despite the hardship it created on New ICC and

without apparent limitation.

The Chapter 11 Trustee cites to the testimony of Jeffrey Prosser in support of the

proposition that "New ICC could not always reimburse Jeff Prosser for his personal expenses and

at the same time pay all of its business obligations, which caused several of Jeff Prosser's

reimbursement requests to be paid in more than one payment." Trustee Springel's Proposed

Findings of Fact and Conclusions of Law, Adv. Doc. No. 656, at at ¶91. *See also* ¶95. The

evidence supports this contention and we so find. The last audited financial statement for New

ICC that is in evidence was prepared for the year 2005. Testimony of Kanai, Transcript of

03/10/2009, Adv. Doc. No. 637, at 47; Exhibit TT194. According to the portion of that audited

financial statement addressing New ICC and its subsidiaries' "Consolidated Statements of

Capital Deficit and Comprehensive Loss", "the liabilities significantly exceed the assets of the

company" and there was no positive equity in the company as of December 31, 2005.

*See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 47-49; Exhibit TT194,

at TT41780.[42] Examination of the financial statements supports this testimony. Thus, as of

---

[42] Even though the deficit increased annually, the auditors did not express a "going concern opinion" for any of the financial statements for years 1999 through 2005. *See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 120-21. A going concern opinion is what an auditor expresses when he has a concern about an entity's ability to survive the next fiscal year. *Id.* at 120. Of course, increasing the capital deficit annually when, as here reflected on the financial statements, substantial operating losses accrued, is not a circumstance that can continue indefinitely without an infusion of capital, when, as here, liabilities exceed assets. "[A] corporation is insolvent under the balance sheet test if the fair market value of its property will not cover its obligations as they fall due, even if it is still operating as a going concern. There is also authority that the test of insolvency is whether the corporation is continuing to operate under a working capital deficit. A corporation that does not have significant capital assets to offset working capital deficits is insolvent, and the fact that it kept functioning while actually insolvent by improperly delaying payments owed to other companies and juggling accounts does not affect the situation, but a finding of insolvency is not necessarily required if there is a question regarding the value of its capital assets, and the corporation can continue its business despite some indicia of insolvency with a reasonable expectation that business conditions will improve and that its business will be reestablished on a sound financial basis." 18B Am Jur 2d Corporations § 1850.

The consolidated financial statements of New ICC reveal that current liabilities exceeded current assets from 1999 through 2005. Thus, the assets were insufficient to pay the existing liabilities, and cash from operating activities would be necessary to make up the difference. In this seven year period, only in 2005 was the cash generated from operating activities sufficient to make up the difference. The net cash generated from operating activities in 2005 was only $11,625,000 above the amount in which current liabilities exceeded current assets. This one year

(continued...)

26

December 31, 2005, New ICC and its subsidiaries were insolvent on a consolidated balance sheet

basis.[43]

The evidence established that Jeffrey Prosser used the funds of New ICC without

---

[42](...continued)
was not sufficient to make up for the years of losses the companies experienced.

- For the year ended December 31, 1999, total current assets were $48,464,000 and total current liabilities were $115,848,000. TT190, at TT4 1615. Thus, current liabilities exceeded current assets by $67,384,000. Net cash provided by operating activities was only $6,889,000. *Id.* at TT4 1618.

- For the year ended December 31, 2000, total current assets were $67,568,000 and total current liabilities were $186,826,000. TT190, at TT4 1615. Thus, current liabilities exceeded current assets by $119,258,000. Net cash provided by operating activities was only $13,664,000.

- For the year ended December 31, 2001, total current assets were $37,052,000 and total current liabilities were $119,283,000. TT191, at TT4 1652-53. Thus, current liabilities exceeded current assets by $82,231,000. Net cash provided by operating activities was only $7,432,000.

- For the year ended December 31, 2002, total current assets were $28,184,000 and total current liabilities were $91,633,000. TT192, at TT4 1685-86. Thus current liabilities exceeded assets by $63,449,000. Net cash provided by operating activities was only $17,758,000. *Id.* at TT4 1690.

- For the year ended December 31, 2003, total current assets were $33,901,000 and total current liabilities were $91,331,000. TT192, at TT4 1685-86. Thus current liabilities exceeded assets by $57,430,000. Net cash provided by operating activities was only $16,205,000. *Id.* at TT4 1690.

- For the year ended December 31, 2004, total current assets were $29,689,000 and total current liabilities were $83,983,000. TT193, at TT4 1728-29. Thus current liabilities exceeded current assets by $54,294,000. Net cash provided by operating activities was only $1,524,000. *Id.* at TT4 1732.

- For the year ended December 31, 2005, total current assets were $29,078,000 and total current liabilities were $84,839,000. TT194, at TT4 1776-77. Thus, current liabilities exceeded current assets by $55,761,000. Net cash provided by operating activities was $67,386,000. *Id.* at TT4 1781.

[43] Mr. Kanai testified that the amount of the capital deficit for the year 2005 indicates that "the liabilities significantly exceed the assets of the company." Transcript of 03/10/2009, Adv. Doc. No. 637, at 48-49. Prior to 2005, the Consolidated Audited Financial Statements also showed a capital deficit for the years ended December 31, 2000 and 1999, TT190, at TT4 1617; the year ended December 31, 2001, TT191, at TT4 1655; the year ended December 31, 2002, TT191, at TT4 1688; the year ended December 31, 2003, TT193, at TT4 1731; and the year December 31, 2004, TT194, at TT1779.

apparent limits. Moreover, for purposes of the distributions, at least Mrs. Prosser viewed New

ICC, her husband, and herself as one and the same.[44] Moreover, there was no budget in place for

the activity in the contra equity account and, for those who managed cash, this was a concern.

Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 30-31[45]. Mr. Kanai recalls

there being a phase when the account grew at a rate of about $1 million per month. Transcript of

03/10/2009, Adv. Doc. No. 637, at 46-47. *See also* TT191, at TT4 1655; TT192, at TT4 1688;

TT192, at TT4 1689; TT193, at TT4 1729; TT194, at TT4 1780, establishing that from 2002

forward more than $12 million per year was designated to the contra equity account. Jeffrey

---

[44] Mrs. Prosser testified, with respect to whether it was Jeffrey Prosser or ICC that made a payment, "I know my husband was paying for it, we own the company, so, you know, I don't know what you can take from that." Transcript of 02/09/2009, Adv. Doc. No. 631, at 58. *See also* Transcript of 02/09/2009, Adv. Doc. No. 631, at 104. In further explanation, Mrs. Prosser stated, "When people refer to Jeff, they'll say ICC. They always say ICC, the people refer to the Prossers, they say ICC. So, don't take this, as because he said ICC and I saw it, it's ICC." Transcript of 02/09/2009, Adv. Doc. No. 631, at 65. *See also* Transcript of 02/09/2009, Adv. Doc. No. 631, at 127 ("Q. And you don't know whether or not ICC paid [property taxes on the Palm Beach residence]? A.Well, ICC is me and my husband so I don't know. Q. So are you saying any payment ICC may have made was the same thing as you and your husband making the payment? A. Well we owned ICC."); *Id.* at 128 ("Q. Mrs. Prosser, is it your testimony that if ICC made a payment to a third party that was the same thing as if either you or Mr. Prosser had made the payment? Yes, or no? A. Yes....because I believe that me and my husband owned ICC. And it was part of income that was reflected on our tax returns and we paid taxes on that income."); Transcript of 02/09/2009, Adv. Doc. No. 631, at 135 ("You know...you keep saying my husband and ICC. I mentioned to you before I do consider ICC and my husband and I as one entity.")

[45] Cash was always a significant challenge for New ICC. *See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 32. The items run through the due from account would be reviewed with Mr. Prosser on a quarterly basis. *Id.* at 32-33 ( "Well, again, when we would do the quarterly financial statements and try to complete the consolidation, this number was an actual number that was disclosed in this changes of stockholders' equity. And that number would generally be larger than what was anticipated. And because of that, we would develop a detailed schedule with all the items that were posted to that account for Mr. Prosser's review so that he can confirm that in fact those were distributions to LLC and not expenses of ICC.").

28

Prosser testified as follows regarding what he viewed to be the limitations on distributions to him

from New ICC:

> Q. And isn't it true that in your mind there were no limits on your ability to use the
> capital of the company for whatever you and your family may have wished for?
> A. Well, the -- I assume that there are always limits. I think that the reality is we
> owned a hundred percent of the company and so to the extent that, you know,
> certainly we had the authority to approve -- I had the ability to approve
> transactions.
> Q. So it's your position that as long as something was okay with you, you could do
> with New ICC's operating capital whatever you personally wished? Is that right?
> A. Well, I had the authority to. However, obviously there is corporate
> responsibility and so forth in running the company. So as I said, I think that within
> reasons that are controlled by the corporate needs of the companies.

*See* Transcript of 12/09/2008, Adv. Doc. No. 615, at 219-20.

Despite this testimony, the consolidated financial statement for the years ended 2004 and 2005,

show that there were capital deficits of $265,970,000 as of December 31, 2004 and $292,679,000

as of December 31, 2005. *See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637,

at 48; TT194, at TT4 1780. Therefore, at that time, there was no positive equity in the company

and the liabilities significantly exceeded the assets. *See* Testimony of Kanai, Transcript of

03/10/2009, Adv. Doc. No. 637, at 49. In other words, on a balance sheet basis, New ICC was

insolvent. *See* 11 U.S.C. §101(32)(A) (defining "insolvent" as "financial condition such that the

sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive

of-- (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such

entity's creditors; and (ii) property that may be exempted from property of the estate under

section 522 of this title").

5. New ICC did not treat the property purchased with funds distributed through the contra equity

account as its own assets.[46]

In his Proposed Findings of Fact and Conclusions of Law, Jeffrey Prosser asserts that

"[n]one of the assets acquired through the transfers included on TT-60 [summary of the

---

[46] Without accepting any of the characterizations of Ms. Christian concerning which transfers were to or for Jeffrey Prosser's benefit we note that Ingrid Christian compiled information and summarized that information to create TT60, which "is a summary of the non-business-related expenses that were identified of [sic] New ICC books and records, that [in her view] appeared to be to be [sic] made for the benefit of Mr. Prosser and/or his family." Testimony of Christian, Transcript of 11/17/2008, Adv. Doc. No. 589, at 170-71. It was not Ms. Christian's task to identify whether items were recorded as fixed assets of New ICC:

> Q. Now, were any of the items that are on your schedule in this Exhibit 160 [sic] listed as fixed assets on the books and records of ICC?
> A. On Exhibit TT60?
> Q. Yes.
> A. Okay. I don't recall but again, as I said before, I was not asked to review where these payments sat on the books and records of New ICC. I was asked to review the underlying support for payments made out of the company and make a determination as to whether they were non business or business related.
> Q. So would it be fair to state, Miss Christian, that you can't tell us, as you sit here today, whether or not any of these items were listed as fixed assets on the books and records of ICC?
> A. I don't recall but I believe that there were very few, if any, that were listed as fixed assets, likely none.
> Q. Right. Of the few, or that you just mentioned, which ones were listed as fixed assets of ICC?
> A. As I just mentioned, I cannot do it, sitting right here today. I do not know which ones.

Transcript of 11/18/2008, Adv. Doc. No. 639, at 221-222.

Counsel for Defendants objected to admission of TT60, and TT60 was conditionally admitted, specifically for purposes of later findings regarding the statute of limitations and the court's agreement with the categorizations made in the summary. *See* Transcript of 11/17/2008, Adv. Doc. No. 589, at 202; Transcript of 03/24/2009, Adv. Doc. No. 642-1, at 233-34.  As stated on the record, the Court recognizes the summary as a helpful guide to locate tab numbers in the ten voluminous binders (TT8) which TT60 summarizes and is not accepting the characterizations made by Ms. Christian to determine the nature of the payments made. *See* Transcript of 11/17/2008, Adv. Doc. No. 589, at 202. As to the statute of limitations, "The Bankruptcy Code does not contain a statute of limitations for turnover actions pursuant to § 542....There are no equitable defenses to a Trustee's demand for turnover of estate property other than the defenses enumerated in the statute." *In re Clark*, 274 B.R. 127, 134 (Bankr. W.D. Pa. 2002) (internal citation omitted).

non-business-related expenses prepared by the Custodian of Records (Ingrid Christian) that, in

her view, appeared to be to be made for the benefit of Mr. Prosser and/or his family] are listed as

assets on the books of New ICC." Adv. Doc. No. 655, at ¶16. The Chapter 11 Trustee asserts,

"Receivables are considered assets. Accordingly, the Payments were reflected as an asset on New

ICC's books in the Due From Account. As the Due From Account is an asset itself, an item of

Property paid for by New ICC and reflected in the Due From Account would not appear on the

fixed assets schedule of New ICC, since it is already reflected as an asset." *See* Trustee

Springel's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 656, at ¶62

(internal citations omitted). The credible testimony established that after the reclassification on

the financial statements, New ICC listed the distributions internally as receivables. The testimony

is clear that, although the receivables account was carried as an asset internally, the distributions

were classified as contra equity on the audited financial statements and New ICC did not

anticipate repayment by Mr. Prosser. *See* discussion *supra* item 3. The credible evidence

established that after the reclassification there was no corporate expectation that the distributions

would be repaid. Thus, the distributions were improperly classified as receivables or as assets on

the company's books and records.

Dennis Kanai testified that the contra equity transactions were accounted for as

receivables on the books and records (in the general ledger), but for external purposes were

reported as contra equity. Transcript of 03/10/2009, Adv. Doc. No. 637, at 85-86, 111. It would

have been "misleading to view it as an asset of the company" for reporting purposes. *Id.* at 90.[47]

While the specific assets purchased using New ICC funds through the receivables account (which

---

[47] That is, the receivable would never be collected.

subsequently was referred to as contra equity for external reporting purposes), were not recorded

as the company's assets, the receivable was recorded as an asset on the general ledger. Testimony

of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 125. In other words, the name of the

account on the internal books and records of New ICC was never changed from a receivables

account. The account had always been maintained as a receivables account.[48] Even though the

---

[48] The Chapter 11 Trustee contends that "the Due From Account is an outstanding obligation on the books and records of New ICC to this day." *See* Trustee Springel's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 656, at 19. That is what the company's general ledger shows. Dennis Kanai testified as follows regarding the treatment on the internal ledger versus the financial statements:

> Q. And when you make that distinction between external reporting -- well, first of all you said as a receivable, right?  That was one -- you said you kept it as a receivable?
> A. Yeah.  On the books and records, in the general ledger if you will, that account is a receivable.
> Q. Is that because it had always been a receivable?
> A. Correct.
> Q. So, you just didn't make the switch, you didn't recategorize it on the books and records, within the company, because that's the way it had always been done?
> A. Correct.
> Q. In other words, you didn't sort of give the account a new name.
> A. That's correct.

*See* Transcript of 03/10/2009, Adv. Doc. No. 637, at 86.

*See also id.* at 111-12:

> Q. Internally it wasn't considered a contra equity. It was considered an asset. You've already testified to that. Isn't that correct?
> A. No. I believe what I said, or what I intended to say, that the internal book keeping convention was to accumulate this activity in what was and has always been an asset account, but it was always mapped into a contra equity account for external reporting purposes.
> Q. Yes. And so, internally it was maintained as a receivable, correct?
> A. The information or the activity was accumulated in an account that happened to be in the asset section on the general ledger.
> Q. And the company never wrote that off, did they?
> A. No. Again, because it was part of the contra equity.

Dennis Kanai testified that he believes that reporting the transactions as contra equity was the appropriate characterization and that the internal name for the account was simply retained

(continued...)

32

receivable itself was recorded in an account in the asset section of the general ledger, the items purchased using the funds disbursed were not recorded as assets of New ICC. *See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 125. It is clear from the testimony that the receivable was not an asset as it would never be recovered by the company and many of the distributions were made to or for the benefit of Jeffrey Prosser while the company was insolvent.

There is no evidence that any of the assets or services posted as distributions in the contra equity account are also recorded by the company as its own assets. Jeffrey Prosser previously turned over a Pissarro painting, which was the only item identified to be in his possession and posted as an asset of the corporation. *See* note 90 *infra*. We find that the transfers recorded in the contra equity account (by whatever name it is known) were actual distributions to or for the benefit of Jeffrey Prosser. Thus, we find that regardless of the propriety of the distributions, which we do not determine herein, New ICC did not treat the property purchased through contra equity transactions as its own assets.

6. Jeffrey Prosser determined and controlled the amount of distributions through New ICC's contra equity account.

---

[48](...continued)
because that is what it had always been called. *See* Transcript of 03/10/2009, Adv. Doc. No. 637, at 84-85. The Chapter 11 Trustee's contention that the due from account remains an outstanding obligation today on the corporate books is correct and points out the control Jeffrey Prosser exercised over the corporate internal records. Because the account was considered an asset on the company's internal records, the company never reported the distributions to any taxing body and never filed the appropriate forms to reflect the distributions. Furthermore, to Jeffrey Prosser's benefit, once the receivables were reclassified as contra equity there was no additional accrual of interest. Nonetheless, we credit Kanai's testimony that the distributions are properly considered to be contra equity transactions. The effect was to take cash out of the company and give it to, or spend it for the benefit of, Jeffrey Prosser or his designees.

It is the Chapter 11 Trustee's position that Jeffrey Prosser controlled where and how transactions were booked and that he directed many transactions to be posted to the contra equity account. *See* Transcript of 07/23/2009, Adv. Doc. No. 680, at 63. We agree and so find. Jeffrey Prosser's control over the amounts posted to contra equity and how they were characterized is clear from the testimony.

Approval of expenditures posted to the account came from Mr. Prosser or his designees. *See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 29. The CFO was not aware of the expenditures before they occurred and there was no budget for this activity. *Id*. at 29-30.

Mr. Kanai testified that a quarterly review process of the amounts posted to the contra equity account was in place for purposes of finalizing the consolidated financial statement. *Id.* at 29. "[B]ased on that activity [in the account], generally it was a number that was not anticipated. Because of that, we would do a detailed review of all the activity and review it with the senior executives to make sure that in fact those transactions belong in that account." *Id.* at 29. Mr. Kanai described how the quarterly reviews were done:

> Q. And can you just briefly describe what that process was?
> A. Well, again, when we would do the quarterly financial statements and try to complete the consolidation, this number was an actual number that was disclosed in this changes of stockholders' equity. And that number would generally be larger than what was anticipated. And because of that, we would develop a detailed schedule with all the items that were posted to that account for *Mr. Prosser's review so that he can confirm that in fact those were distributions* to [ICC, LLC, one of the parent companies of New ICC, of which Jeffrey Prosser was the ultimate owner] and not expenses of [New] ICC.
> Q. Were there ever times during these reviews where Mr. Prosser would challenge some of the entries?
> A. Well, I don't know that challenge is a word. *Mr. Prosser was directly involved in the process*. So, you know, we would review and determine what the proper

34

accounting would be for those transactions.
Q. Is it fair to say then that Mr. Prosser would, in essence, sign off once the review was finished and said he'd agreed or -- with the accounting? Excuse me.
A. Yeah, generally, we would not complete the consolidated financial statements without *Mr. Prosser's approval*.

Transcript of 03/10/2009, Adv. Doc. No. 637, at 33 (emphasis added).

It is clear from the CFO's testimony that what amounts were posted to the contra equity account were at Jeffrey Prosser's direction and under his control.

The board of directors was not involved in or asked to approve any of these transactions. Jeffrey Prosser was questioned as to whether the board of directors voted to approve the transfers of New ICC funds for the benefit of his family, and he answered, "The...board of directors at least of any company I am familiar with don't approve or disapprove specific transactions. Certainly quarterly financial statements were presented to the board and also the annual audits were presented to the board and in those annual -- in those quarterly financial statements the contra-equity account is disclosed and in the annual audits, the contra-equity account is disclosed. So certainly that accounts and those issues were issues that were before the boards when it had meetings."[49] *See* Transcript of 12/09/2008, Adv. Doc. No.

---

[49] We note that the audited financial statements were prepared long after the end of the fiscal (i.e., calendar) years to which they applied. *See* TT189-TT193 (The consolidated financial statements for the years ended December 31, 1998 and 1997, the auditor's report is dated June 4, 1999, TT189, at TT4 1593; for the years ended December 31, 2000 and 1999, the auditor's report is dated October 16, 2001, TT190, at TT4 1614; for the year ended December 31, 2001, the auditor's report was dated May 3, 2002 except with respect to Note 13 for which it was dated May 29, 2002, TT191, at TT4 1651; for the years ended December 31, 2003 and 2002, the auditor's report was dated April 23, 2004, TT192, at TT4 1684; for the years ended December 31, 2004 and 2003, the auditor's report was dated April 22, 2005, TT193, at TT4 1727; for the years ended December 31, 2005 and 2004, the report was dated April 28, 2006, TT194, at TT4 1775.) Thus, the audited financial statements did not provide the board with information concurrent with the timing of the transfers.

615, at 224.[50]  There is no indication from the minutes of the meetings, that the board gave

approval or had any knowledge of the fact that payments were being made for the benefit of

Dawn Prosser and the Adult Prosser Children, whether through contra equity or otherwise. TT10.

The board never gave specific approvals for these transactions. *See* Testimony of Jeffrey Prosser,

Transcript of 12/09/2008, Adv. Doc. No. 615, at 227.[51] Moreover, Richard Goodwin, a board

member, was questioned about this and expressed an understanding of the contra equity account

that is completely inaccurate. Richard Goodwin testified that he understood the contra equity

account was used for the purpose of "compensat[ing] [Jeffrey Prosser] for his having borne

certain expenses of the company." Exemptions Trial Testimony, Transcript of 09/08/2008, at

189-190 (admitted in this proceeding, *see* TT203).

As further evidence of Jeffrey Prosser's complete domination of New ICC, when asked if

he controlled the board of directors of New ICC, he responded that "It is true that I could – I

certainly through the ownership of LLC who controlled EmCom, we...had the authority to

appoint the board of directors of [New] ICC." *See* Transcript of 12/09/2008, Adv. Doc. No. 615,

at 223. At his August 13, 2008 deposition, when asked whether he considered the board to owe

any duties to the company, Jeffrey Prosser responded, "I think the board of directors first...duty is

---

[50] *See also* Transcript of 12/09/2008, Adv. Doc. No. 615, at 225-26 ("Well, the board had
to approve the audits. So from that standpoint, the board -- as the board doesn't go through and
specifically approve repair expense for a company. I mean, the board is there on a high level to
approve or disapprove the financial statements or the high level or the audited financial
statements, not specific transaction [sic].")

[51] This conclusion is supported by the testimony of board members. *See* 04/25/2008
Deposition of Michael Prosser, at 44-45, 49, 83, 206; Exemption Trial Testimony of Raynor,
Transcript of 09/09/2008, at 121-22 (admitted in this proceeding, *see* TT203); Testimony of
Jeffrey Prosser, Transcript of 12/09/2008, Adv. Doc. No. 615, at 214.

to the stockholders who in this case was me." *See* Transcript of 12/09/2008, Adv. Doc. No. 615, at 223-24.

Thus, it is abundantly clear that Jeffrey Prosser controlled all of the corporate activities, including the contra equity account.

7. The testimony regarding an alleged oral agreement or understanding of property ownership between Jeffrey and Dawn Prosser is not credible.

The Chapter 7 Trustee contends that "[r]egardless of claims by the Prossers that they had an 'understanding' for many years that Mrs. Prosser essentially owned all of their marital property, Mrs. Prosser was unable to clarify the terms of such an understanding while testifying during trial." Chapter 7 Trustee's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 658, at ¶145. The evidence supports the Chapter 7 Trustee's contention and we so find. On December 10, 2008, Dawn Prosser testified as follows:

> Q. Now, as I understand it, you believe or you claim that you have an understanding or an agreement with Mr. Prosser with regard to the division of marital assets; is that correct?
> A. That's correct.
> Q. And with regard to that understanding, is it true that your understanding is that apart from real estate in joint names, everything else is yours?
> A. Yes.
> Q. And so when you -- let's just make sure we're on the same page. When you say everything is yours, does that include all of the furniture in the various homes that you lived in with Mr. Prosser?
> A. That's correct.
> Q. Include the art work?
> A. Yes.
> Q. Jewelry?
> A. Yes.
> Q. How about the wine?
> A. Yes.

*See* Transcript of 12/10/2008, Adv. Doc. No. 604, at 169-70.

Mrs. Prosser testified inconsistently as to when this agreement was made, whether before or after the marriage. At trial, Dawn Prosser testified that she and Mr. Prosser had the agreement for "many years" but she did not believe that it predated the marriage. *See* Transcript of 12/10/2008, Adv. Doc. No. 604, at 172. However, at her deposition of August 12, 2008, Mrs. Prosser testified that, in fact, the agreement had been in place "forever" and stated that it "predated the marriage." *See* Transcript of 12/10/2008, Adv. Doc. No. 604, at 172-175. Also in her August 12, 2008 deposition, Mrs. Prosser testified that she could not recall whether the understanding had ever been reduced to writing. *See* Transcript of 12/10/2008, Adv. Doc. No. 604, at 175-76. However, at the July 21, 2008 deposition, she testified as follows, with respect to the agreement she had with Jeffrey Prosser:

> [Q.] Okay, could you please describe that for me? First, is it oral or a written agreement?
> A. Oral.
> Q. Okay, when did you enter into that agreement?
> A. No specific time.
> Q. Well, tell me your understanding of the terms of that agreement.
> A. The furniture and the homes belong to me.
> Q. What else?
> A. Half interest in anything he has.
> Q. Any other terms?
> A. Shares in ATN that later became ICC.
> Q. What about those shares?
> A. Half of it was mine.

*See* Transcript of 12/10/2008, Adv. Doc. No. 604, at 179.

At her deposition, she testified that she had a half interest in everything other than the furniture and the homes. *Id.* at 180. This is inconsistent with her testimony on December 10, 2008, when she testified that "apart from real estate in joint names, everything else is [hers]." *See*

38

*supra.*

Also, Mrs. Prosser was inconsistent as to her understanding of the purpose of the agreement. *See* Transcript of 12/10/2008, Adv. Doc. No. 604, at 183, 186. At her deposition on July 21, 2008, she testified that she did not know whether the purpose of the agreement with her husband was for estate planning purposes. *See* Transcript of 12/10/2008, Adv. Doc. No. 604, at 186. At trial, Dawn Prosser testified that the purpose of the agreement or understanding with Jeffrey Prosser was for estate planning purposes. Transcript of 12/10/2008, Adv. Doc. No. 604, at 183. When asked whether she believed that an agreement for estate planning purposes should be in writing, Dawn Prosser testified that she and Jeffrey Prosser "had planned to get everything set up formally...and [they] just never got around to formalizing anything." *Id*. at 189-90.

Jeffrey Prosser also stated inconsistent positions as to the purported agreement. At trial on December 9, 2008**,** Mr. Prosser testified that it is disputed whether he is the sole owner or half owner of ICC, LLC from October of 1998 forward. Transcript of 12/09/2008, Adv. Doc. No. 615, at 235. However, in response to an interrogatory asking for the same identification, ICC, LLC's answer was that "ICC, LLC's sole member is Jeffrey Prosser." *Id.* at 237-38.[52] Further, Jeffrey Prosser testified "I think the board of directors first...duty is to the stockholders who in this case was me." *See* Transcript of 12/09/2008, Adv. Doc. No. 615, at 223-24. At trial on December 9, 2009, Jeffrey Prosser described the agreement as follows:

> Q. Is there any -- isn't it true that from August 4, 1994 forward it's your position that any time art work was acquired or furniture or personal property, you never had an interest in it because it went directly to Dawn Prosser?

---

[52] According to his testimony, Jeffrey Prosser provided the answer, under oath, on behalf of ICC-LLC based upon the corporation's books and records. Transcript of 12/09/2008, Adv. Doc. No. 615, at 238.

A. That's exactly right. For estate tax planning.

Q. And it's your position that you've never had an interest in any art work or furniture that -- that was used by or enjoyed by you in any of the residences? Is that right?

A. That's correct.

Transcript of 12/09/2008, Adv. Doc. No. 615, at 162-64.[53]

---

[53] *See id.* at 164-65, where Jeffrey Prosser explained how he never had an interest in the property purchased with funds posted to the contra equity account, which he considered to be his "compensation":

Q. I asked you, "And it's your position that those furnishings were never yours because per your deal with Dawn, they automatically went to Dawn because they were furniture, personal property?" And you answered, "For the fifteenth time, yes." Did I read that correctly?

A. You did.

Q. Is your answer different today?

[...]

THE WITNESS: No. My answer is no different today, that if it was a -- after 2000 and it came through the contra-equity account, it would have come through as compensation and as to – to our joint return and then went to Dawn.

Despite this testimony, it should be noted that Jeffrey Prosser must not have intended for absolutely everything to go to Dawn. Jeffrey Prosser's Last Will and Testament provides:

I give, devise and bequeath all the rest, residue and remainder of my property of every kind and description (including lapsed legacies and devises), wherever situate and whether acquired before or after the execution of this Last Will and Testament, to the Trustee under that certain Trust Agreement between myself as Grantor and Carl J. Hartmann III, as Trustee executed prior to the execution of this Last Will and Testament on the 12th day of January, 2000. My Trustee shall add the property bequeathed and devised by this Item to the principal of the above Trust and shall hold, administer and distribute the property in accordance with the provisions of the Trust Agreement, including any amendments thereto made before my death.

 TT160, at TT4 1090-91.

Thus, there are two inconsistencies with Jeffrey Prosser's contention that all property went directly to Dawn. First, his will provides for disposition of his property upon his death. Therefore, he must have retained an interest in some property. Second, the will does not devise the property to Dawn Prosser but rather to a Trust, the terms of which are not provided. Mr. Prosser testified that he does not believe the trust agreement was ever created. Transcript of 12/09/2008, Adv. Doc. No. 615, at 128-129. *But see* testimony of Donovan Hamm, TR 8/26/08

(continued...)

Prior to the Marital Property Agreement (hereinafter "MPA")[54], an agreement the

Prossers entered into in 2006[55] which purports to define their respective interests in their

property, there is no written document evidencing the understanding or agreement which both

Dawn and Jeffrey Prosser have attempted to describe. Regardless, their testimony has been

inconsistent as to the terms and details surrounding the alleged understanding. *See* Testimony of

Dawn Prosser, Transcript of 12/10/2008, Adv. Doc. No. 604, at 192-93. Therefore, this court

finds that there is no credible evidence supporting any definitive oral agreement or understanding

regarding property ownership.

8. Jeffrey and Dawn Prosser entered into the Marital Property Agreement[56] (MPA) shortly after

---

[53](...continued)
at 82:2-23, Doc. No. 2096, as mentioned in our Memorandum Opinion Regarding Exemptions
Claimed by Debtor, Case No. 06-30009, Doc. No. 2613, at 55-56: "Yet, Donovan Hamm, an
attorney, testified credibly that he prepared a will, a revocable trust and some other estate
planning documents for Mr. Prosser that were executed, and the originals were returned to Mr.
Prosser. Trial Testimony of Donovan Hamm[.]"

[54] The MPA, discussed *infra*, is the subject of the Chapter 7 Trustee's fraudulent
conveyance action pending in District Court. Thus, the effect, if any, of that agreement (as it
relates to transfers) will not be addressed herein.

[55] The MPA was dated January 18, 2006, which was nine days after a judgment was
entered against Jeffrey Prosser and his companies, jointly and severally, in the principal amount
of $56,341,843.00 in the Delaware Chancery Court. TT44; TT157.

[56] The Chapter 7 Trustee's fraudulent conveyance action against Dawn Prosser was
commenced as an adversary action, Adv. No. 08-3006, in this court. In his complaint, the
Chapter 7 Trustee asserts that Jeffrey Prosser made transfers after the commencement of
litigation. *See* Adv. No. 08-3006, Adv. Doc. No.  1, at ¶50. Also, in his Trial Brief Regarding
Fraudulent Conveyance Issues, the Chapter 7 Trustee asserts "In January of 2006, a mere nine (9)
days after the entry of the judgment in In re Emerging Communications, Inc. S'holders Litig.,
Civ. A. No. 16415 (Del. Ch. Jan 9, 2006) (the "Greenlight Judgment"), the Debtor entered into a
(continued...)

41

entry of a substantial judgment against Jeffrey Prosser and his companies.

The Chapter 7 Trustee contends that the date upon which the Prossers entered into the

MPA creates an inference that "Jeffrey Prosser was attempting to give away assets in his name to

his wife to render himself judgment proof." Chapter 7 Trustee's Post Trial Brief Regarding

Turnover Adversary, Adv. Doc. No. 659, at 16. We do not agree that the MPA serves to convey

anything to anyone. The MPA provides:

> [T]he parties desire to enter into this Agreement to define their respective
> financial and property rights, together with all other rights, remedies, privileges,
> and obligations arising out of their marriage. The parties agree that this
> Agreement is for the purpose of defining the separately owned property of Dawn
> E. Prosser, which was acquired by her of her own labor during coverture in
> accordance with Ttile 16, Chapter 1 of the Virgin Islands Code, §§68[57]-69[58]....
> TT157, at TT4 1081.

---

[56](...continued)
marital asset division agreement with his wife purporting to transfer personal and real property
from the Debtor to his wife for little or no consideration. Further, Mr. Prosser retains use and
benefit of the property in question. Such transfers constitute fraudulent transfers." Adv. Doc. No.
61, at ¶5. Dawn Prosser filed a Motion to Withdraw the Reference, which was granted by the
District Court. *See* Adv. No. 08-3006, Adv. Doc. No. 74. As noted, those transfers are pending
before the District Court and we offer no opinion thereof.

[57] "The property and pecuniary rights of every married woman at the time of her marriage
or afterwards acquired by gift, devise, or inheritance shall not be subject to the debts or contracts
of her husband, and she may manage, sell, convey or devise the same by will to the same extent
and in the same manner that her husband can property belonging to him." 16 V.I.C. §68.

[58] "The property, either real or personal, acquired by any married woman during coverture
by her own labor shall not be liable for the debts, contracts, or liabilities of her husband, but shall
in all respects be subject to the same exemptions and liabilities as property owned at the time of
her marriage or afterwards acquired by gift, devise or inheritance."16 V.I.C. §69.
   The court notes that Jeffrey Prosser was essentially Dawn Prosser's sole source of income
from the time they were married in 1990. *See* Testimony of Dawn Prosser, Transcript of
12/10/2008, Adv. Doc. No. 604, at 163-64. *See also* Testimony of Jeffrey Prosser, Transcript of
12/08/2008, Adv. Doc. No. 606, at 219-20 (testifying that generally, with the exception of
dividends received through 1998, any money Dawn had was from him).

The agreement defines Dawn E. Prosser's separate Property as follows[59]:

Real Property. All real property titled in the name of Dawn Prosser and recorded at the Office of the Recorder of Deeds, St. Croix, U.S. Virgin Islands.

Personalty. The parties acknowledge that the following items of personalty are the separate property of Dawn Prosser by virtue of Title 16 V.I.C. §69.
   i. A fifty percent (50%) membership interest in Innovative Communication Company, LLC, a Delaware limited liability company.[60]
   ii. A fifty percent (50%) interest in all of the common capital stock of Virgin Islands Community Bank, a U.S. Virgin Islands banking corporation.
   iii. All of the furniture, fixtures, *objects d'art* that are located within the real property described in Article 1, above [i.e., real property located in St. Croix and titled in Dawn Prosser's name].

Personal Effects. Dawn Prosser is the sole owner of her tangible personal effects such as clothing and jewelry.

Despite the fact that Jeffrey and Dawn Prosser were married in 1990 and that they testified to a long-standing agreement as to Dawn's ownership of marital property, the only writing evidencing any agreement of this sort is the MPA dated January 18, 2006. *See* Testimony of Dawn Prosser, Transcript of 12/10/2008, Adv. Doc. No. 604, at 169. Dawn Prosser testified that she does not recall a triggering event for entering into the MPA. Transcript of 12/10/2008,

---

[59] In addition to the categories listed, the agreement also purports to define Dawn Prosser's interest in certain bank accounts, retirement and/or deferred savings plans and employee benefits, and life insurance. Those items are not at issue in this adversary proceeding seeking turnover pursuant to §542.

[60] There is no credible testimony or documentation to evidence that Dawn Prosser had an ownership interest in ICC-LLC. *See* Testimony of Jeffrey Prosser, Transcript of 12/08/2008, Adv. Doc. No. 606, at 94. The only document, to Dawn Prosser's knowledge, which indicates that she has an ownership interest in ICC-LLC is the MPA. *See* Transcript of 12/10/2008, Adv. Doc. No. 604, at 205; TT157. *See also supra* at 38.
   At no point in this trial has Dawn Prosser contended that the property at issue in this adversary was received as distributions *to her* as a shareholder. In fact, Mrs. Prosser testified that "[f]or the most part" her only source of income after 1989 was Mr. Prosser. See Transcript of 12/10/2008, Adv. Doc. No. 604, at 163-64.

Adv. Doc. No. 604, at 202-03; TT157. Moreover, she had very little recollection of the terms of

the written agreement.[61] Notably, the MPA was executed by the Prossers nine days after a

judgment in the principal amount of $56,341,843.00 was entered against Jeffrey Prosser and his

companies on January 9, 2006. TT44 (Delaware Chancery Court Judgment).[62] At the time the

judgment was entered, Jeffrey Prosser read the decision and understood the dollar amount of the

judgment. *See* Testimony of Jeffrey Prosser, Transcript of 12/09/2008, Adv. Doc. No. 615, at 97-

98.[63] Further, he testified that he and Dawn entered into this written agreement because of that

---

[61]

    Q. Are you aware of any written agreement that exists which evidences the gifting
of any of these items to you by your husband?
    A. There's a document that I saw recently, but I don't recall all the specifics.
    Q. Is that the marital property agreement you're referring to that Mr. Stassen
asked you about?
    A. I don't remember what it was.
    Q. Can you describe it?
    A. It was in 2006 I believe, it was done by Attorney Rames.
    Q. Kevin Rames?
    A. Yes.
Testimony of Dawn Prosser, Transcript of 02/09/2009, Adv. Doc. No. 631. at 108.

    [62] Counsel for Defendants objected on the basis of relevance to the line of questioning
regarding the litigation commenced by the Greenlight Entities. *See* Transcript of 12/09/2008,
Adv. Doc. No. 615, at 84. Specifically, counsel objected to the admission of TT44, the Delaware
Chancery Court Judgment. *Id.* at 99. At trial, the line of questioning and admission of TT44 were
permitted with the condition that the objection would be revisited at the end of the case once the
court had the full picture to determine if the line of questioning was appropriate for turnover or
whether it was solely relevant for fraudulent conveyance purposes. *Id.* at 89-90. Now that trial
has concluded, the court finds that TT44 and Jeffrey Prosser's understanding that a judgment was
entered against him is admissible to provide context for the timing of the Prossers' entry into the
MPA, which, by its own terms, does not convey property. Therefore, the court is not addressing it
for purposes of fraudulent conveyance, which is an issue for the various fraudulent conveyance
actions, but rather as evidence related to the gifting of property which the Prossers claim
occurred and to the extent the MPA purports to confirm that such gifting occurred.

    [63] The MPA is a postnuptial agreement defining property rights between Jeffrey and

                     (continued...)

judgment. Although Dawn had no recollection of the event, Jeffrey Prosser testified that she was

concerned about the judgment's effect on their property.[64]

---

[63](...continued)
Dawn Prosser. Generally, antenuptial agreements are regarded favorably and recognized as binding contracts between the parties. *See Dysart v. Dysart*, 45 V.I. 118, 126 (V.I. Terr. Ct. 2002); *See also* 16 V.I.C. §64 ("A conveyance, transfer or lien executed by either husband or wife to or in favor of the other, shall be valid to the same extent as between other persons."). However, in this circumstance, the Prossers are not seeking to enforce the terms of the contract in a dissolution proceeding as is typically the case. Instead, Dawn Prosser seeks to use the MPA as shield against Jeffrey Prosser's creditors in these bankruptcy proceedings, claiming that the property identified is hers alone, despite the overwhelming evidence that Jeffrey Prosser was the source of funding and that no written agreement dividing or recognizing a prior division of these assets existed prior to the judgment entered against Jeffrey Prosser.

A similar circumstance was addressed in a case decided by the Court of Appeals of Arizona. *See State ex rel. Indus. Comm'n v. Wright*, 202 Ariz. 255 (Ariz. Ct. App. 2002). There, a married couple "appealed the trial court's ruling that a modification of a premarital agreement, which would have had the effect of protecting [the husband's] future earnings from garnishment, was a fraudulent conveyance" under Arizona's fraudulent conveyance statute. *Id.* at 256. The couple cited to numerous cases in support of the proposition that marital agreements are generally binding on creditors. *Id.* at 256-57. In response to this argument, the court stated: "However, in each of the cases cited, the marital agreement had been entered into before  the creditor acquired an interest. Appellants fail to cite, and we are unable to find in our case law, precedent in which a post-marital agreement entered into after an obligation is incurred has been held to be binding against the creditor." *Id.* at 257.

Here, too, a judgment was entered against Jeffrey Prosser prior to the MPA, indicating an intent to avoid collection of the judgment entered just nine days earlier. However, these facts indicate a badge of fraud for avoidance of a transfer, which is not an issuse in this turnover action pursuant to §542.

[64] We note that we addressed the origin of the MPA in the Memorandum Opinion regarding Exemptions Claimed by Debtor and cited to Jeffrey Prosser's testimony therein as follows:

> [W]hat precipitated it [the MPA] is that Dawn was obviously very uptight and very stressed with that [Chancery Court Opinion], obviously we had spent 20-plus years building, you know. No one knew what was going to be left. And she was obviously concerned about the home that was in her name and the companies in the Virgin Islands. And I think that's all that it precipitated was to document what our understanding was . . .[and that the] lawsuits that were in process with RTFC already. All of that litigation and, of course, then it was compounded with the Greenlight, what I call the Greenlight decision. And so it was without question a

(continued...)

The court finds that the circumstances that existed at the time the MPA was executed by the parties are relevant, as the parties contend that the MPA is evidence of the gifting of property which the Prossers claim occurred. This court makes its findings regarding the nature of this agreement from the evidence at trial as it relates to the turnover at issue here. However, it is also the subject of the Chapter 7 Trustee's fraudulent conveyance action pending in District Court at 3:08-cv-00147, about which we express no view.

9. Based upon the MPA, property other than that located at the residence in St. Croix is not Dawn Prosser's sole property, regardless of whether the agreement is ultimately determined to be a fraudulent conveyance.

Based upon the terms of the MPA, the Chapter 7 Trustee notes that the only real property listed is the property titled in Dawn's name in St. Croix, and the MPA addressed only certain personal property located within the real property in St. Croix. Chapter 7 Trustee's Proposed Findings of Fact and Conclusions of Law for Turnover Trial, Adv. Doc. No. 658, at ¶¶150, 153. That is correct. However, the stated purpose of the MPA is broader than that. It is to define all of Dawn Prosser's property rights. It states its purpose as to "defin[e] [Dawn and Jeffrey Prosser's] respective financial and property rights, together with all other rights, remedies, privileges, and obligations arising out of their marriage. The parties agree that this Agreement is for the purpose of defining the separately owned property of Dawn E. Prosser...." TT157.  For the purposes of

---

[64](...continued)
very stressful time period for Dawn, and for me, but certainly more so for Dawn. *See* Memorandum Opinion Regarding Exemptions Claimed by Debtor, Case No. 06-30009, Adv. Doc. No. 2613, at 55-56.

the property at issue in this adversary proceeding, the MPA indicates the intent of Jeffrey and

Dawn Prosser that **only** the real property titled in Dawn Prosser's name in the Virgin Islands and

the "furniture, fixtures, [and] *objects d'art*" therein, and her clothing and jewelry, are solely

owned by Dawn Prosser. *See* Transcript of 12/10/2008, Adv. Doc. No. 604, at 204; TT157, at

TT4 1082. Thus, Jeffrey and Dawn Prosser both recognized that there is no sole ownership of

any other asset in Dawn.

 In addition, the parties identified certain items as held by third parties and not located in

the Virgin Islands home: (1) Blackamoor figures Late 17th-Early 18th Century (c. 1680-1720); (2)

Console tables with Italian inlaid marble top 18th Century; (3) Center table Marble top 54" Gold

Leaf base c 1900; (4) Chandelier French c 1880 Rock crystal bronze; (5) one of the Aubusson

carpets listed on TT2 00309; (6) the Armoire - Northern Italian, c 1750, two-door construction;

buried walnut; (7) Continental Mirror c. 1880 carved gesso and gold leaf; (8) chandelier, French,

c. 1840, Iron with gold leaf and crystal fruit drops; (9) Giltwood mirror, Austrian, 19th Century,

Gold leaf, carved wood, and gesso; (10) French vasselier (buffet with plate rack) c. 1770, seven

different woods, with burl walnut panels; (11) English regency partners desk, c. 1820, mahogany

with brown leather top, three drawers at one end, two drawers opposite end; (12) Desk Chair

English regency, c. 1825, mahogany, upholstery fabric, brown pocket weave; (13) English lamps,

peach and ivory porcelain with landscape; (14) Large Italian Oil Jars 18th Century terra cotta

decorated with masks; (15) Italian lamps, carved wood, gesso and goldleaf; (16) French regence

commode c. 1730, painted wood (walnut) with faux peach marble top. *See* TT47, at TT2 00309,

TT2 003011-30015[65]; Testimony of Dawn Prosser, Transcript of 12/10/2008, Adv. Doc. No. 604, at 224-35.[66] Also, as to the property listed on TT2-00316-317, Dawn Prosser testified that these were items packed up from the Lake Placid, New York, residence and placed in storage. Transcript of 12/10/2008, Adv. Doc. No. 604, at 236. Therefore, none of these are located at the St. Croix property and none are Dawn's sole property as delineated in the MPA. Transcript of 12/10/2008, Adv. Doc. No. 604, at 236.

These furnishings were either located in storage or in one of the Prossers' homes outside of the Virgin Islands (i.e., in Lake Placid, New York or in Palm Beach, Florida), as to which they both shared control and enjoyment. We find that all items not located in the Virgin Islands were not solely Dawn Prosser's according to the express description contained in the MPA, and it is evident from the MPA and other evidence at trial that both Jeffrey and Dawn Prosser had an interest in all items which were not in the Virgin Islands residence.[67]

10. The plots of land on which the Estate Shoys main house and guest house are situated are titled in Dawn Prosser's name only, and the remainder of the Estate Shoys property is titled in

---

[65] Mrs. Prosser stated that the round pedestal table on TT2 00313 was returned to the dealer approximately ten years ago and must have been inadvertently included in the schedule of assets. Transcript of 12/10/2008, Adv. Doc. No. 604, at 229.

[66] Mrs. Prosser identified some items specifically listed on TT2 00315 as items which she no longer possessed, but she testified that she thought that all of the items on the page were no longer in her possession but rather were in the possession of the Chapter 11 Trustee. Transcript of 12/10/2008, Adv. Doc. No. 604, at 235.

[67] Jeffrey Prosser also had use and enjoyment of the Virgin Islands home and its contents. He identifies himself as domiciled in the Virgin Islands, listing this address as his home in his bankruptcy petition. *See* Voluntary Petition, Case No. 06-30009, Doc. No. 1. *See also* item 12, in text, *infra*.

both Jeffrey and Dawn Prosser's names.

Both Jeffrey and Dawn Prosser point out that the parcels of property on which their homes sit in St. Croix are titled in Dawn Prosser's name alone. *See* Jeffrey Prosser's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 655, at ¶57; Dawn Prosser's Proposed Findings of Fact, Conclusions of Law and Brief, Adv. Doc. No. 674, at ¶1. The Estate Shoys property is comprised of two homes: the guest house and the main house, sitting on Plot Numbers 4, 4A, 5, 10A, and 10AA. Across the street from the houses are Plot Numbers 168, 169, 170, and 171. Testimony of Jeffrey Prosser, Transcript of 12/08/2008, Adv. Doc. No. 606, at 157. The Shoys guest house (also referred to as the beach house), is situated on plots 4, 4A and 10AA, and, at this time, is where the Prossers reside when in St. Croix. Testimony of Dawn Prosser, Transcript of 02/09/2009, Adv. Doc. No. 631, at 44, 72.[68]  The structure referred to as the main house is the large unfinished building on plots 5 and 10A.[69] Testimony of Dawn

---

[68] Dawn Prosser testified on February 9, 2009, that it was her understanding that Shoys, LLC, a company of which she claims to be the sole owner, owns the guest house. Transcript of 02/09/2009, Adv. Doc. No. 631, at 72. Dawn Prosser was not entirely sure, however, that Shoys, LLC actually owned the property:
Q. And it's your testimony that Shoys, LLC owns the guest house?
A. I think so. It was my understanding and then somewhere along the line I heard that it may not have been done correctly and -- but my understanding, yes, LLC owns the guest house.
Transcript of 02/09/2009, Adv. Doc. No. 631, at 72.
Shoys, LLC at one time did own certain parcels of the Estate Shoys property, however, those were conveyed to Dawn Prosser by Dawn Prosser, signing as the sole member and manager of Shoys, LLC. Thus, the evidence establishes that Shoy's LLC owns no part of the property at issue. *See* the following footnote.

[69] The deeds relating to the Estate Shoys property establish the following:
(1) Warranty deed dated January 15, 1990, in which Plots No. 5 and 10A were conveyed to Dawn E. LaBennett (Dawn Prosser), *see* TT127, at TT3 01317-19 (conveyance occurred before she and Jeffrey Prosser were married);
(2) Quitclaim deed dated December 30, 1992, in which grantors quitclaimed unto Jeffrey Prosser
(continued...)

Prosser, Transcript of 02/09/2009, Adv. Doc. No. 631, at 45. The main house is intended to be

the residence of Jeffrey and Dawn Prosser when construction is complete. Testimony of Dawn

Prosser, Transcript of 02/09/2009, Adv. Doc. No. 631, at 85.

　All but two of the deeds show both Jeffrey and Dawn Prosser as title owners of the

Estate Shoys plots. *See* note 69*, supra*. The two deeds which are titled in Dawn Prosser's name

alone are the deeds which convey the plots where the guest house and main house are situated.

To conform his bankruptcy schedules to the deeds, Jeffrey Prosser filed an Amended Schedule A

(the most recent schedule is dated January 11, 2008) that now indicates that Shoy's Plots 168,

169, 170, and 171 are owned as tenants by the entirety, and that he has only a possessory interest

in plots 4, 4A, 4, 10A, and 10AA, where the homes sit. TT6, at TT0050.[70]

---

[69](...continued)
and Dawn Prosser any interest in Plot No. 5 and Plot No. 10A, *see* TT127, at TT3 01320-24;
(3) Warranty deed dated June 10, 1994, in which Plot No. 169 was conveyed to Jeffrey Prosser
and Dawn Prosser, *see* TT127, at TT3 01305-08;
(4) Warranty deed dated June 11, 1994, in which Plot No. 168 was conveyed to Jeffrey Prosser
and Dawn Prosser, *see* TT127, at TT3 01301-04;
(5) Warranty deed dated July 12, 1994, in which Plot No. 170 was conveyed to Jeffrey Prosser
and Dawn Prosser, *see* TT127, at TT3 01309-12;
(6) Warranty deed dated October 3, 1998, in which Plot No. 171 was conveyed to Jeffrey Prosser
and Dawn Prosser, *see* TT127, at TT3 01313-16; and
(7) Warranty deed dated August 31, 2005, in which Dawn E. Prosser as sole member and
manager of Anna's Hope (Shoys), LLC, the Grantor, conveyed to Dawn E. Prosser Rem. Plot 4,
Plot 4-A, and Plot 10-AA, *see* TT127, at TT3 01297-01300.
　Pursuant to 28 V.I.C. §7(c), "A conveyance or devise of real property to husband and
wife jointly creates an estate by the entirety unless otherwise provided in the deed or will."

[70] On his Schedule A as of September 25, 2006, Jeffrey Prosser listed Shoys Plot Nos.
168, 169, 170, and 171 as property owned as tenants by the entirety but did not provide any
information on Schedule A regarding the other Estate Shoys Plots where the guest house and
main house are located. TT2, at TT00011. His Amended Schedule A, dated February 5, 2007,
adds Plots 4A, 5A, 10A, and 10AA (subsequently amended to correct the legal description as
Plots 4, 4A, 5, 10A, and 10AA), in which he lists a possessory interest. TT3, at TT00026. Jeffrey
(continued...)

11. Other than payments made by New ICC to AON Risk Services, the payments made by New ICC related to Estate Shoys were recorded as contra equity.[71]

The Chapter 11 Trustee contends that "New ICC made approximately $13 million in direct payments to the various third-party vendors working on the construction of the residence at Rem 4, Plot Nos. 5A & 10A, Shoy's Christiansted, St. Croix, U.S.V.I., the unfinished palatial mansion in St. Croix intended to be lived in by Jeff Prosser and Dawn Prosser." Trustee Springel's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 656, at ¶22. Mr. Barbee testified that, of the payments made by New ICC, he was able to trace ninety-six percent of those payments to the contra equity account. Transcript of 03/23/2009, Adv. Doc. No. 642, at 155. As to the remaining four percent, he stated that he was not testifying that the remaining percentage was not posted to the contra equity account, but that he was simply unable to trace them. *Id.* According to Jeffrey Prosser, the payments for the construction of the Estate Shoys main house were made directly from his income through either his personal accounts or with payments run through contra equity. Transcript of 12/08/2008, Adv. Doc. No. 606, at 170; TT177; TT196; TT8. The Chapter 11 Trustee has not provided evidence to the contrary. Furthermore, the books and records of New ICC do not reflect ownership of the Shoys main house. Testimony of Ingrid Christian, Transcript of 11/17/2008, Adv. Doc. No. 589, at 77. We find, based upon the evidence, that any payments out of New ICC for the construction of the

---

[70](...continued)
Prosser's interest is identified in the same manner in his subsequently filed Amended Schedules dated November 30, 2007, and January 11, 2008. *See* TT5, at TT00039; TT6, at TT00050.

[71] Ms. Christian was not assigned the task of identifying how New ICC recorded transactions, whether as contra equity or business expenses, *see* discussion *infra* at item 32. She did, however, identify that the AON Risk Services payments were expensed by New ICC.

main house were recorded as contra equity.

However, insurance payments relating to the Estate Shoys property were recorded inconsistently. Generally, insurance payments were recorded in the contra equity account, and consequently, these payments were not expensed by New ICC. *See* Testimony of Christian, Transcript of 11/17/2008, Adv. Doc. No. 589, at 123-24. The payments to AON Risk Services for builder's risk on the construction of the main house on Estate Shoys were treated differently. They were actually expensed by New ICC as opposed to being run through contra equity. *Id.* at 82, 124. "[T]he AON Risk Builder's payment was clearly...for insurance provided on the Shoys mansion and it was included as an expense to New ICC as opposed in the [sic] Due from Shareholders Account." *Id.* at 124. The amount paid to AON Risk Services by New ICC totaled $591,941.81. *See* TT60, at TT4 1824; Tab 19 to Exhibit TT8. The purpose of constructing the main house on Estate Shoys, titled solely in Dawn's name, was for a personal residence for Jeffrey and Dawn Prosser. Therefore, we find that the corporate funds paid to AON Risk Services were used for the benefit of Jeffrey and Dawn Prosser without any benefit to New ICC. However, there is no proof that any Defendant had possession, custody, or control of those funds during the bankruptcy case as is required by §542(a). Thus, although the benefit of this transfer inured only to the benefit of Dawn Prosser as alleged sole owner and Jeffrey Prosser to the extent he has an interest, possessory or otherwise, in the property for which the risk premium was made, neither Jeffery nor Dawn Prosser have been shown to have the requisite "possession, custody, or control" of the payments which were made to AON Risk Services. Thus, turnover is not warranted.

**12. Jeffrey Prosser retained control of and continued to enjoy the use of the Estate Shoys property, including the land titled in Dawn Prosser's name only, and represented that it was, in fact, his property.**

The Chapter 7 Trustee contends that, despite the fact that certain parcels of property are titled in Dawn Prosser's name alone, Jeffrey Prosser has an equitable interest in property which he purchased and represented to be his own. Chapter 7 Trustee's Post Trial Brief Regarding Turnover Adversary, Adv. Doc. No. 659, at 17-18. The evidence supports this contention and we so find. Pursuant to 11 U.S.C. §541, the property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case...."[72]

Mrs. Prosser testified that she is the 100% sole owner of both the guest house and the main house. Transcript of 02/09/2009, Adv. Doc. No. 631, at 45. However, immediately thereafter, Mrs. Prosser admitted that Mr. Prosser was the source of funds used to purchase the guest house. *Id.* According to Jeffrey Prosser, the payments for the construction of the Estate Shoys main house were made directly from his income through either his personal accounts or with payments run through contra equity. Transcript of 12/08/2008, Adv. Doc. No. 606, at 170; TT177; TT196; TT8. Yet, Mr. Prosser asserts only a possessory interest in the property on which

---

[72] An "equitable interest" is defined as "[a]n interest held by virtue of an equitable title or claimed on equitable grounds, such as the interest held by a trust beneficiary." BLACK'S LAW DICTIONARY (9th ed. 2009). "Equitable" is defined as "[j]ust; consistent with principles of justice and right." *Id. See In re Linderman*, 20 B.R. 826, 829 (Bankr. W.D. Wash. 1982 (finding that "[t]he application of the non-bankruptcy law of Washington defining a beneficial interest clearly indicates that [the corporate debtor] acquired an equitable interest in the individual debtors' real property by its payment of the sum of $5,440.00 toward mortgage payments from the period of December, 1978 through June, 1981. This being the case, said equitable interest in property should be included in the bankruptcy estate of [the corporate debtor]....") Thus, payment can create an equitable interest.

the guest house and main house sit. Transcript of 12/08/2008, Adv. Doc. No. 606, at 156; TT5, at

TT00039; TT6, at TT00050.

Regardless of title, the undisputed evidence established that Jeffrey Prosser has, on

multiple occasions, represented that the main house and guest (beach) house were his property. In

his personal financial statement dated May 1, 2002, to Bank of America N.A., Jeffrey Prosser

listed both the Shoys main house, with a value of $4,500,000.00, and the Shoys guest house, with

a value of $3,000,000.00, as his own assets "free of any interest or claim of interest thereto of any

other person...." TT134, at TT3 1360-1361.[73] In addition, Jeffrey Prosser provided a balance

sheet to Valentino McBean, who is the Senior Officer for Banco Popular in the Virgin Islands, a

bank from which Jeffrey Prosser has sought loans.[74] Testimony of Jeffrey Prosser, Transcript of

12/08/2008, Adv. Doc. No. 606, at 176; TT135, at TT3 01365. That December 31, 2002, balance

sheet also lists the Shoys (main) house and guest (beach) house as Mr. Prosser's personal assets.

TT134, at TT3 1366. Subsequently, Mr. Prosser provided a balance sheet, dated December 31,

2003, for himself and Dawn Prosser to Mr. Dow, the president of Virgin Islands Community

---

[73] Jeffrey Prosser signed the Bank of America Certification of Financial Statement in which he certified "that the financial information set forth on the financial statement dated 05/01/02 and furnished to Bank of America herewith is true, accurate and complete in all material respects; that such statement, taken as a whole, presents a fair summary of the undersigned's financial condition as of the date of such statement; that each of the assets set forth therein is owned by the undersigned free of any interest or claim of interest thereto of any other person.. . . ." TT134, at TT3 01360. Jeffrey Prosser testified that the signatures appearing on the Certification of Financial Statement and on his May 1, 2002 balance sheet, which follows that Certification, are his own. Transcript of 12/08/2008, Adv. Doc. No. 606, at 173.

[74] Jeffrey Prosser testified that his signature appears on the balance sheet dated December 31, 2002, in TT134 following a fax cover sheet to Mr. McBean. Transcript of 12/08/2008, Adv. Doc. No. 606, at 176-77; TT134, at TT3 01366.

54

Bank (VICB).[75] Testimony of Jeffrey Prosser, Transcript of 12/08/2008, Adv. Doc. No. 606, at 177; TT134, at TT3 01367-68. The joint balance sheet lists the Shoys main house as worth $4,500,000.00 and the guest house as worth $2,000,000.00. TT134, at TT3 01368. Thus, Jeffrey Prosser claimed ownership of the Shoys houses on his personal balance sheets provided to Bank of America, Banco Popular, and VICB. TT134, at TT3 01361, 01366, 01368.[76]

There is additional evidence that Mr. Prosser has an equitable interest in the homes. The two homes on Estate Shoys are encumbered by mortgages. Testimony of Jeffrey Prosser, Transcript of 12/08/2008, Adv. Doc. No. 606, at 161. The Merrill Lynch mortgage is on the main house and the First Bank mortgage is on the guest house. *Id.* The Merrill Lynch mortgage was taken in approximately 1990 and the First Bank mortgage was in either 2004 or 2005. *Id.* Mr. Prosser testified that he makes the monthly mortgage payments for both Estate Shoys mortgages. *Id.* Both Jeffrey J. Prosser and Dawn E. Prosser are listed as mortgagors on the First Bank Puerto Rico mortgage taken on the guest house. DP 67. Both Jeffrey J. Prosser and Dawn E. Prosser are listed as mortgagors on the Merrill Lynch Credit Corporation mortgage taken on the main house. DP 68.

Jeffrey and Dawn Prosser have provided muddled testimony as to an understanding they had regarding ownership of property, allegedly for estate planning purposes. Although first

---

[75] The balance sheet sent to Mr. Dow was signed by Jeffrey Prosser and the signature is dated February 17, 2004. Testimony of Jeffrey Prosser, Transcript of 12/08/2008, Adv. Doc. No. 606, at 177-78; TT134, at TT3 01368.

[76] Jeffrey Prosser testified that he never recalled claiming the Estate Shoys homes as his assets. Transcript of 12/08/2008, Adv. Doc. No. 606, at 169-70.

denying that there was any written agreement, when its existence was discovered,[77] Jeffrey and Dawn Prosser refused to produce the document. The Chapter 7 Trustee filed an emergency motion to compel production, Adv. Doc. No. 430, which was granted by this court's order dated August 22, 2008, Adv. Doc. No. 431. As relevant here, pursuant to MPA entered into by the Prossers on January 18, 2006, "All real property titled in the name of Dawn Prosser and recorded at the Office of the Record of Deeds, St. Croix, U.S. Virgin Islands" is listed under the heading "Description of Separate Property of Dawn E. Prosser". TT157. However, on Dawn E. Prosser's Balance Sheet dated six months after the MPA, on June 30, 2006, beneath the "Real Estate" subcategory of her assets is written: "Shoys (50%)." Mrs. Prosser recognized this document as her balance sheet as of that date. *See* Testimony of Dawn Prosser, Transcript of 02/09/2009, Adv. Doc. No. 631, at 42. Thus, this document, too, is credible evidence supporting the finding that the Prossers intended that Jeffrey Prosser have, and, in fact, he has a 50% ownership interest in the property. *See* TT98, at TE 02597.

Notwithstanding the terms of the MPA, the credible evidence establishes that Jeffrey Prosser has more than a possessory interest in the Estate Shoys property, as reflected in documents issued by Jeffrey Prosser and others issued by Dawn Prosser identifying their assets. Jeffrey Prosser resides in the property and paid for its construction, maintenance, furnishings, and services such as lawn maintenance, etc. He has an equitable and beneficial interest therein.[78]

---

[77] In this court's Memorandum Opinion Regarding Exemptions Claimed by Debtor, we found that Mr. Prosser concealed the marital asset division agreement. Case No. 06-30009, Doc. No. 2613, 54-57.

[78] *See In re Stewart*, 325 Fed. Appx. 82, 84-85 (3d Cir. 2009) (finding the transferor retained a beneficial interest and imposing a resulting trust where a conveyance from mother to

(continued...)

13. Jeffrey Prosser has an ownership interest in the Hermon Hill property.

The Chapter 7 Trustee asserts that the property identified as "Hermon Hill" must be turned over pursuant to §542. *See* Chapter 7 Trustee's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 658, at ¶204. Plots 96 and 97-A, which are the Hermon Hill property, are located about twenty-five minutes from Estate Shoys and are completely separate from the Shoys property. Testimony of Jeffrey Prosser, Transcript of 12/08/2008, Adv. Doc. No. 606, at 158. The plots are vacant land. *Id.* Mr. Prosser testified that this property is owned jointly with Dawn Prosser as tenants by the entirety. Transcript of 12/09/2008, Adv. Doc. No. 615, at 156; TT6, at TT00050, in his Amended Schedule A, Jeffrey Prosser valued the property at $50,000. TT6, at TT00050. Jeffrey Prosser admits in his Amended Schedule A that he has an ownership interest in this property. Thus, Jeffrey Prosser's interest is property of the Chapter 7 estate and must be turned over to the Chapter 7 Trustee.[79]

14. Audio Equipment was purchased for the Prosses' residence in Palm Beach and the homes in

---

[78](...continued)
son was clearly for purposes of estate planning; the parties understood the transferor would own the property until her death; neither party's conduct changed; the transferor continued to live at the property and pay the costs associated with the property).

[79] Jeffrey Prosser claimed this property as exempt. *See* Amended Schedule C, Case No. 06-30009, Doc. No. 1226. However, his exemptions were denied for the reasons stated in the Memorandum Opinion Regarding Exemptions Claimed by Debtor. Case No. 06-30009, Doc. No. 2613. Jeffrey Prosser appealed the Order denying his exemptions, and that appeal is currently pending as Case No. 3:09-cv-00147.

St. Croix either by Jeffrey Prosser or through contra equity.[80]

The Chapter 11 Trustee asserts that "[p]ayments for expensive audio equipment located in the Prossers' personal Palm Beach residence were made by New ICC and/or Jeff Prosser." *See* Trustee Springel's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 656, at ¶26. Payments were made. However, the Chapter 11 Trustee has produced no evidence that payments made by New ICC were recorded as anything other than contra equity, and therefore has not established that New ICC has an interest in the audio equipment. The audio equipment was not shown to have been listed as an asset of New ICC.

The Chapter 7 Trustee asserts that Jeffrey Prosser paid for the audio equipment installed in the Palm Beach and Estate Shoys residence either through his own personal account or through contra equity. Chapter 7 Trustee's Proposed Findings of Fact and Conclusions of Law for Turnover Trial, Adv. Doc. No. 658, at ¶¶233-34. Jeffrey Prosser asserted that he could not remember who paid for the audio equipment in the guest house at the Estate Shoys property. *Id.* at ¶234. The records in evidence produced by Audio Advisors reflect payments made by New ICC and Jeffrey Prosser. TT16. Therefore, we find from the evidence at trial that the payments to Audio Advisors for equipment purchased for the Prossers' residences were paid for by Jeffrey Prosser directly or through the corporation and recorded as contra equity, and the audio equipment was intended for the joint use and enjoyment of the Prossers in their homes. Thus, Jeffrey Prosser has an interest in the audio equipment.

---

[80] The Trustee's similar contention regarding audio equipment in the Prosser home in Lake Placid, New York is now moot. That property was sold earlier in Jeffrey Prosser's bankruptcy case.

58

15. The Scott Lindsay purchases recorded as contra equity transactions were not recorded as
fixed assets of New ICC.

The Chapter 7 Trustee asserts that payments to Scott Lindsay, an interior designer, went
through the contra equity account and the items purchased were not recorded as fixed assets of
New ICC. *See* Chapter 7 Trustee's Proposed Findings of Fact and Conclusions of Law for
Turnover Trial, Adv. Doc. No. 658, at ¶249. We agree and so find. Scott Lindsay assisted with
furnishing the Palm Beach, Lake Placid, and St. Croix properties. Testimony of Dawn Prosser,
Transcript of 02/09/2009, Adv. Doc. No. 631, at 91. Some of the furnishings purchased for use in
the main home in St. Croix when it was completed are still being stored by Scott Lindsay.[81] *Id.*
Payments totaling $5,051,075.00 were made to Scott Lindsay Antiques and Interiors for art and
furnishings from either Jeffrey Prosser's personal accounts or through New ICC. TT178; TT 196
(Tab 2). Jeffrey Prosser recalled that the majority of the Scott Lindsay invoices were paid either
directly by him or through the contra equity account. Transcript of 12/08/2008, Adv. Doc. No.
606, at 197. Mrs. Prosser confirmed that her husband paid for the furnishings in their homes.
Transcript of 12/10/2008, Adv. Doc. No. 604, at 187-88; Transcript of 02/09/2009, Adv. Doc.
No. 631, at 93. Mr. Prosser, however, testified that he did not own any furniture or works of art.
*See* Transcript of 03/26/2009, Adv. Doc. No. 642-3, at 147.

Despite Dennis Kanai's testimony that some of the items relating to Scott Lindsay were
on the books and records of New ICC as assets, he was unable to state where those assets were
located, whether in one of the Prossers' homes or on corporate property. Transcript of
03/10/2009, Adv. Doc. No. 637, at 140. The Chapter 11 Trustee did not provide evidence

---

[81] Construction is not complete.

regarding how the transactions involving payments to Scott Lindsay were treated by New ICC, whether as assets of the company or as transactions run through the contra equity account.[82] Alan Barbee testified that the payments for furniture from Scott Lindsay, were booked in the contra equity account and there was no corresponding entry in the books and records of New ICC placing these items into a fixed asset account. Transcript of 03/24/2009, Adv. Doc. No. 642-1, at 120-21. Based on Mr. Barbee's review of New ICC's books and records, he ascertained that New ICC's accounting department had allocated the payments to Scott Lindsay in a way to distinguish "between those items that were placed into contra-equity and those items that were retained in other financial categories of the company[.]" Transcript of 03/24/10, Adv. Doc. No. 642-1, at 74-75.[83]

We find that, other than the items identified on the corporate books and utilized at the Bjerget House (the corporate office) there is no evidence of any specific items which were

---

[82] Ingrid Christian testified as follows: "I do not recall with regards to the payments for Scott Lindsay whether or not they were in the 'Due from Shareholder Account.' I believe that some were and some were not. I do not recall which ones were. I can't testify to that here today." Transcript of 11/18/2008, Adv. Doc. No. 639, at 203.

Eling Joseph, Jeffrey Prosser's personal secretary, testified that furnishings purchased from Mr. Lindsay for the Palm Beach home were "noted as St. Croix office equipment or office furniture" for accounting. Transcript of 03/23/2009, Adv. Doc. No. 642, at 24. However, she did not testify specifically which furniture was so treated.

[83]
Q. In other words, if it's post- -- if an expenditure to Scott Lindsay was for furniture, that was allocated by the company to furniture purchased for the Bjerget house, the corporate office, that would -- did that show up in the fixed assets of the company?
A. Yes.
Q. And that fixed assets is a category on the audited statements of New ICC, correct?
A. Yes.
See Transcript of 03/24/10, Adv. Doc. No. 642-1, at 75.

considered corporate assets booked to contra equity. The Chapter 11 Trustee has not produced

evidence showing that specific furnishings purchased through Scott Lindsay were in fact booked

as fixed assets but used by the Prossers in one of their residences as personal property.


16. The purchases made from Michael Connors Antiques with New ICC funds were recorded as

contra equity transactions, not as assets of New ICC.

The Chapter 11 Trustee asserts that "New ICC paid for personal furnishings and fine arts

purchased from antique dealer Michael Connors that were not for New ICC." Trustee Springel's

Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 656, at ¶28. Jeffrey and

Dawn Prosser are in possession of various art work and antiques purchased from Michael

Connors Antiques. *See* Testimony of Jeffrey Prosser, Transcript of 12/09/2008, Adv. Doc. No.

615, at 59. A total of $1,385,134.25 was paid to Michael Connors from either Jeffrey Prosser's

personal account or through New ICC. TT179.[84] Of that amount, $749,312.77 was paid through

New ICC, and $635,821.48 was paid from Jeffrey Prosser's personal account. TT179.

Ms. Christian testified that she recalled that most of the payments through New ICC to

Michael Connors were posted to the contra equity account. Transcript of 11/19/2008, Adv. Doc.

No. 639-1, at 117. Mr. Barbee testified that the payments to Michael Connors identified on

TT179 could be allocated to three different categories: payments made by Jeffrey Prosser,

payments through contra equity, and payments recorded in another general ledger account of

New ICC. *See* Transcript of 03/24/2009, Adv. Doc. No. 642-1, at 76-77. Alan Barbee did not

---

[84] Dawn Prosser testified that she never wrote a check to Mr. Connors for the paintings
purchased through him for the Prossers' homes. Transcript of 02/09/2009, Adv. Doc. No. 631, at
130-31.

identify which of the New ICC payments were recorded as contra equity transactions.

We find that the Chapter 11 Trustee has not established that the corporations treated any of the art work that has not already been turned over by Jeffrey Prosser as corporate property. *See* items 17 and 18 *infra.*

<u>17. Art work and furniture funded through Jeffrey Prosser's personal account or through New ICC continued to be used by Jeffrey Prosser despite the assertion that he gifted all the property to Dawn Prosser.</u>

The Chapter 7 Trustee contends that the art work and furnishings which Jeffrey Prosser claims have been gifted to his wife are still used and enjoyed by Jeffrey Prosser without restriction. *See* Chapter 7 Trustee's Post Trial Brief Regarding Turnover Adversary, Adv. Doc. No. 659, at 20. The evidence supports the contention and we so find. Notwithstanding the Prossers' contention that Jeffrey Prosser gifted all of the furniture and art work to Dawn Prosser, the undisputed evidence is that Jeffrey Prosser continued to use and enjoy these items that were purchased and kept in his homes. *See* Testimony of Dawn Prosser, Transcript of 02/09/2009, Adv. Doc. No. 631, at 106-07.[85] Continued possession and use is inconsistent with the concept of

---

[85] Dawn Prosser testified as follows:
Q. Okay. And even though these items that are in Palm Beach you claim were gifted to you by your husband, you didn't prohibit him from using them?
A. No.
Q. And would that also be true with respect to the items that you have listed as being gifted to you by your husband that are located in St. Croix?
A. Correct.
Q. He's still entitled to use them, he can sleep in the bed, he can sit in the chairs and so forth?
A. Yes.

(continued...)

giving up right, title, and interest as is required for making a gift. *Remak v. Quinn*, 17 V.I. 552, 555 (D.V.I. 1980) .

Based on the undisputed evidence, we find that there were no gifts of furniture and art work. Rather Jeffrey Prosser retained a property interest in same. Further, as to furniture and art work in the Virgin Islands, the MPA does nothing more than acknowledge an agreement by the parties that items which Dawn Prosser acquired as gifts or by her own labor are her separate property. As stated above, the parties' conduct does not indicate a present intention to relinquish possession, use or control sufficient to gift these items, which Jeffrey Prosser continued to use and enjoy.[86]  Moreover, the evidence does not support the contention that Dawn Prosser acquired these items as a result of her own labor. Mrs. Prosser testified that "[f]or the most part" her only source of income after 1989 was Mr. Prosser. See Transcript of 12/10/2008, Adv. Doc. No. 604, at 163-64. Thus, the MPA, which does not by its own terms convey property, has no impact on ownership of this property. We find that Jeffrey Prosser retained an interest in the furniture and art work.

18. Jeffrey Prosser exercised control over the two Pissarro paintings loaned to the Jewish Museum and the Pissarro painting(s) remaining in the Prossers' residence.

---

[85](...continued)
Transcript of 02/09/2009, Adv. Doc. No. 631, at 107.

[86] The Restatement recognizes that when property is in the common possession of a donor and donee the delivery element of gifting becomes problematic. *See* Restatement (Third) Property §6.2, comment e. "In such a case, the purported gift may be established by proof (i) that the donor notified the donee that the property belongs to the donee and (ii) that subsequent conduct of the donor and donee was consistent with the donee's ownership of the property." Thus, the conduct of the parties is important in determining whether gifting occurred.

63

The Chapter 7 Trustee seeks turnover of Camille Pissarro paintings which he asserts are owned by Jeffrey Prosser.[87] *See* Chapter 7 Trustee's Post Trial Brief Regarding Turnover Adversary, Adv. Doc. No. 659, at 22. We find that, for purposes of this turnover action, the Chapter 7 estate has an interest in the three paintings at issue.

Two paintings by Camille Pissarro were loaned to the Jewish Museum: (1) *Une Crique a Saint Thomas, Antilles* (a.k.a. *Inlet and Sailboat*) and (2) *Paysage des Antilles: St. Thomas* (a.k.a. *Figures Conversing by a Country Road*). *See* DP 42 and 43. Regarding the paintings loaned to the Jewish Museum, both Incoming Loan Agreements were signed by Dawn Prosser on July 3, 2007. *Id.* However, despite the fact that Dawn Prosser signed the loan agreements, the arrangements for the loans were handled by Eling Joseph, the executive secretary to Jeffrey Prosser as the CEO and chairman of the board of New ICC, at the behest of Mr. Prosser. *See* Testimony of Eling Joseph, Transcript of 03/23/2009, Adv. Doc. No. 642, at 9, 45-46.[88] Eling Joseph was the one who actually filled out the applications for the Jewish Museum, and in the

---

[87] Mrs. Prosser testified that she owned either four or five Pissarro paintings, and one of these was an unfinished painting. *See* Transcript of 02/09/2009, Adv. Doc. No. 631, at 114. Mrs. Prosser further testified that one painting was turned over to the Chapter 11 Trustee, *see* note 90 *infra,* two Pissarro paintings were loaned to the Jewish museum, and two remain at the Prossers' residence. *Id.* at 114-15. However, the insurance coverage for the policy period of September 1, 2007 through September 1, 2008, shows only four Pissarro paintings, one of which is the painting that was turned over to the Chapter 11 Trustee. TT21, at TT01460-62. The accounting of paintings provided to Jeffrey Prosser by Michael Connors, through whom the purchases were made, lists the same four Pissarro paintings. *See* TT109, at TT3 00170-72. The court is unaware of a second painting that remains in the Prossers' home and finds from the cumulative evidence that there are only four. However, to the extent additional paintings exist, the same analysis provided herein applies to those paintings as well.

[88] *See* Testimony of Eling Joseph, Transcript of 03/23/2009, Adv. Doc. No. 642, at 46 ("Like I said, I was the one who communicated with [the museum]. I filled out the application. Mr. Prosser approved it and I organized the setting up of them going to the home, getting the painting, measuring it, packing it, and sending it to the Jewish Museum.")

process of making these arrangements, she did not have any dealings with Dawn Prosser. *Id.* at

46. Prior to the loan, these paintings were kept in the Palm Beach home. *Id.* Under the space

provided for shipping address and contact information in the agreements, the address listed is the

Prossers' Palm Beach residence; however, the contact person identified is Eling Joseph - not

Dawn Prosser. TT42 and TT43. Dawn Prosser was identified on the loan agreements as the

"Lender," at the instruction of Jeffrey Prosser, who according to Ms. Joseph, stated that because

of the "bankruptcy situation, he just wanted to have it in Dawn's name." Testimony of Eling

Joseph, Transcript of 03/23/2009, Adv. Doc. No. 642, at 47-48.

Nonetheless, Dawn Prosser claims that she is the sole owner of these paintings, which she

claims were acquired by way of gift from Jeffrey Prosser. *See* Testimony of Dawn Prosser,

Transcript of 02/09/2009, Adv. Doc. No. 631, at 123-24.[89] Yet, even she referred to the paintings

as a part of "our collection," which she corrected as "my collection" when asked about her

statement. *Id.* at 85. Also, inconsistent with Dawn Prosser's claim of sole ownership, is the

insurance policy covering, *inter alia*, these two paintings which lists Jeffrey J. Prosser and Dawn

E. Prosser as the insured. TT18, at TT00830-832.

In a letter dated October 10, 2000, addressed solely to Mr. Prosser, Mr. Connors provides

an accounting of the paintings that, according to the letter, *Mr. Prosser* purchased. TT109, at

TT3 00170-72. The accounting lists, *inter alia*, four Pissarro paintings: (1) *Une Crique a Saint*

---

[89] Jeffrey Prosser testified consistently with Dawn Prosser, that it was Dawn who loaned
the paintings to the museum and not he. *See* Transcript of 12/08/2008, Adv. Doc. No. 606, at
127. Jeffrey Prosser also testified that Dawn Prosser is the owner of the Pissarro paintings.
*See* Transcript of 12/09/2008, Adv. Doc. No. 615, at 216.

*Thomas, Antilles*, (2) *Woman Carrying a Jug*, (3) *Le Grand Noyer, Matin, Eragny,*[90] (4) *Paysage Des Antilles: St. Thomas*. *Id.* at TT2 00171-72. *Woman Carrying a Jug*[91] remains in the Prossers' residence. *See* Testimony of Dawn Prosser, Transcript of 02/09/2009, Adv. Doc. No. 631, at 114.

We find Dawn Prosser's claims of sole ownership to be inconsistent with the evidence. We find that Jeffrey Prosser exercised control over the two Pissarro paintings loaned to the Jewish Museum and the Pissarro painting(s) remaining in the Prossers' residence, and retained possession, use and enjoyment of all.

19. Jeffrey Prosser exercised control over and has an interest in the Blackamoor figures.[92]

The Chapter 7 Trustee asserts that Jeffrey Prosser's interest in works of art referred to as

---

[90] *Le Grand Noyer, Matin, Eragny*, which had been hanging in the Prossers' home, was voluntarily turned over to the Chapter 11 Trustee. *See* Trustee Springel's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 656, at 11. This one piece of art was scheduled on ICC's books as a fixed asset when the Chapter 11 Trustee took control of the company. *See* Testimony of Christian, Transcript of 11/17/2008, Adv. Doc. No. 589, at 149.

[91] *Woman Carrying a Jug* was "originally booked as an asset to the company and then it was re classed or reclassified into the 'Due from Shareholder Account' when that account was created." Testimony of Christian, Transcript 11/18/2008, Adv. Doc. No. 639, at 197-99.

[92] Ms. Christian testified that there was no indication within New ICC's books and records that the company paid for these figures. Transcript of 11/19/2008, Adv. Doc. No. 639-1, at 139. In a fax to Dawn Prosser dated October 25, 2007, Scott Lindsay provided a list of items which he states were sold to her and among them are the four Blackamoor figures. TT15, at TT 00409. The fax does not indicate the source of payment for the items. *Id.* We note that the Complaint commencing this Adversary was filed on October 19, 2007.  The invoice for the Blackamoor figures, dated December 27, 1997, states that the cost of the items is billed to "Mr. and Mrs. Jeffrey Prosser" and shipped to "Mr. and Mrs. Jeffrey Prosser." TT15, at TT00408. Thus, the fax to Dawn Prosser on October 25, 2007, does not establish that the figures are solely the property of Dawn Prosser. In fact, several of the invoices for items purchased from Scott Lindsay are addressed to Jeffrey Prosser alone.

66

"the Blackamoor figures" is evident as he identified himself as the owner of the sculptures.

*See* Chapter 7 Trustee's Post Trial Brief Regarding Turnover Adversary, Adv. Doc. No. 659, at

23. We agree based upon the evidence at trial. Dawn Prosser has claimed that the Blackamoor

figures, currently held by a third party for repair, are her sole property as a gift from her husband.

*See* TT47, at TT200309; Transcript of 12/10/2008, Adv. Doc. No. 604, at 224-225. However,

Jeffrey Prosser represented that he is the owner of these figures when he signed a conservation

treatment proposal. TT73.  Jeffrey Prosser specifically signed the proposal as "Owner" post-

petition on May 25, 2007. TT73. Mrs. Prosser was unable to identify who presently has

possession of the Blackamoor figures for the purpose of repairs. Transcript of 12/10/2008, Adv.

Doc. No. 604, at 224-25. Furthermore, a letter dated January 5, 1998, certifying the condition of

the Blackamoors was addressed solely to Jeffrey Prosser (TT21, at TT01486) and a letter dated

January 2, 1998, regarding the shipment of the figures was addressed to both Jeffrey and Dawn

Prosser from Scott Lindsay, (*Id.* at TT01487).

 Thus, the credible evidence substantiates Jeffrey Prosser's interest in the figures and we

find that he has an interest therein.


20. The millions of dollars in wines at issue ordered by Mr. Prosser were not purchased for use
by New ICC.

 The Chapter 7 Trustee asserts that wines Jeffrey Prosser purchased for personal use were

through the contra equity account and were not the same as wines that were purchased for

corporate events, which would have been expensed by New ICC.  *See* Chapter 7 Trustee's Post

Trial Brief Regarding Turnover Adversary, Adv. Doc. No. 659, at 24. We find that the credible

evidence supports this contention and that the wines at issue belong to Jeffrey Prosser's Chapter

7 estate. Wines were purchased from a variety of sources and paid for with different credit cards.

Eling Joseph would often place wine orders for Jeffrey Prosser. Testimony of Eling Joseph,

Transcript of 03/23/2009, Adv. Doc. No. 642, at 32. The purchases from Park Avenue Liquor

store were charged to one of Mr. Prosser's credit cards[93] and were generally shipped to one of his

homes. *Id.* at 32, 91-93. Eling Joseph also ordered wines for Mr. Prosser from a store in St.

Croix. *Id.* at 51. Ms. Joseph could not recall a time when Mr. Prosser purchased wines to be

shipped to New ICC for the company's use. Transcript of 03/23/2009, Adv. Doc. No. 642, at 34.

Ms. Christian determined, from review of Jeffrey Prosser's Banco Popular credit card

statements that for the period of approximately January 1999 through either July or August of

2006, when the credit card accounts were closed, that over $6 million in wine purchases were

made from Park Avenue Liquors and paid for through the Banco Popular account. Transcript of

11/18/2008, Adv. Doc. No. 639, at 82; TT30. Ms. Christian testified that she "was able to

determine that all payments on the [Banco Popular] card were made by New ICC or by one of the

other entities, inter companies to New ICC. So ICC was the ultimate payer of the amount."

Transcript of 11/18/2008, Adv. Doc. No.  639, at 86. However, because of the way in which

Jeffrey Prosser directed Banco Popular transactions to be booked by the corporation, Ms.

Christian could not testify as to whether these were contra equity transactions:

> A. You can't really -- it's difficult to say how they were put into the contra-equity
> account because, as I've testified before, with regards to the Banco Popular

---

[93] Significant purchases of wine were made using both the Banco Popular credit card and
American Express credit card. *See* Testimony of Christian, Transcript of 11/19/2008, Doc. No.
639-1, at 167; TT28 (American Express credit card statements); TT30 (Banco Popular credit card
statements).

statements, there would be total expenses on a Banco Popular credit card that
would be expensed, and then a portion of that amount was booked into the
contra-equity account, but you could not do a particular line item by line item
analysis to determine what exactly was moved into the contra-equity account. A
portion of the expenses as a number was put into that account. So I do not know
what that specifically related to.

Q. So some of the wine charges you've seen in the contra-equity account?

A. With regards to the American Express I guess they'd be in the contra-equity
account. Again, I did not do a review to determine what was in the contra-equity
account versus any other account on the company's books and records. That was
not my charge. That was not the purpose of this particular Exhibit TT60.

Transcript of 11/19/2008, Adv. Doc. No. 639-1, at 170.

While it is clear that not all of the wines were booked into contra equity, based on her

review of the books and records, Ms. Christian did not tie any particular payments that New ICC

made on the Banco Popular accounts to any particular purchase of wines though she did review

correspondence approving purchases of wine. *See* Transcript of 11/19/2008, Adv. Doc. No. 639-

1, at 173. She testified that it would be possible to take certain steps in an effort to trace some of

the bottles of wine but that it would take significant time and effort to do so and she was unsure

whether she would be able to trace the total number. *Id.*

As to the American Express payments, those were reflected as contra equity transactions.

*See* Testimony of Christian, Transcript of 11/19/2008, Adv. Doc. No. 639-1, at 171; Testimony

of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 25. There is no indication from the

books and records that the purchases were for the company. Testimony of Christian, Transcript

of 11/18/2008, Adv. Doc. No. 639, at 84-85. Although the evidence concerning the recording of

the Banco Popular card purchases indicates that New ICC paid for the wines, the wines

themselves were not listed as corporate assets.

We find that the wines were purchased for Jeffrey Prosser. The purchases were booked

through the contra equity account when paid with an American Express credit card and that

unspecified portions also were booked through contra equity when paid with a Banco Popular

credit card. To the extent New ICC funds not recorded in contra equity were used, there is no

evidence to support which wines, or how much was paid for them, are attributable to New ICC

such that the Chapter 11 Trustee can substantiate turnover and recover the value.


21. Wines were ordered at the behest of Mr. Prosser.

     Mr. Prosser ordered substantial quantities of wines. At times, he directed Eling Joseph,

his secretary, to place orders on his behalf from Park Avenue Liquor as well as a store in St.

Croix. *See* Testimony of Joseph, Transcript of 03/23/2009, Adv. Doc. No. 642, at 32, 51. Jeffrey

Prosser also ordered substantial quantities of wine with Peter Weissman, and pursuant to this

relationship, they purchased both wines and future contracts of wines. *See* Testimony of Jeffrey

Prosser, Transcript of 12/08/2008, Adv. Doc. No. 606, at 33, 46-47.

     The Chapter 7 Trustee asserts that, despite Dawn Prosser's claim of an ownership interest

in the wines,[94] the evidence shows that Jeffrey Prosser is solely responsible for the purchase and

---

[94] In Dawn Prosser's Proposed Findings of Fact, Conclusions of Law, Dawn Prosser states that "[a]ll of the wine in question has been consumed. As such, the issue of turnover of the wine is moot." Adv. Doc. No. 674, at ¶10. However, at trial on December 10, 2008, she agreed that there is a collection of wines that are in dispute in this adversary proceeding. Transcript of 12/10/2008, Adv. Doc. No. 604, at 217. Moreover, half of the wine collection was sold by the Chapter 7 Trustee pursuant to Court Order. *See* Order (I) Authorizing Procedures for Sales of the Debtor's Personal Property Assets; (II) Approving Sales of the Debtor's Personal Property Assets Free and Clear of Liens, Claims, Interests, and Encumbrances; and (III) Approving Form of Notice of Sales of Assets Pursuant to 11 U.S.C. §§105 and 363, Fed.R.Bankr.P. 6004 and LBR 6004-1, Case No. 06-30009, Doc. No. 1494; Chapter 7 Trustee's Notice of Proposed Auction and Sale of Debtor's Personal Property Assets Pursuant to 11 U.S.C. §363 and Court Approved Sale Procedures, Case No. 06-30009, Doc. No. 2337 and Exhibit A thereto; Chapter 7 Trustee's

(continued...)

storage of the wines at issue.  *See* Chapter 7 Trustee's Post Trial Brief Regarding Turnover

Adversary, Adv. Doc. No. 659, at 24. His contention is supported by all of the credible evidence.

Dawn Prosser testified that, while she may have purchased an odd bottle of white wine or

champagne at some point in time, she did not purchase wines for investment purposes and she

never purchased wine by the case or in large quantities. *See* Transcript of 12/10/2008, Adv. Doc.

No. 604, at 221; Transcript of 02/09/2009, Adv. Doc. No.  631, at 87.[95] Dawn Prosser assumed,

but did not know for certain, that Jeffrey Prosser purchased the wines that they stored in any of

the storage facilities or homes in Palm Beach, St. Croix, and formerly in the home in Lake

Placid. Transcript of 02/09/2009, Adv. Doc. No.  631, at 87.  Furthermore, she never personally

purchased wines through or with Peter Weissman, though Jeffrey Prosser did.  *See* Testimony of

Dawn Prosser, Transcript of 12/10/2008, Adv. Doc. No. 604, at 221-23 .

    As to the purchases of wines with Peter Weissman, Jeffrey Prosser wrote a letter dated

October 12, 1999, to Mr. Weissman in which he stated, "As you are aware the relationship

involving the purchase of wines and future contracts of wines is strictly between yourself and

I."[96] TT121, at TT3 01086; Transcript of 12/08/2008, Adv. Doc. No. 606, at 46. Furthermore,

---

[94](...continued)
Report of Sale Regarding Certain of Debtor's Personal Property Assets Pursuant to 11 U.S.C.
§363 and Court Approved Sale Procedures, Case No. 06-30009, Doc. No. 2523. The other half of
the wine collection is subject to the preliminary injunction. If, in fact, the wines have been
consumed in violation of the preliminary injunction, then the Chapter 7 Trustee is entitled to the
value thereof.

[95] According to Sybil Prosser, Dawn Prosser drank champagne more than wine.
*See* 12/19/2007 Deposition of Sybil Prosser, at 92.

[96] Despite the fact that the agreement between Jeffrey Prosser and Peter Weissman was
memorialized in writing as purchases just between the two of them, Jeffrey Prosser provides a
                                                                            (continued...)

Peter Weissman recalled that, while Mrs. Prosser may have been present for a few meetings he

had with Jeffrey Prosser, "she wasn't actively involved in any of the decision making, any of the

financial considerations or the approval of the wine proposed to be purchased." 08/12/2008

Deposition of Weissman, at 25.

Despite the overwhelming and otherwise uncontradicted evidence to the contrary, Dawn

Prosser implausibly asserts that, pursuant to an understanding that she had with Mr. Prosser, the

wines, or at least a portion of them, are hers. Transcript of 12/10/2008, Adv. Doc. No. 604, at

170. At times, Mrs. Prosser claimed only a "half interest" in the wines. *See* Transcript of

02/09/2009, Adv. Doc. No.  631, at 86-87, 135. However, there is no credible evidence that

Dawn Prosser has any interest in the wines.[97] The bulk orders of wine were purchased pursuant to

an agreement between Jeffrey Prosser and Mr. Weissman, with no indication that Dawn Prosser

had any interest in the wines purchased. The wines purchased through others and paid for with

--------

[96](...continued)
different recollection in his testimony. *See* Transcript of 12/08/2008, Adv. Doc. No. 606, at 38-
39 ("I think that Peter Weissman, and there were certain wines, again, that Dawn, when we
ordered wine together, that -- and when I say together, it just wasn't Peter Weissman and I. It was
Peter Weissman and his family, his children's Trust and so forth, and Dawn and I. When we as a
group, ordered wine, everybody, just because it was a small group, pretty well knew who liked
which wines and when they were being ordered.") However, we find the writing, which was
contemporaneous in time with these purchases to be more credible than testimony nearly ten
years later.

[97] The MPA, which purports to define Dawn Prosser's separate interest in furniture,
fixtures, *objects d'art*, and personal effects such as clothing and jewelry that are located within
the St. Croix real property by its own terms does not define any ownership interest in the wines.
Jeffrey Prosser listed on his Amended Schedule B as of January 11, 2008, that he and
Dawn owned the wines jointly. *See* TT6, at TT00051. Previously filed versions of Schedule B
(dated before the Amended Schedules of November 30, 2007) did not specifically list the wines.
*See* TT2, at TT00012-13; TT3, at TT00027-28. This Adversary Proceeding commenced on
October 19, 2007.

Jeffrey Prosser's corporate or personal credit cards likewise were made with no consideration by, to, or from Dawn Prosser. As indicated by Jeffrey Prosser's letter, he considered his purchases of wines to be his own venture.

Thus, the credible evidence supports the conclusion, and we find that, all wines were solely Jeffrey Prosser's. As such, all wines must be turned over to the Chapter 7 Trustee.

22. The women's jewelry items funded and/or insured through the contra equity account are not treated as assets of New ICC.

It is the position of the Chapter 7 Trustee that Jeffrey Prosser, in an effort to minimize his personal assets, purchased jewelry which Dawn Prosser claims ownership of as gifts from her husband, but Jeffrey Prosser is the true owner of the jewelry.  *See* Chapter 7 Trustee's Post Trial Brief Regarding Turnover Adversary, Adv. Doc. No. 659, at 25. We disagree and find that, to the extent Jeffrey Prosser had an interest in the jewelry, he intended to gift the jewelry to Dawn Prosser. Dawn Prosser asserts that Jeffrey Prosser purchased jewelry for her as gifts, and those items are her property, not property of New ICC. *See* Dawn Prosser's Proposed Findings of Fact, Conclusions of Law, Adv. Doc. No. 674, at ¶¶44, 43 (Paragraph 43 is incorrectly numbered. It follows the paragraph identified as 45 and is prior to the paragraph identified as 46).  The jewelry possessed by Dawn Prosser is not listed in the fixed assets of New ICC. *See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 135. Ingrid Christian has never seen Dawn Prosser's jewelry listed on a balance sheet of New ICC. *See* Transcript of 11/18/2009, Adv. Doc. No. 639, at 228. Jeffrey Prosser testified that he purchased most of the jewelry listed on the

schedules compiled by Dawn Prosser which identify the assets she claims belong to her.[98]

Transcript of 12/08/2008, Adv. Doc. No.  606, at 108. The credible evidence established that Mr.

Prosser treated the purchases of jewelry as gifts for his wife. *See* Testimony of Joseph, Transcript

of 03/23/2009, Adv. Doc. No. 642, at 107.

Thus, for purposes of this turnover action, we find that New ICC did not treat these assets

as its own and that Jeffrey Prosser did, in fact, intend to gift the jewelry to Dawn Prosser. Thus,

turnover of the jewelry is not appropriate. Neither trustee proved the elements of turnover as to

the jewelry.

23. The Mercedes SLK 350 allegedly gifted to Sybil Prosser was not treated as an asset of New
ICC and was recorded as a contra equity transaction.

The Chapter 11 Trustee asserts that a Mercedes SLK 350 must be turned over pursuant to

§542 on the basis that New ICC paid the purchase price of the vehicle. Trustee Springel's

Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 656, at ¶¶36, 106. It is

undisputed that funds from New ICC's bank account were used to pay for the vehicle currently in

the possession of Sybil Prosser. *See* TT89, at TE2 02485; Testimony of Jeffrey Prosser,

Transcript of 12/09/2008, Adv. Doc. No.  615, at 219; Tab 158 to TT8, at T05820-22. However,

for the reasons that follow, we find that the Chapter 11 estate has not established turnover as to it.

The vehicle was purchased at a dealership in the San Francisco area and delivered to Sybil

---

[98] Dawn Prosser compiled an inventory of assets which she contends are her property.
These schedules are found in Exhibit TT47.

Prosser. *See* 12/19/2007 Deposition of Sybil Prosser, at 93.[99] The Mercedes is titled in Sybil

Prosser's name. *See* 12/19/2007 Deposition of Sybil Prosser, at 77. According to Sybil Prosser,

the Mercedes was a graduation gift from her father, and she gave no thought to who paid for it.

12/19/2007 Deposition of Sybil Prosser, at 77. Dawn Prosser testified that she and Jeffrey

Prosser purchased the vehicle for Sybil Prosser. *See* Transcript of 02/02/2009, Adv. Doc. No.

631, at 110-11.

Despite this evidence, we note that in an email from Eling Joseph to the accounting

department, the Mercedes was characterized as equipment for Shoys[100] at the direction of Jeffrey

Prosser. *See* Testimony of Eling Joseph, Transcript of 03/23/2009, Adv. Doc. No. 642, at 15-17,

25-26; Tab 158 to Exhibit TT8, at T 05823.[101] Ms. Christian did not recall finding any indication

that the Mercedes was recorded as a fixed asset of New ICC. *See* Transcript of 11/18/2008, Adv.

Doc. No. 639, at 223. In fact, the payment to Smythe European, Inc. on May 25, 2005, in the

amount of $55,708.00 for the purchase of the Mercedes is reflected on company's general ledger

among the transactions in the receivables LLC account, accounted for as contra equity on the

---

[99] Sybil Prosser lived in San Francisco for a year, but at the time of her deposition on December 19, 2007, she had moved to Miami, Florida. *See* 12/19/2007 Deposition, at 4-5.

[100] The Chapter 11 Trustee has made much of the characterization of the Mercedes as equipment for Shoys. The reference to Shoys, although not specified in the email, appears from testimony to mean the main house that was being constructed as a residence for the Prossers. *See* Transcript of 03/23/2009, Adv. Doc. No. 642, at 25-26. Nonetheless, the attempt to characterize the property in this manner would not result in a "personal" expenditure appearing as a "business" purchase, but rather would continue to appear as personal in nature just with a different purpose. The purpose of intentionally mischaracterizing the transaction was not developed on the record.

[101] According to Eling Joseph, the Mercedes was intended to be for Sybil from the time the Mercedes dealership was first contacted. Transcript of 03/23/2009, Adv. Doc. No. 642, at 13.

audited financial statements. *See* DP18, at 001909; Testimony of Barbee, Transcript of

03/23/2009, Adv. Doc. No. 642, at 163-64[102]; Tab 158 to TT8.

We find that Jeffrey Prosser directed New ICC funds to be used to purchase the Mercedes

for Sybil Prosser. The transaction was reflected in contra equity, and the company did not treat

the vehicle as one of its assets. Therefore, we find that the Chapter 11 Trustee has not proven an

interest in the Mercedes owned by Sybil Prosser.


24. Lyndon Adrian Prosser's condominium was not treated as an asset of New ICC, and he

received a housing allowance from New ICC as a result of his employment.

The Chapter 11 Trustee asserts that the condominium owned by Lyndon Adrian

LaBennett Prosser ("Adrian Prosser") is property of the Chapter 11 estate as the corporation

funded the purchase of the condominium. *See* Trustee Springel's Proposed Findings of Fact and

Conclusions of Law, Adv. Doc. No. 656, at ¶¶21, 37, 111. Although the company did provide

funds, the Chapter 11 Trustee has not established entitlement to turnover. In his Amended

Response to Plaintiff's First Request for Admissions, Adrian Prosser admitted that

approximately $104,132.09[103] was paid to him by ICC-LLC on or about April 29, 2005, as a

---

[102] Mr. Barbee testified that the receivables LLC corresponds to contra equity. Testimony of Barbee, Transcript of 03/23/2009, Adv. Doc. No. 642, at 164-65. "[The receivables LLC] is a component of the, of the total dollar amount that is reflected as a reduction [*sic*] to the capital deficit on the balance sheet of New ICC, and also in the statement of, of capital deficits." *Id.* at 164. The evidence, including other testimony of Mr. Barbee, proves that the capital deficit was increasing. The word "reduction" is clearly a "slip of the tongue."

[103] Ms. Christian identified "a payment made on April 28, 2005 to the benefit of Adrian Prosser for the amount of $104,132.09" from ICC-LLC.  Transcript of 11/18/2008, Adv. Doc. No. 639, at 104; TT63, at TE2 01909. According to Ms. Christian, "TT63 reflects non-business

(continued...)

down payment on the purchase of a residence, referred to as the West Palm Beach

Condominium. TT86, at TE 02472-73. Jeffrey Prosser testified that "[t]here was certainly an

advance. Whether that was through LLC or through the contra equity, I don't know." Testimony

of 12/09/2008, Adv. Doc. No. 615, at 215. Mr. Prosser further testified that he could not recall

the characterization of this transfer. *Id.* At his deposition taken December 19, 2007, Adrian

Prosser testified that he put $120,000.00 as a down payment on the West Palm Beach

Condominium. 12/19/2007 Deposition of Adrian Prosser, at 9. He understood the money to be a

gift from his parents. *Id.* at 9-10. Clearly, the condominium itself was not listed as a corporate

asset.

The evidence indicates that the $104,132.09 was booked by New ICC in the contra equity

account. Based upon a review of the receivables LLC account on New ICC's general ledger

(accounted for as contra equity on the audited financial statements), a transaction was posted to

the account as a transfer to LLC in the amount of $104,017.09 the day before ICC LLC

transferred $104,132.09 to Adrian Prosser.[104] DP18, at 001907. The difference in the amounts is

---

[103](...continued)
payments made out of ICC, LLC for the personal benefit of Jeffrey Prosser and/or his family. The
activities [sic] based on a  bank account that was opened up in the name of ICC, LLC in 2004,
and the activity is taken from that. The activity is identified from that bank account and the
accounting records that have been kept by New ICC with regards to this particular bank
account." Transcript of 11/18/2008, Adv. Doc. No. 639, at 102.

[104] Mr. Kanai testified that receivables LLC and receivables from shareholder were treated
the same:
> Q. ...[W]hen you say receivables LLC, are you treating that as one and the same as
> receivables form shareholder?
> A. Correct. As I stated earlier, we used the convention that the majority of the
> activity that went above to any of the holding companies above, or Mr. Prosser, or
> his family personally, all was aggregated through that receivables account.

(continued...)

exactly $115.00.

For the three months prior to his deposition, Adrian made the mortgage payments from his own accounts.12/19/2007 Deposition of Adrian Prosser, at  at 11. Prior to that, he testified that the mortgage payments were made through the corporation as part of his compensation. *Id.* at 11-12.[105] Ingrid Christian testified that "Adrian Prosser was an employee of the company[106] for a few years' time...and so there were housing payments made for him of I think approximately $5,000 a month. They were excluded from the schedule [of non-business payments] because he was an employee and it was a benefit that was received by other executives of the company." Transcript of 11/17/2008, Adv. Doc. No. 589, at 132; *See also* Transcript of 11/18/2008, Adv. Doc. No. 639, at 90. That is, these housing payments were treated by the Chapter 11 Trustee as having been for a business purpose. As to the down payment categorized as to or for the benefit of Adrian Prosser by Ms. Christian in her analysis of New ICC's books and records, we find the transaction was recorded as a receivable on the internal ledger of New ICC and ultimately recorded as a contra equity transaction on the financial statements. *See* Transcript of 11/19/2008,

---

[104](...continued)
Transcript of 03/10/2009, Adv. Doc. No. 637, at 28.

[105] "Look, I don't know where the logic came from, how it came about. I never had a conversation with anybody about the amount that I should get. I know what the mortgage was going to be. I know what the quarterly homeowners association fees are, and I know what the taxes are going to be at the end of the year. So based on those numbers, I have a housing allowance." *See* 12/19/2007 Deposition of Adrian Prosser, at 54.

[106] Ms. Christian clarified that even though Adrian Prosser did not actually work for New ICC specifically but rather for a subsidiary, St. Croix/St. Thomas Cable, his housing allowances were provided by New ICC. Transcript of 11/17/2008, Adv. Doc. No. 589, at 132. Jeffrey Prosser testified that Adrian Prosser ran St. Thomas and St. Croix Cable and also worked for New ICC directly for a period of time. Transcript of 12/09/2008, Adv. Doc. No. 615, at 204.

Adv. Doc. No. 639-1, at 228.

Therefore, we find there is insufficient evidence to establish that New ICC treated Adrian

Prosser's condominium as a corporate asset. There is no contention by the Chapter 11 Trustee

that the monthly payments are subject to turnover. We find that turnover is not warranted.


25. Jeffrey Prosser has an ownership interest in North Shore Real Estate Corporation ("North

Shore").

The Chapter 7 Trustee asserts that Jeffrey Prosser has an ownership interest in North

Shore Real Estate Corporation ("North Shore"). *See* Chapter 7 Trustee's Proposed Findings of

Fact and Conclusions of Law for Turnover Trial, Adv. Doc. No. 658, at ¶¶205, 210.[107]  The

credible evidence substantiates Mr. Prosser's ownership in North Shore. Mrs. Prosser recalled

that Mr. Prosser paid for the purchase of the Carden Beach condominium owned by North Shore.

Transcript of 12/10/2008, Adv. Doc. No. 604, at 214; Transcript of 02/09/2009, Adv. Doc. No.

631, at 131. A bank statement from the Virgin Islands Community Bank to Mr. Prosser

evidences a debit to his personal checking account in the amount of $327,028.61 dated January

25, 1999, for the purchase of Carden Beach. TT128. Title to the Carden Beach condominium is

held by North Shore.

The ownership of North Shore is disputed. Mrs. Prosser claims that she is the sole owner

of North Shore. *See*  Transcript of 02/09/2009, Adv. Doc. No. 631, at 133. According to Jeffrey

---

[107] The Chapter 7 Trustee also asserts that "the real property owned by North Shore,
namely the Carden Beach condominium, as well as North Shore's bank account must be turned
over to the Trustees pursuant to 11 U.S.C. sec 542." *Id.* at ¶217. As stated in text, *infra*, this
contention is without merit.

Prosser, Dawn Prosser was the owner of North Shore "from the very beginning."[108] Transcript of

12/10/2008, Adv. Doc. No. 604, at 129-30. Jeffrey Prosser stated that he served as an officer of

North Shore and was one of the incorporators but did not own North Shore. *Id.* at 131.

However, there are documents to the contrary. With respect to ownership of North Shore,

there are two stock certificates, each designated as "Number 1", one providing that both Jeffrey J.

Prosser and Dawn Prosser are the shareholders of North Shore (*see* TT104, at TT3 00045) and

the other providing that Dawn E. Prosser is the sole shareholder of North Shore (*see* DP17, at

SPRONE-103296).[109] Both are signed by Jeffrey Prosser. The stock certificate identifying both of

the Prossers as shareholders is undated. TT104, at TT3 00045. The stock certificate which

identifies only Dawn Prosser as a shareholder is dated January 7, 1999. DP17, at SPRONE-

103296. The source of these stock certificates was Kevin Rames, the lawyer for North Shore.

*See* Testimony of Jeffrey Prosser, Transcript of 12/10/2008, Adv. Doc. No. 604, at 142. In

correspondence, Mr. Rames stated that the owners of North Shore were Mr. and Mrs. Jeffrey

---

[108] He asserts this belief as to ownership of North Shore despite the fact that he signed a stock certificate identifying himself and Dawn as shareholders. *See* discussion *infra.* In Jeffrey J. Prosser's Proposed Findings of Fact and Conclusions of Law, he argues that he never had an ownership interest in North Shore. Adv. Doc. No. 655, at ¶73, 78. He argues this despite having signed a stock certificate which identified him as a stockholder of North Shore. It certainly cannot be argued that he was unaware of the stock certificate.

[109] At the close of evidence on March 26, 2009, counsel represented to the court that they were conferring as to which additional documents produced by Attorney Kevin Rames, they would stipulate to admission, as only portions of TT104 (Custodian of Record Declaration from Kevin Rames and Related Documents Concerning North Shore Real Estate Corporation) and DP17 (also documents relating to North Shore) were admitted during trial. *See* Transcript of 03/26/2009, Adv. Doc. No. 642-3, at 192. In this court's April 3, 2009 Order scheduling briefing and closing arguments in this Adversary Proceeding, the court provided, "Any evidence the parties choose to submit regarding an affidavit by Kevin Rames as to Northshore Realty must be submitted by April 13, 2009." Adv. Doc. No. 641. No affidavit was filed within the timeframe provided.

Prosser. TT104, at TT3 00002, TT3 00016 (letter addressed to the Office of the Lieutenant

Governor[110]). The first letter regarding the closing statement on the Carden Beach condominium

is dated January 25, 1999, and the letter to the Lieutenant Governor is dated May 13, 1999.

Therefore, after the date of the stock certificate which lists only Dawn Prosser, the corporation

was represented to government officials to be wholly owned by both Jeffrey and Dawn Prosser.

Furthermore, there is no evidence that the representation to the Lieutenant Governor was

withdrawn or amended to state that only Dawn Prosser is the owner of North Shore.

Although two conflicting stock certificates have been produced, the attorney for the

corporation represented in an official letter to the Office of the Lieutenant Governor that both

Jeffrey and Dawn were the owners of the corporation. The court finds this to be convincing and

credible evidence of ownership. There is no evidence in this record that the stock certificate

solely listing Dawn Prosser was relied upon or represented to reflect the ownership of North

Shore. Thus, Jeffrey Prosser is an owner of North Shore.


26. According to New ICC's books and records, the company characterized payments relating to
the Carden Beach Condominium as rent.

To the extent the Chapter 11 Trustee asserts an interest in the condominium owned by

North Shore based upon payments, characterized by New ICC as rent, we find he has not

established such an interest. North Shore owns a condominium referred to as the Carden Beach

---

[110] The letter sent by Attorney Kevin A. Rames was for the purpose of advising the Office
of the Lieutenant Governor that the name "North Shore Real Estate Corporation" had been
cleared with the office on the day that the Articles of Incorporation, also sent with the letter, were
filed.

condominium. *See* Testimony of Dawn Prosser, Transcript of 12/10/2008, Adv. Doc. No. 604, at

211. Payments by New ICC to North Shore for the Carden Beach Condominium were

characterized in the accounting system as rent. *See* Testimony of Christian, Transcript of

11/18/2008, Adv. Doc. No. 639, at 236-38, 246. Condominium fees were expensed by New ICC.

*See* Testimony of Christian, Transcript of 11/18/2008, Adv. Doc. No. 639, at 241; TT60, at TT4

1822. Property taxes in the amount of $2,547.52 relating to the Carden Beach Condominium

were expensed by New ICC. *See id*. at 239; TT60 at TT4-1821.[111] The amount of rent paid to

North Shore is $311,672.50. *See* Testimony of Christian, Transcript of 11/19/2008, Adv. Doc.

No. 639-1, at 242-43; TT60, at TT4 1826. From the time the payments to North Shore

commenced, they were always categorized as rental payments. *See* Testimony of Christian,

Transcript of 11/18/2008, Adv. Doc. No. 639, at 247.

Ms. Christian testified that the accounting staff did not know what the payments to North

Shore represented and there was no documentation, such as a rental agreement, as she would

have expected to find in support of the payments classified as rent. Transcript of 11/18/2008,

Adv. Doc. No. 639, at 246-47. However, employees did reside at the Carden Beach

condominium while New ICC was making the rental payments. Holland Redfield was employed

by New ICC for a period of approximately eight years and served as Vice President of Corporate

Affairs for some of that time. *See* Testimony of Redfield, Transcript of 12/10/2008, Adv. Doc.

No. 604, at 11. Mr. Redfield lived at the Carden Beach condominium, and it was his

understanding that the company provided this housing to him for the four years he resided there.

---

[111] There is no explanation as to why New ICC paid an obligation of North Shore for
condominium fees and property taxes. There was no lease that required New ICC to make those
payments as part of the rent owed.

*Id.* at 13, 19. Mr. Redfield also testified that prior to his residence there in 2004, Adrian Prosser

lived at the condominium while he was employed by New ICC. *Id.* at 13-14.

Therefore, the credible evidence supports the fact that the rental payments made to North

Shore for use of the Carden Beach Condominium had a business purpose. We find there is no

evidence to indicate that New ICC had an ownership interest in the Carden Beach condominium

owned by North Shore.


27. AMJ, Inc. is a corporation owned by Dawn Prosser.

The Chapter 7 Trustee asserts that Jeffrey Prosser has an ownership interest in the real

property owned by a corporation named AMJ, Inc. ("AMJ"). *See* Chapter 7 Trustee's Proposed

Findings of Fact and Conclusions of Law for Turnover Trial, ¶¶218-24. We find that the

contention is without merit. The Chapter 7 Trustee established that Mr. Prosser served for a

period of time as president of AMJ, but did not produce evidence of ownership in the corporation

or in AMJ's assets.[112] Mrs. Prosser claims to be, and we find that she is, the sole owner of AMJ,

which owns a condominium referred to as the Schooner Bay condominium. Transcript of

02/09/2009, Adv. Doc. No. 631, at 111-12. *See also* item 28 in text.


28. New ICC booked payments to AMJ, Inc. as rent for use of the Schooner Bay Condominium.

To the extent the Chapter 11 Trustee asserts an interest in the Schooner Bay

---

[112] Jeffrey Prosser represented that he was president of the corporation in a letter dated
May 16, 2003. *See* TT96, at TE2 02587; Testimony of Jeffrey Prosser, Transcript of 12/09/2008,
Adv. Doc. No. 615, at 70. However, he testified that he could not recall the inner workings of the
corporation. Transcript of 12/09/2008, Adv. Doc. No. 615, at 69.

condominium, New ICC did not exist in 1988 or 1989 at the time that the condominium was

acquired. *Id.* at 112. New ICC's books and records did not contain any record of payment for the

real estate owned by AMJ, and AMJ was not listed as an asset of New ICC. Testimony of

Christian, Transcript of 11/18/2008, Adv. Doc. No. 639, at 259; Testimony of Kanai, Transcript

of 03/10/2009, Adv. Doc. No. 637, at 134.

New ICC paid rent to AMJ for use of the Schooner Bay condominium and those

payments were used for the mortgage, association fees, and general upkeep of the unit. Transcript

of 02/09/2009, Adv. Doc. No. 631, at 112-13. Ms. Christian testified the payments to AMJ were

classified as rental payments in the accounting system of New ICC. Transcript of 11/18/2008,

Adv. Doc. No. 639, at 259. However, there is no evidence that the Schooner Bay condominium

was used for a business purpose in the same way that the Carden Beach condominium had been.

Moreover, according to Ms. Christian, there was no rental agreement associated with the

Schooner Bay condominium in New ICC's books and records and " there was not knowledge by

the accounting staff who were booking these particular entries of what AMJ was." Transcript of

11/18/2008, Adv. Doc. No. 639, at 250. Nonetheless, New ICC characterized the payments as

rent in the books and records.

Despite the lack of evidence as to any business purpose for the rental payments, AMJ, not

Dawn Prosser, owns the condominium, and AMJ is not a Defendant in this Adversary

Proceeding. The Chapter 11 Trustee has not pierced the corporate veil of AMJ, so AMJ and

Dawn Prosser are treated as separate entities.[113] Therefore, to the extent the Chapter 11 Trustee

---

[113] Regarding the burden of proof, *see  In re Levitsky,* 401 B.R. 695, 710 (Bankr. D. Md.
2008): "[I]n seeking to bring into the bankruptcy estate the debtor's residence which is titled in

(continued...)

asserts a right to recover the rental payments, he cannot do so here. We find that the Chapter 11

Trustee has not proven an interest in AMJ or the Schooner Bay condominium for purposes of

turnover.


29. The lease of the Cadillac SRX in the possession of Michael Prosser was in his own name

individually, not in New ICC's name, despite lease payments made by New ICC.

The Chapter 11 Trustee asserts that the Cadillac SRX in the possession of Michael

Prosser,[114] a New ICC board member and Jeffrey Prosser's brother, was paid for by New ICC and

should be turned over to the Chapter 11 estate. *See* Trustee Springel's Proposed Findings of Fact

and Conclusions of Law, Adv. Doc. No. 656, at ¶35, 106. The Chapter 11 Trustee has not

established a right to turnover of this vehicle.

The Chapter 11 Trustee's sole argument with regard to turnover of the Cadillac presented

in his Proposed Findings of Fact and Conclusions of Law is that "New ICC paid for a Cadillac

SRX driven by Michael Prosser. *December 10, 2008 Trial Testimony of Jeff Prosser*; at 80:13-

22. The Cadillac SRX is still in the possession of Michael Prosser in Falls City, Nebraska. *Id*.**"**

---

[113](...continued)
the name of the non-filing corporation (and which is the sole asset of the debtor's solely-owned
corporation), the Trustee  bears the burden of proving that the corporation is a fraud, created by
the debtor to hinder, delay and defraud creditors, and that the debtor disregarded corporate
formalities in using the corporation for his own personal benefit. The Trustee is not seeking to
pierce the corporate veil in the usual sense of holding a stockholder individually liable for the
debts of the corporation. Rather, she contends that because the debtor has fraudulently treated the
corporate property as his own, reverse veil piercing permits her to administer the Property for the
benefit of the debtor's creditors."

[114] Michael Prosser served on the board of New ICC beginning midyear in 1999.
04/25/2008 Deposition of M. Prosser, at 22.

*See* Trustee Springel's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 656,

at ¶35. The only citation to the record in support of the Chapter 11 Trustee's assertion is the

following testimony of Jeffrey Prosser:

> Q...Isn't it true that New ICC paid for your brother Michael Prosser to drive a
> Cadillac in Omaha, Nebraska? Cadillac SRX?
> A. To the best of my knowledge, when he had the Cadillac he was driving it in
> Florida.
> Q. Well, where is that Cadillac now?
> A. It's in Falls City, Nebraska, I believe.
> Q. And it's still with your brother in Falls City, Nebraska, correct?
> A. It's my understanding, yes.

Transcript of 12/10/2008, Adv. Doc. No. 604, at 80.

Jeffrey Prosser did not testify as to payment for the Cadillac. He did not state whether New ICC

paid for it or how New ICC characterized or recorded the payments. As previously stated, for

purposes of turnover, it is significant how the company recorded transactions. Furthermore, in his

Proposed Findings of Fact and Conclusions of Law, the Chapter 11 Trustee cites to no record of

payment(s).

The court has located no evidence in this record indicating how payments were

characterized and recorded by the company. Thus, we find that the Chapter 11 Trustee has not

met his burden regarding turnover of the vehicle or the lease payments.


30. The cigars and cigar collections were solely for Jeffrey Prosser's use and enjoyment.

The Chapter 7 Trustee asserts that any cigars and/or cigar collection(s) in the possession

of the Prossers are the sole property of Jeffrey Prosser. *See* Chapter 7 Trustee's Proposed

Findings of Fact and Conclusions of Law for Turnover Trial,  ¶¶349-51. We agree and so find

86

based upon the uncontested evidence. Mr. Prosser testified that he smoked cigars and did not

believe that Dawn Prosser was a cigar smoker. Transcript of 12/09/2008, Adv. Doc. No. 615, at

83. Mr. Prosser agreed to the characterization of the cigars as his property. *Id.* There is no

evidence that Dawn Prosser had any interest in the cigars or cigar collections. Nonetheless,

Jeffrey Prosser did not disclose the cigars in his schedules. *See* TT6. We find that the cigars are

property of Jeffrey Prosser's estate in Jeffrey Prosser's possession, and, accordingly, the cigars

must be turned over.


### 31. Purchases of property by the Adult Prosser Children using the American Express credit cards were paid through New ICC and posted to the contra equity account.

The Chapter 11 Trustee contends that the Adult Prosser Children have not reimbursed

New ICC for the amounts charged to their American Express cards, which they used to acquire

personal property in their possession. *See* Trustee Springel's Proposed Findings of Fact and

Conclusions of Law, Adv. Doc. No. 656, at ¶¶49, 51, 53, 55. Mr. Kanai testified as follows

regarding charges made by the Adult Prosser Children to the American Express accounts:

> Q. Well, let me ask you a different way. Did you ever see payments made to
> American Express with respect to any credit cards held by Mr. Prosser or his
> family members?
> A. There was a myriad of payments to American Express, yes.
> Q. And those were reflected in this due from shareholder account?
> A. Yes, sir.

Transcript of 03/10/2009, Adv. Doc. No. 637, at 25.

There is no evidence that New ICC treated any of the items purchased as its assets. We

find that the Chapter 11 Trustee has not met his burden as to transactions posted to the American

Express cards which were recorded as contra equity. There is no basis for turnover.

32. The Chapter 11 Trustee did not produce sufficient evidence to prove turnover for any funds transferred out of New ICC.

As stated at the outset, for the purpose of determining whether turnover is appropriate, it is significant how New ICC recorded and dealt with these transactions. However, Ms. Christian, as the Custodian of Records of New ICC, "was not asked to review where these payments sat on the books and records of New ICC. [She] was asked to review the underlying support for payments made out of the company and make a determination as to whether they were non business or business related." Testimony of Christian, Transcript of 11/18/2008, Adv. Doc. No. 639, at 221-222. She was unable to state with certainty whether any of the specific items of the property at issue were listed as fixed assets of New ICC. *Id.* She stated that she could not recall but "believe[d] that there were very few, if any, that were listed as fixed assets, likely none." *Id.* Moreover, upon review of transfers made to or for the benefit of Jeffrey Prosser in the books and records of New ICC, Ms. Christian testified that the majority of these transfers were posted to the "due from shareholder account", also known as the "contra equity account". *See* Transcript of 11/17/2008, Adv. Doc. No. 589, at 25, 32; Transcript of 11/18/2008, Adv. Doc. No. 639, at 186-87, 310. The only payments Ms. Christian identified as personal in nature, but expensed by New ICC, were the insurance payments related to the construction of the Estate Shoys main house. *See* item 11 in text *supra*. However, with respect to those payments, neither Jeffery nor Dawn Prosser have the requisite "possession, custody, or control" of the payments made to AON Risk Services. Thus, the Chapter 11 Trustee has failed to prove entitlement to recover the funds or the value of

the funds, or the assets purchased with the funds or the value of those assets.

## CONCLUSIONS OF LAW

Count I: Turnover

For the reasons stated herein, the Chapter 11 Trustee has not met his burden to establish that turnover is appropriate. The Chapter 7 Trustee has established an interest in the Estate Shoys property, Hermon Hill property, North Shore Real Estate Corporation, art work, furnishings, and audio equipment, which are in the possession of Jeffrey and Dawn Prosser (or their agents) and used and enjoyed jointly by the Prossers. The Chapter 7 Trustee has also established Jeffrey Prosser's interest in wines and cigars as his sole property and in the possession of the Prossers. Jeffrey Prosser's interest in each of these items is property of the Chapter 7 estate and must be turned over to the Chapter 7 Trustee.

Section 542(a) of the Bankruptcy Code provides, "an entity...in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."  Courts are not in agreement as to the applicable standard of proof in a turnover action. *See In re Equipment Lessors, Inc.*, Case No. 98-4752, 1999 U.S. Dist. LEXIS 8317, 1999 WL 391390 (E.D. Pa. May 26, 1999).  Some courts require "preponderance of the evidence" while others require "clear and convincing evidence." *Id.* The

growing majority of courts are applying the preponderance of evidence standard.[115] "[C]ourts

agree that the burden is assigned to the party seeking inclusion of the assets in the bankruptcy

estate." *Id.* We find that the Trustees must show by a preponderance of the evidence that the

property identified in this Adversary Proceeding is, in fact, property of one or both of the estates.

Pursuant to §541[116], in determining what is property of the estate, the issue is not who has

---

[115] *In re Santaella*, 298 B.R. 793, 800 (Bankr. S.D. Fla. 2002) (finding that "application of the lower preponderance of the evidence standard, however, is consistent with the growing weight of authority. See, e.g., *In re Vebeliunas*, 252 B.R. 878, 886 n.9 (Bankr. S.D.N.Y. 2000); *In re Clayton*, 235 B.R. 801, 806 n. 2 (Bankr. M.D.N.C. 1998); *In re Quality Health Care*, 215 B.R. 543, 549 (Bankr. N.D. Ind. 1997); *In re Alofs Manufacturing Co.*, 209 B.R. 83, 89-91 (Bankr. W.D. Mich. 1997); *In re Sharon*, 200 B.R. 181, 199 (Bankr. S.D. Ohio 1996), *aff'd* 234 B.R. 676 (6th Cir. BAP 1999); *In re Patton*, 200 B.R. 172, 173-74 (Bankr. N.D. Ohio 1996); *In re Burkholder*, 177 B.R. 260, 262 (Bankr. N.D. Ohio 1995); *see also* Norton Bankruptcy Law & Practice 2d § 52:17 (West 2002) ("The applicable standard of proof in a turnover action is subject to debate, but courts are increasingly finding that a preponderance standard -- not a clear-and-convincing standard -- is appropriate.").

[116] "The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

(2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is--

(A) under the sole, equal, or joint management and control of the debtor; or

(B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

(3) Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.

(4) Any interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 of this title.

(5) Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date--

(A) by bequest, devise, or inheritance;

(B) as a result of a property settlement agreement with the debtor's spouse, or of an

(continued...)

title or possession. *See In re Community Hospital of Rockland County*, 5 B.R. 7, 10 (Bankr.

S.D.N.Y. 1979). Section 541(a)(1) provides the estate includes "all legal or equitable interests of

the debtor in property as of the commencement of the case." Property of the estate is broadly

defined. *See In re Langley*, 30 B.R. 595, 599-600 (Bankr. N.D. Ind. 1983); *In re Fisher*, Case No.

07-61338-7, 2008 Bankr. LEXIS 2935, at *14-15, 2008 WL 4723492 (Bankr. D. Mont. Oct. 10,

2008). "[T]he question of whether the interest is property of the estate is a federal question to be

decided by federal law." *See In re Langley*, 30 B.R. 595, 598 (Bankr. N.D. Ind. 1983). "Most

courts find that the debtor's interest in property jointly held by a nondebtor becomes property of

the estate upon the filing of the bankruptcy petition, but that the nondebtor's interest is not

property of the estate." *Winters by & Through McMahon v. George Mason Bank*, 94 F.3d 130,

134-135 (4th Cir. 1996). In the Third Circuit, it is well settled that §541(a)(1) includes an

individual debtor's interest in property held as a tenant by the entirety. *See In re Brannon*, 476

F.3d 170, 174 (3d Cir. 2007).

In order to determine what interests a debtor possesses at the time the bankruptcy petition

is filed, the court must look to state law. *See Stewart v. Shubert*, 325 Fed. Appx. 82, 84 (3d Cir.

2009). Bankruptcy courts must apply the choice of law rules of the state in which the court sits to

determine applicable law.  *See In re PHP Healthcare Corp.*, 128 Fed. Appx. 839, 843 (3d Cir.

---

[116](...continued)
interlocutory or final divorce decree; or
    (C) as a beneficiary of a life insurance policy or of a death benefit plan.
  (6) Proceeds, product, offspring, rents, or profits of or from property of the estate, except such
as are earnings from services performed by an individual debtor after the commencement of the
case.
  (7) Any interest in property that the estate acquires after the commencement of the case."
11 U.S.C. §541(a).

2005); *Bohm v. The Horsley Co.,* 333 B.R. 261, 276 (Bankr. W.D. Pa. 2005). This case is

pending in the Virgin Islands. In determining applicable substantive law, the court shall apply the

governing principles found in the Restatement (Second) of Conflict of Laws as there is no local

law to the contrary. *Benjamin v. Eastern Airlines, Inc.*, 18 V.I. 516, 519 (D.C.V.I. 1981).[117] With

respect to conveyances of interests in land, the law applied by the courts of the situs will be

followed.[118] The real property at issue in this Adversary Proceeding is located in the Virgin

Islands. With respect to conveyances of movables, the law of the state which has the most

---

[117] "The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary." 1 V.I.C. §4. "The Territory of the Virgin Islands possesses a unique status in American jurisprudence because of its adoption of the American Law Institute's...Restatements of Law as its primary rules of decision 'in the absence of local laws to the contrary.'" *In re Manbodh Asbestos Litigation Series*, 47 V.I. 215, 226 (V.I. Super. Ct. 2005). "To identify the applicable common law in those circumstances, the language of title 1, section 4 directs courts to examine first 'the restatements' and second, only to the extent not so expressed in a Restatement, the common law as understood and applied in the decisions of the courts of the United States. In spite of this seemingly clear directive, there can be little argument that title 1, section 4 is ambiguous, as the phrase 'in the absence of local laws to the contrary,' is susceptible to being understood in two or more ways. To date, courts have interpreted 'local laws' to include both legislation and common law precedent." *Id.* at 226-27.

Thus, by statute, the Virgin Islands applies the Restatement (Second) of Conflict of Laws. *See Benjamin*, 18 V.I. at 519 (applying Restatement (Second) Conflict of Laws to determine applicable law in the absence of local laws to the contrary); *Thomas v. Transp. Servs. of St. John, Inc.,* 47 V.I. 130 (V.I. Super. Ct. 2005) (applying the Restatement (Second) Conflict of Laws in the absence of local laws to the contrary).

[118] "(1) Whether a conveyance transfers an interest in land and the nature of the interest transferred are determined by the law that would be applied by the courts of the situs. (2) These courts would usually apply their own local law in determining such questions." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 223.

significant relationship[119] to the parties will be applied.[120]

Much of the personal property is located in the Virgin Islands and Florida. Generally, the Virgin Islands has the most significant relationship to the parties. Dawn Prosser and Jeffrey Prosser are residents of the Virgin Islands. Moreover, for purposes of defining interests in movables acquired during marriage, "one spouse's interest in movables acquired by the other spouse during coverture is determined by the law of the State in which the spouses were domiciled[121] at the time the movable was acquired." *United States v. Cotier*[122], 403 F.Supp. 397, 403 (D.N.J. 1975) (citing to the RESTATEMENT (SECOND) CONFLICT OF LAWS §258). At all

---

[119]    In *Benjamin*, in the context of a personal injury case, the court analyzed a list of factors to determine whether another state had a more significant relationship than the state where the injury occurred: "where the conduct causing the injury occurred, the domicile, residence, nationality, place of incorporation and place of business of the parties, and the place where the relationship between the parties is centered." 18 V.I. at 520. The court found that application of Virgin Islands substantive law was not appropriate where the only factor favoring its application was residency of all plaintiffs. *Id.*

[120]    "The interests of the parties in a thing are determined, depending upon the circumstances, either by the 'law' [in the case of immovables] or by the 'local law' [in the case of movables] of the state which, with respect to the particular issue, has the most significant relationship to the thing and the parties under the principles stated in § 6." *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 222 and the comments thereto.

[121]    Domicile is defined as "[t]he place at which a person has been physically present and that the person regards as home; a person's true, fixed, principal, and permanent home, to which that person intends to return and remain even though currently residing elsewhere." Black's Law Dictionary (9th ed. 2009).

[122]    In *Cotier*, the United States sought to foreclose federal tax liens against certain pieces of jewelry, and the dispute concerned the ownership of the burdened property as between the former spouses, particularly whether the husband had gifted the items to the wife during marriage. 403 F.Supp. at 399-400.

relevant times, Jeffrey and Dawn Prosser's domicile has been the Virgin Islands.[123] The funds used to purchase the property at issue are either the funds of New ICC or Jeffrey Prosser. Therefore, all of the transfers originated from the Virgin Islands, either by New ICC, a Virgin Islands corporation, or by Jeffrey Prosser, a Virgin Islands resident. The law of the Virgin Islands, unless otherwise noted, will apply.[124]

In the Virgin Islands, "the general rule is that record title to personal property raises a legal presumption of ownership, but, much like possession and other indices of ownership, the presumption created is rebuttable....The strength of the presumption varies with the surrounding circumstances. As one court explained, speaking of real rather than personal property but nonetheless relevant to [the] inquiry: 'Real estate is presumed to be owned by the person in whose name the record title stands, and such presumption is strengthened by the number of years the record title has remained the same, and by the record titleholder continuing in the exclusive possession and control and management thereof as the apparently exclusive owner.' *Ward v. Ward*, 197 Okla. 551, 172 P.2d 979, 980 (Okla. 1946). Expanding on this premise, it is reasonable to conclude that the legal presumption is relatively weaker where the record titleholder has enjoyed no such dominion over the property...." *See Coman v. Coman*, 9 V.I. 473, 479 (VI 1973) (citations omitted).

---

[123] We note that though the Prossers had residences in both Florida and New York, their domicile has been the Virgin Islands. The Last Will and Testament of Jeffrey J. Prosser, dated January 12, 2000, confirms that considered St. Croix to be his domicile. *See* TT160. Dawn Prosser is a naturalized citizen of the United States Virgin Islands. *See* Testimony of Dawn Prosser, Transcript of 02/09/2009, Adv. Doc. No. 631, at 49.

[124] Where appropriate, other states' laws will be cited if found to be applicable for a particular transaction based upon conflict of law principles.

94

In order to prove ownership by way of gift, Virgin Islands' case law provides three

essential elements which must be proven: (1) donative intent, (2) delivery, and (3) acceptance.

*See Callwood v. Cruse*, 47 V.I. 396, 402 (V.I. Super. Ct. 2006). In order for the gift to be

effective, the intent to make a gift must be "clear, unmistakable, and unequivocal".  *See Id.*

(citing to 38 AM.JUR.2D Gifts §18 (2005)). "The circumstances surrounding the purported gift

must show an intent to absolutely divest the donor of title, dominion and control of the subject

matter.'" *Remak v. Quinn*, 17 V.I. 552, 555 (D.V.I. 1980) (citing to *de Chabert v. Wheatley*, 392

F. Supp. 62, 63 (D.V.I. 1975)). Where the alleged donor continues to treat the property involved

as his own, the conduct weighs against finding that the property has in fact been gifted.  *de*

*Chabert*, 392 F. Supp. at 63.[125] Here, as stated earlier as to many of the items allegedly gifted to

Dawn Prosser (real property, furnishings, art work, wines, etc.) Jeffrey Prosser retained custody,

control, possession, use, and enjoyment to the point of signing documents in which he declared

that real estate titled solely in Dawn Prosser's name was his own. Moreover, Dawn Prosser

admitted that Jeffrey Prosser continued to use and enjoy all the property. *See* Transcript of

12/10/2008, Adv. Doc. No. 604, at 193-94. She often stated orally and in writing that she had a

---

[125] *In Rogers v. Rogers*, the homestead of the divorcing parties was titled solely in the name of the wife, though it was disputed whose funds paid for the purchase of the property, but improvements were made with joint funds. 14 V.I. 252, 258-59 (V.I. Terr.Ct. 1977).  In that case, the court determined that "the testimony does not support a presumption of a gift. The clear intent of the husband in making the improvements was that they would be for the purpose of providing a marital home for the parties. The court [found] that it clearly was the husband's intent to have a one-half interest in the improvements. See Restatement (Second) of Trusts § 443. There is no basis for concluding that the wife had any different intent with respect to the improvements. Even assuming that the land was purchased solely with the wife's funds, it was purchased at a time and with an understanding that the land, and a boat that was purchased by the husband, both would be for the benefit of both of the parties. Moreover, [the court did] not find that the land was purchased solely with the wife's funds, but with joint funds." 14 V.I. 252, 259 n.5 (V.I. Terr.Ct. 1977).

half interest in the property. Jeffrey Prosser listed a possessory interest in the Shoys houses as an interest in his bankruptcy schedules. Jeffrey Prosser often testified that the alleged gifts were all made "for estate planning purposes." All of the credible evidence clearly established that Jeffrey Prosser had and has no present intent to permanently gift anything other than jewelry to Dawn Prosser. Rather, using Dawn Prosser as the title holder is strictly "for estate planning purposes" - that is, a conditional gift applicable in the future when one of the spouses dies. There is clearly no intent to "absolutely divest the donor (Jeffrey Prosser) of his title, dominion and control" as is required. *Remak*, *supra*, 17 V.I. at 555.

*Chapter 11 Trustee's Turnover Claim*:

### Contra Equity Transactions

The Chapter 11 Trustee has taken the position that the payments described above disbursed through the contra equity account were "fraudulent and wrongful" in nature. *See* Trustee Springel's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 656, at ¶86. The Chapter 11 Trustee further alleges that payments continued to be made and booked through contra equity to the detriment of creditors, making it difficult for New ICC to continue the operations of the company. *Id.* at ¶¶87, 90.[126]

---

[126] Allegations of that nature sound in fraudulent conveyance, not in turnover. In fact, the Chapter 11 Trustee did bring fraudulent conveyance actions regarding the property as an alternative method of recovery for the benefit of New ICC's estate against certain of the Defendants, but not against Jeffrey Prosser. *Cf. In re Vencom, Inc.*, 355 B.R. 3 (Bankr. W.D. Ky. 2006) (where the debtor corporation's shortfall resulted from paying personal living expenses of the defendants, the court found turnover to be appropriate; the trustee alleged and proved, *inter alia,* misappropriation of corporate funds, piercing the corporate veil, unlawful distribution, and fraudulent transfers); *In re Aqua Clear Technologies*, 361 B.R. 567 (Bankr. S.D. Fla. 2007)

(continued...)

The starting position for purposes of the Chapter 11 Trustee's argument is that the payments of New ICC funds through contra equity constituted *improper* distributions. In Trustee Springel's Proposed Findings of Fact and Conclusions of Law, he seeks a finding "that the Property[127] is property of one or more of the Estates under Bankruptcy Code § 541" because "one or more of the ICC Debtors (i) not only paid the purchase price for the Property, but also (ii) paid for the maintenance and/or insurance of the Property, (iii) paid the taxes on the Property, and (iv) recorded the Payments made for the Property in the Due From Account as an asset of New ICC on its books and records...." Adv. Doc. No. 656, at 36. The court agrees that the Trustee proved the asserted facts. However, the fact that the majority of the payments were posted as contra equity transactions does not permit the court to come to the conclusions asserted by the Trustee. Even if the payments classified as contra equity were, in fact, receivables that the company treated as assets on its internal books, the items paid for with the funds so posted were not claimed as assets by the company. The Chapter 11 Trustee filed a proof of claim in Jeffrey Prosser's personal bankruptcy.[128]

---

[126](...continued)
(finding, *inter alia,* director and president of debtor corporation liable for breach of fiduciary duty where debtor paid personal household expenses).

[127] "Property" is defined "(i) personal property that was acquired by one or more of the Defendants with funds of New ICC and/or Jeff Prosser for the benefit of any of the Defendants (the "Acquired Property") and (ii) certain real and personal property, including the Acquired Property, for which New ICC paid insurance (the "Insured Property," and together with the Acquired Property, the "Property")." Adv. Doc. No. 656, at 5.

[128] Trustee Springel asserts that "New ICC holds an unliquidated claim against the Debtor for inter alia, (a) fraud and/or fraudulent transfers of New ICC's funds and property; (b) breach of fiduciary duty, waste, negligence, gross negligence, negligence per se, unjust enrichment, conspiracy, and related claims arising from the malfeasance, nonfeasance, acts, errors, and

(continued...)

Pursuant to §541(a)(1), "[t]he commencement of a case...creates an estate. Such estate is comprised of all of the following property, wherever located and by whomever held: (1)...all legal or equitable interests of the debtor in property as of the commencement of the case." The Chapter 11 Trustee cannot use §542 to recover property which has been transferred out of the corporation and attributed to Jeffrey Prosser by the corporation. The court looks to the treatment of the transactions at the time the case commenced. The Chapter 11 Trustee cannot go back in time and characterize these payments differently than the corporation did at a time contemporaneous with the transactions. It is the Trustee's burden under §542 to prove that the Defendants are in possession "of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title...." The Chapter 11 Trustee has not proven that the Chapter 11 estate has an interest in the items paid for with corporate funds treated as contra equity transactions, attributed to Jeffrey Prosser by New ICC, and transferred out of the corporation as distributions to him. The transfers were treated and recorded by the company in such a way that they cannot be both distributions to Jeffrey Prosser and New ICC property for purposes of §542.[129]

---

[128](...continued)
omissions committed by Prosser while serving as a director, officer and control person of New ICC; and (c) any and all other claims and/or causes of action held by New ICC against Prosser or his bankruptcy estate for damages arising from payments and benefits derived by Prosser, the misappropriation of New ICC funds or property, and the breach of any duty owed by Prosser to New ICC." *See* Claim 61-1, Case No. 06-30009, at 1-2.

[129] In the Chapter 11 Trustee's Supplemental Post-Trial Brief (Turnover Adversary Proceeding), the Chapter 11 Trustee argues, "Solely because an individual pays taxes on amounts (*fraudulently* or otherwise) channeled to that individual does not mean that such amounts were properly transferred to that individual. Adv. Doc. No. 694, at 5 (emphasis added). The Chapter 11 Trustee acknowledges that the transfer occurred, and his argument centers around the

(continued...)

The weight of the evidence established that (1) the contra equity was disclosed on New ICC's audited financial statements, (2) those statements were presented to the board, albeit well after the transactions occurred, and (3) there is no evidence of any expectation by New ICC that the funds would be repaid on a current basis (either when the account was booked as a "due from shareholder receivables account" or when it was reclassified as "contra equity" on the audited financial statements). The Chapter 11 Trustee has introduced a plethora of evidence indicating that the payments run through the contra equity account were made without any limit on the distributions; Jeffrey Prosser controlled the amounts; the distributions were taken even when the company had cash flow problems; distributions where made when there was substantial negative equity in the corporation and when it was insolvent on a balance sheet basis. However, if the matter comes down to whether or not funds were *transferred* out of New ICC improperly, then the transfer must *first* be avoided before recovery of the property is appropriate. Only upon recovery do the transfers become property of the Chapter 11 estate. *See* §541(a)(3). A turnover action does not lie against assets that are not property of the estate and the alleged impropriety of the transfers simply is not a §542 turnover issue.

Possession of assets of the estates by one not entitled thereto is the sole issue. From the

---

[129](...continued)
propriety of the transfer. Once again, this argument is evidence that a turnover action is not appropriate for resolving these allegations. The Chapter 11 Trustee has the opportunity to prove the propriety and alleged fraudulent nature of the transfers in the fraudulent conveyance actions and seek recovery of the property pursuant to §550.
    The Chapter 11 Trustee also states, "In reality, the Prossers didn't, and Adult Prosser Children simply chose not to, pay taxes on the Payments." *Id.* at 6. However, the purpose of this proceeding is not to determine tax liability. Whether any of the Prossers received payments which they allegedly did not reflect as income on their tax returns does not determine ownership for purposes of this turnover proceeding.

perspective of New ICC, these payments were transfers to Jeffrey Prosser and recognized as such

by recording them in the contra equity account. The court finds that Jeffrey Prosser was the

individual ultimately in control of how and what was posted to the account. However, neither the

board[130] nor the CFO took issue with the account. The CFO stood by the fact that the use of the

contra equity account was appropriate and in compliance with GAAP. The Chapter 11 Trustee

has produced no contrary evidence. It is the Chapter 11 Trustee's burden to prove the estate has

an interest in the property held by third parties. Without proof of such interest, turnover is not

warranted.

The Chapter 11 Trustee cited case law in support of the proposition that "[p]ayments are

significant indicia of ownership." Trustee Springel's Proposed Findings of Fact and Conclusions

of Law, Adv. Doc. No. 656, at ¶102. We agree but the case law relied on is distinguishable from

the facts of this case.  In *In re Linderman*, 20 B.R. 826 (Bankr. W.D. Wash. 1982), the issue was

the individual debtors' entitlement to certain claimed exemptions. The debtors were the sole

stockholders of a corporation, also a debtor. A portion of the mortgage payments for the

individual debtors' home had been paid through the corporate debtor's account. The home was

sold and the individual debtors sought to exempt a portion of the proceeds from the sale. The

trustee objected on the basis that the individual stockholders were not permitted to claim

corporate assets as exempt. The issue before the court was whether the corporate funds used to

make mortgage payments created an equitable interest to the extent of that contribution. Pursuant

to applicable state law, the court determined that the corporation did acquire an equitable interest.

---

[130] We note, from the testimony, it is unclear whether the board understood the nature of
the transactions posted to the contra equity account. At least one board member was unaware that
these transactions were not business related. *See* Testimony of Richard Goodwin *supra*, at 36.

100

Unlike the facts presented here, there is no argument in *Linderman* that the corporate funds were taken through a contra equity account in the form of distributions to the shareholder. *Linderman* does not address the issue that has been raised in this case.

The Chapter 11 Trustee also cites to *In re Kaiser*, 791 F.2d 73 (7th Cir. 1986). In *Kaiser* the trustee asserted that the Wises, who were the sole owners of a group of corporate debtors, were holding property, which was either formally or nominally owned by the Wises but actually constituted property of the estate. As to the real property at issue, Wise purchased the land using borrowed money for two of the four parcels. The corporate debtor built a theme park on the land. It did not pay rent but rather repaid the loans and also paid real estate taxes. The interest on the loans was deducted on the corporate income tax returns rather than on the Wises'. The land was listed as an asset on one of the corporate debtor's disclosure statements. The trustee in the case sought to pierce the corporate veil to reach what was ostensibly an asset of the shareholder. The court found it significant that the corporate disclosure statement filed in the bankruptcy proceeding listed the property as a corporate asset and that Wise was the one who filed the statement. Furthermore, the corporate debtor *treated the land* as a corporate asset. These facts are distinguishable from the facts before this court. Here, none of the defendants have represented that the items at issue are corporate assets. Furthermore, there is no evidence that New ICC treated any of the items run through contra equity as corporate assets. In fact, based upon the change in the audited financial statements, the funds going out through the contra equity account were specifically booked in that manner because no repayment of the receivable account, that actually was listed in the corporate books as an asset, was anticipated.

In *In re Clayton Grain Elevator, Inc.*, 46 B.R. 502 (W.D. La. 1984), the trustee was in

possession of certain items which had been left on the real estate belonging to the bankruptcy estate of the corporate debtor and sought declaratory relief in conjunction with an application to sell. He also asserted that the defendants appropriated corporate funds to their own use. The court found that numerous checks for the purchase of personal property were paid from the debtor corporation's *general account and the commodity account* without evidence of corporate authorization and without any explanation from defendants. On that basis the court found that defendants did not have corporate authorization to use the funds for these personal purchases. Although a mobile home on estate property was titled in the name of one defendant, he testified that he received title by way of gift but claimed he could not recall who owned the mobile home before he did. He was unable to provide the court with a satisfactory explanation and the court found the mobile home was purchased with corporate funds and without authorization. These facts are distinguishable from the facts in this case. Here, the defendants have offered an explanation for the way corporate funds were used for non-business related purchases and how these transactions were documented on the corporate books and records. Although the funds were taken out of the corporate account, they were attributed by the company as distributions to Jeffrey Prosser. Whether or not the manner in which Jeffrey Prosser obtained the corporate funds (i.e., through his control of New ICC) for his own use constituted misappropriation of corporate funds is not the issue before the court; rather, turnover pursuant to §542 is the issue in this adversary proceeding.

In *In re North American Dealer Group, Inc.*, 34 B.R. 246 (E.D.N.Y. 1983), the trustee of the corporation's bankruptcy estate sought turnover of a piece of real property of which legal title was held by the former executive vice president and principal stockholder of the debtor. The

closing expenses for the property were paid by the debtor either directly or by way of officer

loan. The debtor also made some of the mortgage payments and paid for improvements and

maintenance either directly or by way of officer loans. The stockholder, however, annexed to the

agreement of sale of his stock, a schedule of the corporate property, among which was the real

property at issue in the adversary proceeding. A handwritten note next to the listing was initialed

by the stockholder and stated that the deed was titled in his name. The schedule was also signed

by the stockholder. Therefore, the stockholder admitted that the property belonged to the

corporation and the court found that he was wrongfully holding legal title to the property. In this

case, there is no such admission as to any of the property, although we have found regarding

some items that legal title is not conclusive. The contra equity account is once again a major

distinguishing feature in this case.

The Chapter 11 Trustee also asserts that turnover is appropriate based upon *In re B & P

Distributors, Inc.*, 1 B.R. 426 (Bankr. E.D. Pa. 1979), where two vehicles were purchased by the

debtor corporation but the titles were registered in the names of shareholders and officers. The

court found that it was the practice of the corporate debtor to purchase vehicles for business use

by these officers. Ultimately, the court ruled that there was a business purpose. The court

analogized to the facts of another case in which it had determined that the debtor made all

payments on and retained control of the vehicle purchased despite title. Here, the property

purchased and recorded to contra equitiy was in no way intended for a business purpose and the

corporation did not retain control over the property that was purchased.

The Pissarro Paintings: The Chapter 11 Trustee contends that four Pissarro paintings were

purchased with New ICC funds, and that in all but one case, these transactions were reflected on

the contra equity account. The one Pissarro painting which remained on the books of New ICC as

an asset was voluntarily turned over to the Chapter 11 Trustee by Mr. Prosser. *See* Transcript of

07/23/2009, Adv. Doc. No. 680, at 61-62.[131] Counsel for the Chapter 11 Trustee stated, "The only

distinction between that one and the remaining ones [i.e., three] is that the others somehow ended

up getting booked ultimately in the contra equity account." *Id.* at 62. The court finds this is a

distinction which makes a difference. The analysis affects the outcome of a turnover action

which does not have the same elements as a fraudulent conveyance action.[132] The fact is, on the

financial statements of New ICC, there was a reduction in equity to reflect the transfers at issue.

New ICC did not profess an ownership interest in the three paintings, only in the "receivable"

owed by Jeffrey Prosser to New ICC as a result of those purchases. Dennis Kanai testified that

the contra equity transactions were accounted for as receivables in the general ledger, but for

external purposes were reported as contra equity. Transcript of 03/10/2009, Adv. Doc. No. 637,

at 85-86, 111. As the receivable was not being serviced, it would have been "misleading to view

it as an asset of the company" for reporting purposes. *Id.* at 90. Even though the receivable itself

---

[131] Mrs. Prosser testified that Item 6 on TT2 00321, "Le Grand Noyer, Matin, Eragny" by Camille Pissarro, was turned over to the Chapter 11 Trustee. *See* Transcript of 12/10/2008, Adv. Doc. No. 604, at 239. The Court recognizes that the painting was sold by the Chapter 11 Trustee. *See* Motion for Order Authorizing Auction Sale of Fine Art, Antiques, and Other Property by Christie's, Inc., Case No. 07-30012, Doc. No. 498; Modified Order Authorizing Chapter 11 Trustee to Sell Fine Art (Camille Pissarro, Le Grand Noyer, Matin, Eragny, Oil on Canvas, Case No. 07-30012, Doc. No. 601; Updated and Final Report of Sale (Camille Pissarro, Le Grand Noyer, Matin, Eragny), Case No. 07-30012, Doc. No. 738.

[132] Counsel for the Chapter 11 Trustee inquires "how those paintings are not just like the ones [sic] that Mr. Prosser admitted was the property of the estate, simply because Mr. Prosser, as the control person, determined where it would be recorded on internal books and instructed in that fashion?" *See* Transcript of 07/23/2009, Adv. Doc. No. 680, at 62. If Mr. Prosser, as an insider, fraudulently transferred funds out of the company, that fraud must be proven and avoidance of the transfer must be accomplished *before* recovery of the property is appropriate.

was recorded in an account which happened to be in the asset section of the general ledger, the

item purchased using the funds disbursed was not recorded as an asset of New ICC.

*See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 637, at 125. Thus, turnover is

not warranted.

Art work and Furnishings: New ICC made payments for the purchases of art work and

furnishings used or intended for use in the Prossers' homes. These payments have been recorded

as contra equity and, for the reasons already expressed, turnover to the Chapter 11 estate is

inappropriate.

Estate Shoys: The Chapter 11 Trustee has not met his burden to prove that any payments

for the purchase and construction of the Estate Shoys property were recorded as expenses as

opposed to contra equity. Furthermore, the Estate Shoys property was not listed as a fixed asset

of the corporation. Therefore, turnover of the property is not appropriate. However, the Chapter

11 Trustee has proven that certain insurance payments related to the construction of the main

house were expensed by the corporation. The insurance payments will be addressed separately.

*See infra.*

Audio Equipment: The Chapter 11 Trustee asserts that New ICC made payments for

expensive audio equipment located in the Prossers' homes. The Chapter 11 Trustee, however, did

not produce evidence regarding how New ICC treated these transactions, whether as contra

equity or otherwise. Therefore, he has not met his burden and turnover to the Chapter 11 estate is

not appropriate. The audio equipment was not listed as an asset of the corporation.

Wines: The Chapter 11 Trustee also sought turnover of wines which were purchased by

Jeffrey Prosser using New ICC's funds. Purchases were made on an American Express account

and Banco Popular account, and ultimately paid by New ICC. As to purchases made using the

American Express card, the payments were recorded as contra equity. However, only a portion of

the Banco Popular charges were treated as contra equity. The Chapter 11 Trustee was unable to

show on an item by item basis, which transactions were treated as contra equity. Therefore, the

Chapter 11 Trustee did not produce sufficient evidence to prove in which wines the estate has an

interest and turnover will not be ordered to the Chapter 11 estate.

Jewelry: The women's jewelry possessed by Dawn Prosser is not listed as a fixed asset of

New ICC. The Chapter 11 Trustee has not proven that purchases of jewelry were expensed by

New ICC. Turnover of the women's jewelry in the possession of Dawn Prosser will not be

granted to the Chapter 11 estate.

Mercedes: The Chapter 11 Trustee sought recovery of a Mercedes in the possession of

Sybil Prosser. However, the funds used to purchase the vehicle were recorded as contra equity by

the company and treated as a distribution to Jeffrey Prosser. The Mercedes was not listed as an

asset of the corporation. Therefore, the Chapter 11 Trustee has not proven that New ICC had an

ownership interest in the Mercedes and turnover is not appropriate.

Cadillac: As to the Cadillac, which at the time of trial was in the possession of Michael

Prosser, the Chapter 11 Trustee did not produce evidence showing that New ICC purchased the

vehicle or, if it did, how the vehicle was recorded by New ICC. In this case, the way transactions

were recorded is significant for purposes of determining whether the estate is entitled to recovery.

The Chapter 11 Trustee has failed to meet his burden.

West Palm Beach Condominium: The Chapter 11 Trustee also sought recovery of the

condominium in which Adrian Prosser resides. However, the Chapter 11 Trustee did not meet his

106

burden in establishing that New ICC treated Adrian Prosser's condominium as a corporate asset.

The evidence shows that the funds used for a down payment were recorded as contra equity.

Turnover was not established.

Payments for the Adult Prosser Children: As to expenses paid for the Adult Prosser

Children, the Chapter 11 Trustee has not identified any payments with certainty that were not

treated as contra equity transactions, and therefore, he has not met his burden.

**Non-Contra Equity Transactions**

The Condominiums owned by North Shore and AMJ: Not all the property at issue in this

adversary proceeding involves transactions that were posted to the contra equity account. For

instance, the Chapter 11 Trustee asserts an interest in the Carden Beach condominium, owned by

North Shore, and the Schooner Bay condominium, owned by AMJ. Despite the fact that New

ICC characterized the payments to North Shore as rent, the Chapter 11 Trustee has characterized

these payments as payments to or for the benefit of Dawn Prosser. *See* Testimony of Christian,

Transcript of 11/19/2008, Adv. Doc. No. 639-1, at 246; TT60, at TT4 1821, 1822, 1826. In

preparing TT60, Ingrid Christian testified that she placed these payments in her schedule of

transfers that benefitted Dawn Prosser based on her understanding from the books and records

she reviewed that "Dawn Prosser was at least at one point...the owner or one of the owners of

North Shore." Transcript of 11/19/2008, Adv. Doc. No.  639-1, at 242-43. Ms. Christian

provided the following explanation for disregarding New ICC's characterization of the payments

as rent:

Because, based on my review of the underlying support for these payments, unlike

> which is the practice of the company to obtain, find documentation of rental
> agreements, and so on, as it has for all other rental activity that I've seen in the
> books and records, it did not do so for these two  entities [AMJ and North Shore].
> And furthermore, in discussions with the staff as to what these two entities
> represented, the accounting staff had absolutely no idea. And normally you would
> expect an accounting staff would know when rent is being paid, whether it be on
> behalf of an employee who is staying at an entity or not, they tend to know what
> they're paying. In this case they did not know what AMJ was. They did not know
> what North Shore Realty was.

*See* Transcript of 11/19/2008, Adv. Doc. No. 639-1, at 246-47.

Because there were no rental agreements and also as a result of the fact that Dawn and/or Jeffrey

Prosser, through Dawn's ownership of AMJ and the joint ownership of North Shore, were

reaping the benefit of these so-called rental payments without business documentation to back

them up, the Chapter 11 Trustee views the payments as suspicious. *Id.* at 252. Furthermore, the

Chapter 11 Trustee contends that, because ultimately Jeffrey Prosser is the sole shareholder of

New ICC, the "rental" classification is simply a determination that he made. *Id.* The Trustee

proved that Jeffrey Prosser controlled the corporations and how they treated payments, i.e., as

either business expenses or as distributions through contra equity.

However, the Carden Beach condominium was provided as a residence to corporate

employees. Therefore, the credible evidence supports the fact that the rental payments made to

North Shore for use of the Carden Beach Condominium had a business purpose, and there is no

evidence to indicate that New ICC had an ownership interest in the Carden Beach condominium.

In fact, the condominium is owned by North Shore, which is not a party to this proceeding.

Moreover, there was no evidence provided as to who or what entity has possession, custody or

control of the rents paid by New ICC, and North Shore (the payee) was not sued. Thus, a

turnover action for the rents does not stand.

As for the Schooner Bay condominium, while a business purpose is not apparent based on this record, AMJ is the owner of Schooner Bay. New ICC's books and records did not reflect ownership of the corporation or its assets and, in fact, New ICC did not exist at the time that the Schooner Bay condominium was acquired.  To the extent that there was not a business purpose for the payments categorized as rent to AMJ, recovery from AMJ cannot be accomplished in this turnover Adversary Proceeding as the corporation is not a named party and there was no proof as to what person or entity has possession of the rents.

Aon Risk Services: Based upon the evidence presented, the Chapter 11 Trustee's case for turnover turned on how New ICC treated the transactions. The only non-business transactions identified with certainty as being expensed by New ICC, as opposed to being treated as contra equity, were the payments to AON Risk Services. The Chapter 11 Trustee established that New ICC's corporate funds were used to purchase builder's risk insurance relating to the construction of the main house, which is titled solely to Dawn Prosser and was intended to be the Prossers' personal residence. However, the Defendants do not have the requisite "possession, custody, or control" of the payments which were made to AON Risk Services. Thus, turnover is not warranted despite New ICC's interest in the funds.

*Chapter 7 Trustee's Turnover Claim:*

As to the property currently in the possession of Dawn Prosser, Mrs. Prosser argues that Mr. Prosser gifted her all of the assets and that her ownership interest is protected by 16 V.I.C. §68, which provides "The property and pecuniary rights of every married woman at the time of her marriage or afterwards acquired by gift, devise, or inheritance shall not be subject to the debts

or contracts of her husband, and she may manage, sell, convey or devise the same by will to the

same extent and in the same manner that her husband can property belonging to him."

Application of 16 V.I.C. §68 assumes that Jeffrey Prosser did, in fact, gift property to Dawn

Prosser. While there is evidence that some items were given as gifts,[133] there is no credible

evidence supporting the argument that Jeffrey Prosser gifted *all* of his property to Dawn Prosser.

*See* text at 94-95. Neither Dawn nor Jeffrey Prosser were able to adequately articulate the alleged

oral understanding they had regarding property ownership and their testimony was not consistent

as to the extent of the alleged gifts. The only other evidence presented of an agreement regarding

ownership of property is the MPA[134], which is currently the subject of a fraudulent conveyance

action pending in District Court.

     Nonetheless, for purposes of turnover, the Chapter 7 Trustee contends that, based upon

the timing of the judgment against Jeffrey Prosser and his companies and the execution of the

MPA only nine days later, there is a strong inference "that Jeffrey Prosser was attempting to give

away his assets in his name to his wife to render himself judgment proof." Chapter 7 Trustee's

Post Trial Brief Regarding Turnover Adversary, Adv. Doc. No.  659, at 17.  Thus, the Chapter 7

Trustee states that the MPA is "contrary to public policy according to the law of the Third Circuit

and accordingly, should be unenforceable." *Id.*  For purposes of turnover, we disagree.

     An agreement is against public policy if it is injurious to the interests of the
     public, or contravenes some established interest of society or some public statute,

---

    [133] For example, Jeffrey Prosser gave his wife women's jewelry, which he did not use and over which he did not exercise significant dominion and control.

    [134] The MPA recognized that only the real property in St. Croix titled in Dawn's name and the furniture, fixtures, and *objects d'art* located therein and personal effects such as clothing and jewelry were Dawn's sole property. *See* TT157.

or is against good morals, or tends to interfere with the public welfare. *Canal Ins. Co. v. Ashmore*, 126 F.3d 1083 (8th Cir.1997). The Court has a duty to refuse to enforce a contract that is contrary to public policy and tends to injure the public good or contravene some established interest of society. *Thomas James Associates, Inc. v. Jameson*, 102 F.3d 60 (2nd Cir. 1996).

*Berne Corp. v. Virgin Islands*, 46 V.I. 106, 115 (V.I. Terr. Ct. 2004).

Courts consider the following in determining whether a contract contravenes public policy:

> (a) the nature of the subject matter of the agreement; (b) the strength of the public policy underlying any relevant statute; (c) the likelihood that refusal to enforce the bargain will further any such policy; (d) how serious or deserved would be the forfeiture suffered by the party attempting to enforce the bargain; and (e) the parties['] relative bargaining power and freedom to contract. See 17A Am.Jur.2d, Contracts § 244.

> *Berne Corp.*, 46 V.I. at 115.

"The Court has a duty to refuse to enforce a contract that is contrary to public policy and tends to injure the public good or contravene some established interest of society." *Id.* Whereas here the Chapter 7 Trustee is arguing that the transfer of an interest in property was done to avoid a judgment, the allegations are more akin to a fraudulent conveyance claim. These allegations cannot be resolved in an action for turnover pursuant to §542.

This court will apply the law of the Virgin Islands to determine the respective property rights of Jeffrey and Dawn Prosser to the property which they continue to use and enjoy together as a married couple, despite assertions of purported gifting by Jeffrey Prosser to Dawn Prosser as reflected in the MPA. As previously noted and as stated in the MPA, the Virgin Islands recognizes that spouses can own separate property, such as property acquired prior to marriage and property acquired after marriage by way of gift, devise, or inheritance.[135] Therefore, as the

---

[135] As to ownership of property by spouses, the "Virgin Islands is not a community
(continued...)

evidence has shown and for the reasons already stated, Dawn Prosser has acquired separate

property: women's jewelry[136] which she has identified as her own, her half interest in North

Shore, and her ownership of AMJ. However, many items at issue in this proceeding do not fall

within the category of Dawn Prosser's separate property.

There is a presumption that property acquired during the marriage is marital property and

this presumption is applied even outside of dissolution proceedings in the Virgin Islands. *Felix v.*

---

[135](...continued)
property jurisdiction." *Dyndul v. Dyndul*, 541 F.2d 132, 133 (3d Cir. 1976). Therefore, both
spouses do not necessarily have an ownership interest in property acquired during the marriage.
*See* 16 V.I.C. §68 (defining "separate property of wife" and providing that "[t]he property and
pecuniary rights of every married woman at the time of her marriage or afterwards acquired by
gift, devise, or inheritance shall not be subject to the debts or contracts of her husband, and she
may manage, sell, convey or devise the same by will to the same extent and in the same manner
that her husband can property belonging to him"); 16 V.I.C. §62 (providing that "[w]hen property
is owned by either husband or wife, the other has no such interest as will make the same liable
for the contract or liabilities of either the husband or wife who is not the owner of property,
except as otherwise provided in this chapter"); 16 V.I.C. §69 (providing that "the
property...acquired by any married woman during coverture by her own labor shall not be liable
for the debts, contracts, or liabilities of her husband, but shall in all respects be subject to the
same exemptions and liabilities as property owned at the time of her marriage or afterwards
acquired by gift, devise or inheritance). As to 16 V.I.C. §69, however, we note Mrs. Prosser's
testimony that "[f]or the most part" her only source of income after 1989 was Mr. Prosser. *See*
Transcript of 12/10/2008, Adv. Doc. No. 604, at 163-64. *But see* notes 137-139 and
accompanying text, *infra*.

[136] The Chapter 7 Trustee seeks a finding "that Jeffrey Prosser is the owner of the jewelry,
that he was trying to minimize his personal assets by giving high value jewelry items to his wife,
that she in turn was trying to minimize the value of the jewelry and these assets must be turned
over to the estates." Chapter 7 Trustee's Post Trial Brief Regarding Turnover Adversary, Adv.
Doc. No. 659, at 25. First, to the extent this is an allegation of fraudulent transfers, that is an
issue for the District Court to determine. As for turnover, in the Chapter 7 Trustee's Post Trial
Brief, he identifies several items of jewelry worth hundreds of thousands of dollars; however,
simply based upon the value, this court cannot conclude that these were not gifts to Dawn
Prosser. *Id.* at 25. The Chapter 7 Trustee simply asserts that Jeffrey Prosser is the true owner of
the jewelry, indicating that every item of jewelry purchased by Jeffrey Prosser and given to Dawn
Prosser was a sham. *Id.* at 25. This claim has not been proven.

*Felix,* 39 V.I. 39, 42 (V.I. Terr. Ct. 1998).[137],[138]  However, the court makes it clear that "the

presumption can be rebutted with evidence that would prove that ownership lies solely with one

party." *Id.* at 41-42 (citation omitted). In fact, in support of the rebuttable presumption, the court

in *Felix* cited to *De Gimenez v. Curran*, 1 V.I. 386 (D.V.I. 1937), which was not an action for

divorce but rather a case in which a wife sought "restitution of certain articles of personal

property seized by the defendant...from the home of plaintiff and her husband...pursuant to an

execution issued...upon a judgment" against her husband. The wife contended that the items were

---

[137] Although addressing the respective property interests of spouses in the context of an
action for divorce, the court, in *Felix v Felix*, noted that "[i]t is the public policy of our Territory
to promote the vision of marriage as a partnership by designating the products born of the marital
union as marital property. The Territory's advocacy of the marital partnership is not only evident
*during the union*, but it is especially important at the marital dissolution." 39 V.I. at 42.
Therefore, the "presumption that property acquired during the marriage is marital property" has
application even during the marriage. *Id*. at 41-42. "[T]he term 'marital property' finds no
definition in the Virgin Islands Family Code...." *Lewit v. Lewit*, 52 V.I. 118, 123 (V.I. Super.Ct.
2009) (citing to *Fuentes v. Fuentes*, 38 V.I. 29 (V.I. Terr.Ct. 1997)).

[138] While the Virgin Islands ostensibly applies the concept of marital property outside the
context of divorce, other courts do not do so. *Cf. In re Carver,* 2003 Bankr. LEXIS 70, at *6-7
(Bankr. S.D. Ill. Jan. 24, 2003) (applying Illinois state law and stating that "even if the home
might be considered marital property despite being titled only in the debtor's name, in Illinois, a
spouse's interest in marital property does not vest until a petition to dissolve the marriage is
filed"); *In re Emerson,* 2005 Bankr. LEXIS 3125, at *18 (Bankr. D. Mont. Dec. 29, 2005)
(finding that "in the absence of a dissolution proceeding and in a separate property, not a
community property state, such as Montana, the common ownership of the married parties under
MCA §40-4-202 does not become effective in creating an individual interest for Debtor in his
wife's real property until a dissolution proceeding is commenced in state court"); *In re
Balzano,* 399 B.R. 428, 431(Bankr. D. Md. 2008) (finding that "the mere marriage of a debtor to
the titled owner of real property does not create an interest of the debtor in property so as to bring
the property into the bankruptcy estate" and "[t]he Maryland marital property laws are effective
to create property rights only upon divorce.") The court in *Balzano* further stated that payments
from a joint checking account alone did not create a joint interest in the property. *Id.* at 432. *But
see In re Okon,* 310 B.R. 603, 607 (Bankr. N.D. Ill. 2004) ("When the question before the court
concerns the relative rights of a debtor in bankruptcy and the debtor's non-debtor spouse to
particular property, state law on marital property must be consulted.")

her separate property.[139] In *Curran*, the court noted that "it must often occur that the testimony of the spouses themselves concerning the acquisition and disposition of particular chattels will be the only available evidence of ownership....Of course, the probative value of such testimony must be determined by the trier of fact in the same manner as the probative value of any other evidence is determined." 1 V.I.C. at 388. As to numerous items, the wife testified inconsistently as to her acquisition and the court found, in those instances, that she had failed to prove ownership. *Id.* at 389-390.

Here, Dawn Prosser and Jeffrey Prosser have testified inconsistently as to ownership of the property at issue - at times testifying that Dawn Prosser owns everything and at other times testifying she owns a fifty percent share of certain items. At times, Jeffrey Prosser claimed full ownership of items (including those titled only to Dawn Prosser such as the Estate Shoys homes) as his sole assets on balance sheets used in an effort to obtain loans. As explained, *supra*, even the MPA, which purports to confirm that certain identified items or categories of items constitute the separate property of Dawn Prosser by way of gift or acquisition by her own labor, is inconsistent with the conduct of the parties. Despite the evidence of gifting in the MPA, the clear weight of the evidence, based, *inter alia*, on the conduct of the parties, does not support the contention that gifts were made, other than as to Dawn Prosser's jewelry. Rather, other than

---

[139] The case applied prior law in effect at the time, which contained sections that correspond to current 16 V.I.C. §§68 and 69. Under the prior law, a wife was directed to record a statement of her separate interest in marital property with Recorder of Deeds, because without said statement, the property was presumed to be that of the husband. Without filing a statement, the wife could only rebut the presumption of her husband's ownership by producing competent evidence to protect her interest against the creditors of her husband. *See* 1921 Codes, Title II, ch. 14, §§ 8, 9, 10. We are not concerned here with a recorded statement by Dawn Prosser nor will the property be presumed to be property of Jeffrey Prosser, but we apply the presumption of marital property stated in *Felix*.

wines and cigars, which the credible evidence established were solely Jeffrey Prosser's, the

evidence proved  clearly and convincingly that the assets and services purchased by Jeffrey

Prosser and allegedly gifted to Dawn Prosser were for the benefit of the marital unity.

We turn to the assets alleged to be Dawn Prosser's.

Estate Shoys: As to the Estate Shoys property, the warranty deed dated January 15, 1990,

shows that Plots No. 5 and 10A were conveyed to Dawn E. LaBennett, prior to her marriage to

Jeffrey Prosser. *See* TT127, at TT3 01317-19. The main house is the large unfinished building on

plots 5 and 10A. Testimony of Dawn Prosser, Transcript of 02/09/2009, Adv. Doc. No. 631, at

50. When Plot No. 5 and 10A were purchased there was a home on the property, but that home

was demolished to begin construction of the main house. Testimony of Dawn Prosser, Transcript

of 02/09/2009, Adv. Doc. No. 631, at 51-53. Therefore, the plots of land separately owned by

Dawn Prosser still exist, but the appreciation in value, to which Jeffrey Prosser made substantial

contributions, occurred during the marriage and is presumed to be marital property. As for the

property described as Rem. Plot 4, Plot 4-A, and Plot 10-AA in the warranty deed dated August

31, 2005, also in Dawn Prosser's name alone, that property was acquired during the marriage.

*See* TT127, at TT3 01297-01300. As Jeffrey Prosser has been identified as the source of the

funds used to purchase, construct, maintain and furnish the property and continues to possess,[140]

use, and enjoy the property, the presumption is that this is marital property.

Thus, the evidence indicates, that notwithstanding title and the MPA, Jeffrey Prosser has

an equitable interest in the Estate Shoys property where the guest house and main house sit. *See*

*In re Stewart,* 325 Fed. Appx. 82 (3d Cir. 2009)*.*

---

[140] His bankruptcy schedules list a possessory interest in this property. *See* TT6.

115

Furthermore, despite assertions that Jeffrey Prosser gifted his property to Dawn Prosser for estate planning purposes, this court is not handling estate planning and Jeffrey Prosser continued to possess, use, and enjoy the property as his own. In *Stewart*, the court found that, based upon applicable state law, where a mother executed a deed conveying her property to her son for estate planning purposes but she continued to reside at the property and pay the bills and taxes associated with the property, a resulting trust arose in her favor, and she was the equitable owner of the property. *Id.* at 84-85.

Here, the overwhelming evidence indicates that Jeffrey Prosser retained possession and control of, and continued to enjoy the use of, the Estate Shoys property, including the land titled in Dawn Prosser's name only, and at various times represented that it was, in fact, his property. He and Dawn shared possession, control and use of the property, and it is clear he did not intend to entirely give up his own interest in it. According to the Prossers' testimony, the funding for purchase of the guest house and for the construction of the main house was generally Jeffrey Prosser. The Prossers resided in the home together. While the general rule is that the individual who has record title is presumed to be the owner of real property, the presumption is weaker where the record titleholder does not have exclusive possession and control. *See Coman*, 9 V.I. at 479. Dawn Prosser did not have exclusive possession and control over the property. She admitted that Jeffrey Prosser still has use and enjoyment of all of her alleged solely owned property (except jewelry and clothing). The mortgages were in both parties' names and Jeffrey Prosser identified the property as his own asset on multiple occasions.  Regardless of the terms of the MPA and title in Dawn's name, the evidence proved that Jeffrey Prosser had an equitable interest in the property in which he and Dawn resided.

116

As to property which Jeffrey Prosser through his own funds or through the contra equity account purchased and continued to use and share with Dawn Prosser, the issue for the Chapter 7 Trustee is whether Jeffrey Prosser transferred his interest in property to Dawn Prosser by way of gift. "Among the circumstances which tend to rebut the presumption of a gift or advancement, or to show that the presumption is unreasonable, is the fact that the property conveyed consists of the husband's entire estate." *Scanlon v. Scanlon*, 127 N.E.2d 435, 439 (Ill. 1955). "Other factors tending to overcome the presumption of a gift where the husband has paid the purchase price, are the making of improvements, payment of taxes and the mortgage debt, occupancy of the premises as a home and a place of business, and the exercise of control and management of the property." *Id.* We find these factors relevant here. The evidence does not support the alleged gifting of Jeffrey Prosser's entire estate.

We examine the alleged gifts of personal property.

Art work and furnishings: Art work and furnishings funded through Jeffrey Prosser's personal account or through New ICC continued to be used by Jeffrey Prosser despite the assertion that he gifted all the property to Dawn Prosser. As to items that are subject to the terms of the MPA, the MPA did not purport to convey an interest in any items but rather was written as an acknowledgment by Jeffrey and Dawn Prosser that certain items acquired by Dawn Prosser's own labor or by way of gift are her own separate property, consistent with the terms of 16 V.I.C. §§68 and 69. Jeffrey Prosser and Dawn Prosser have asserted that throughout the marriage Jeffrey Prosser has gifted all property to Dawn Prosser for estate planning purposes. However, gifting is inconsistent with the Prossers' conduct. Both of the Prossers used and enjoyed the art work and furniture in their various residences and planned to use the items which were being

117

stored for future use. The Chapter 7 Trustee has proven that Jeffrey Prosser has an ownership

interest in these items.

Women's Jewelry: As to property, such as women's jewelry, *see* TT47, at TT2 00319-

320, TT2 00322-327, the Chapter 7 Trustee asserts that "the Court may find that Jeffrey Prosser

is the owner of the jewelry, that he was trying to minimize his personal assets by giving high

value jewelry items to his wife...." Chapter 7 Trustee's Post Trial Brief Regarding Turnover,

Adv. Doc. No. 659, at 25. However, the Chapter 7 Trustee is not describing a turnover claim,

but rather making allegations of a fraudulent conveyance. We have no evidence that Jeffrey

Prosser retained substantial control over Dawn's jewelry.[141] Therefore, as stated, *supra*, the

Chapter 7 Trustee has failed to meet his burden in requesting turnover of women's jewelry.

Items Inventoried by Dawn Prosser: With respect to items which are not the subject of the

MPA but that Mrs. Prosser nonetheless asserts Jeffrey Prosser gifted to her, Jeffrey Prosser's

Statement of Financial Affairs (SOFA) does not list any gifts from Mr. Prosser to Mrs. Prosser

during the year preceding the filing of his bankruptcy case. TT1, at TT00003. Jeffrey Prosser

filed his petition commencing his voluntary Case No. 06-30009 on July 31, 2006. There are some

assets on Dawn Prosser's inventory that either may or do fall within this one-year period.

However, TT47 does not provide a date of ownership for much of the property listed and it is not

clear from the inventory of assets which, if any, should have been reported on Mr. Prosser's

---

[141] The Chapter 7 Trustee asserts that the jewelry is ultimately the property of Mr. Prosser
and that he exercised control over the items. As evidence of this assertion, the Chapter 7 Trustee
points to the Chopard appraisals which were addressed to Mr. Prosser alone, *see* TT66, at TE2
01981-84. However, the court finds that Jeffrey Prosser intended to gift to her the women's
jewelry identified by Dawn as her own.

118

SOFA. Several items are listed with dates of ownership in 2005.[142] The acquisitions in 2005 may or may not fall within the one-year period, but without a specific date, it is not clear whether these assets should have been included on Jeffrey Prosser's SOFA. Several items were clearly acquired by Dawn within the one-year period[143]; however, Dawn does not identify these items as gifts from Jeffrey Prosser either, such that disclosure on his SOFA would be required. Numerous records of jewelry purchases have been admitted as evidence. However, the Chapter 7 Trustee has not specifically identified for the court purchases made by Jeffrey Prosser which fall within this timeframe.

Hermon Hill: Jeffrey Prosser admitted he and Dawn Prosser jointly own the Hermon Hill property as tenants by the entirety. Where "entireties property is not exempt...the trustee may obtain authority to sell the property, including a nondebtor spouse's interest, pursuant to section 363(h)." *See In re Romano*, 378 B.R. 454, 470 (Bankr. E.D. Pa. 2007) (citing 4 Collier on Bankruptcy, P 522.10[3], at 522-78.2 (15th ed. rev. 2007). Jeffrey Prosser valued this undeveloped real estate at $50,000. The Chapter 7 Trustee has met his burden of proof. Thus, the Hermon Hill property is not of inconsequential value, and Jeffrey Prosser admitted that he has an

---

[142] The following items were identified as acquired in 2005: (1) a set of gold Tiffany earrings are identified as a gift, TT47, at TT2 00319, (2) a John Hardy ring, the source of which is illegible but appears to say "daughter", *id.* at TT2 00324, (3) one gold/blue stone necklace, *id.*, (4) one pair of earrings, *id.*, (5) one bracelet, *id.*, (6) another pair of Tiffany gold earrings identified as purchased by her son, *id.*, (7) a Tiffany star broach identified as a gift, *id.* at TT2 00326, and (8) a pair of Tiffany star earrings, *id.* We note that various types of property are included in TT47 (jewelry, furnishings, art work, etc.) although the only items which are identified specifically with an acquisition date of 2005 or later happen to be jewelry.

[143] Among these are a Ritsu 14 karat mushroom ring, identified as an item that Dawn purchased for herself in 2006, *id.* at TT2 00323, a Ritsu Mother of Pearl gold ring acquired in 2007 as a birthday gift, *id.* at TT2 00324, Cartier watch acquired in 2006 as a birthday gift, *id.*, *etc.*

ownership interest in this property, which is an asset of his estate that may be used, leased, or

sold by the trustee pursuant to 363(b).

        North Shore and the Carden Beach Condominium: As to the Chapter 7 Trustee's claim

"that the real property owned by North Shore, namely the Carden Beach condominium, as well as

North Shore's bank account must be turned over to the Trustees pursuant to sec. 542[,]" there is

no support for the contention that the corporate property should be turned over. The Chapter 7

Trustee has neither asserted nor proven that the corporate entity is a fiction and that the corporate

veil should be pierced.[144] Therefore, the condominium and the corporate bank account remain

corporate property. *See In re Levitsky,* 401 B.R. 695, 710 (Bankr. D. Md. 2008) (citing to

*Kreisler v. Goldberg*, 478 F.3d 209, 214 (4th Cir. 2007) for the proposition that "[a]ssets owned

by a corporation in which a debtor is a stockholder are not property of the debtor, but that of the

corporation."). "Thus, the assets of a non-debtor corporation do not become assets of the

bankruptcy estate of a stockholder of the corporation, even when the individual owns all of the

stock. It is only the interest in stock held by an individual debtor in a corporation that is property

of the debtor's bankruptcy estate, because it represents the debtor's equitable ownership interest

in the corporation." *Id.* Therefore, inasmuch as the court found that Jeffrey Prosser has an

ownership interest in North Shore, *see* text *supra* at item 25, that ownership interest (but not the

---

        [144] "[I]n seeking to bring into the bankruptcy estate the debtor's residence which is titled
in the name of the non-filing corporation (and which is the sole asset of the debtor's solely-owned
corporation), the Trustee bears the burden of proving that the corporation is a fraud, created by
the debtor to hinder, delay and defraud creditors, and that the debtor disregarded corporate
formalities in using the corporation for his own personal benefit. The Trustee is not seeking to
pierce the corporate veil in the usual sense of holding a stockholder individually liable for the
debts of the corporation. Rather, she contends that because the debtor has fraudulently treated the
corporate property as his own, reverse veil piercing permits her to administer the Property for the
benefit of the debtor's creditors." *In re Levitsky,* 401 B.R. 695, 710 (Bankr. D. Md. 2008).

assets of the corporation) must be turned over to the Chapter 7 Trustee as property of the bankruptcy estate. Pursuant to §542, this court finds that this interest in property is of use to the bankruptcy estate and is not of inconsequential value.

AMJ and the Schooner Bay Condominium: The Chapter 7 Trustee also contends that the Schooner Bay condominium should be turned over to the Trustees. However, the Trustee failed to prove that Jeffrey Prosser has an ownership interest in the condominium or in the corporation, AMJ, Inc., which owns the condominium. *See* Chapter 7 Trustee's Proposed Findings of Fact and Conclusions of Law for Turnover Trial, Adv. Doc. No. 658, at 39-40. The Chapter 7 Trustee simply provides that (1) AMJ, Inc. was created to own the condominium; (2) Jeffrey Prosser was the President of AMJ; and (3) Mrs. Prosser did not have a source of income other than her husband to purchase the condominium. *Id.* While this court found that Jeffrey Prosser was, in fact, president of AMJ, *see* text *supra* at item 27, there is no basis on which to conclude that Jeffrey Prosser has an ownership interest in the corporation, let alone in the condominium owned by the corporation.

Wines: As to wines purchased by Jeffrey Prosser, wines were purchased through bulk orders pursuant to an agreement between Jeffrey Prosser and Mr. Weissman and through stores that charged Jeffrey Prosser on his credit card, with no indication that Dawn Prosser had any interest or even knowledge of which wines were purchased or who purchased them. The wines are not of inconsequential value and are the property of the Chapter 7 estate. They must be turned over to the Chapter 7 Trustee.

Cigars: There is no evidence that Dawn Prosser had any interest in the cigars or cigar collections. They are solely property of Jeffrey Prosser's estate and must be turned over to the

121

Chapter 7 estate.

Audio Equipment: It is the Chapter 7 Trustee's position "that any and all audio equipment installed in any of the real property in dispute in this matter is a fixture of that property." Chapter 7 Trustee's Proposed Findings of Fact and Conclusions of Law for Turnover Trial, Adv. Doc. No. 658, at 29, n.3. Jeffrey Prosser testified that audio equipment was installed in the Palm Beach residence, which is the subject of a separate adversary proceeding,[145] the Lake Placid residence, which has been sold,[146] and the Estate Shoys homes. The audio equipment in the Estate Shoys homes are the property at issue in this turnover proceeding.

As to the audio equipment installed in the Estate Shoys homes, we look to the law in the Virgin Islands. In *James v. Antilles Gas Corp.*, the court applied three factors to determine whether an item was real or personal property: "(1) the extent of actual physical annexation to the realty; (2) application or adaptation of the structure to the use or purpose to which the realty is devoted; and (3) intention of the person making annexation to make a permanent accession to the land." 43 V.I. 37, 42 (V.I. Terr. Ct. 2000). The court defined a fixture as "a chattel attached to the realty which becomes accessory to it and part and parcel of it[.]" *Id.* at 43.

The Chapter 7 Trustee has not provided the court with the information necessary to make this determination. The items listed throughout TT16 do not clarify the issue for the court. Numerous items were purchased. How those items were installed, if those items were installed,

---

[145] This court issued its Memorandum Opinion, Report and Recommendation to the District Court and Certification Pursuant to District Court Order in that adversary on October 9, 2009. Adv. No. 08-3002, Adv. Doc. No. 212. The matter is pending in the District Court.

[146] An order was entered approving the sale of the Lake Placid property on October 28, 2008. Adv. No. 08-3009, Adv. Doc. No. 86.

and where inside the home those items were installed is not apparent from the documents.

Clearly, Jeffrey Prosser and Dawn Prosser have possession, custody, and control of this

equipment and its value as shown on the documents is not inconsequential. To the extent that the

audio equipment is not a fixture, Jeffrey Prosser has an interest in these items based upon his

payment for the items and the fact that he ordered the equipment for the apparent joint use of

himself and Dawn Prosser in their personal homes. If they are fixtures, Jeffrey Prosser has an

interest based upon his interest in the realty. Either way, Jeffrey Prosser's interest is property of

his Chapter 7 estate. Whether the audio equipment is severable from the property such that it can

physically be removed and turned over has not been established. Further proceedings will be

ordered regarding the characterization of the audio equipment.


Count II: Injunctive Relief

On October 30, 2007, the court entered a Temporary Restraining Order. *See* Adv. Doc.

No. 18. Then, on December 11, 2007, this court entered an Order Granting Application for

Preliminary Injunction. *See* Adv. Doc. No. 79.

As neither estate has an interest in the following, a permanent injunction will not be

granted and the preliminary injunction will be dissolved as to (1) the Cadillac in the possession

of Michael Prosser, (2) the Carden Beach condominium, (3) AMJ and its assets (including the

Schooner Bay condominium), and (4) Hermon Hill property.

As to the following, the preliminary injunction will be made permanent and the following

property shall be turned over to the Chapter 7 Trustee forthwith: (1) cigars and (2) wines.

As to the following items, the preliminary injunction will remain in place pending the

outcome of the fraudulent conveyance actions against Dawn Prosser and against the Adult

Prosser Children: (1) the art work and furnishings still in one of the Prossers' homes or in storage

for use in the Prossers' homes, (2) the Estate Shoys Property,[147] (3) jewelry, (4) Mercedes, and

(5) Adrian Prosser's West Palm Beach condominium.


Count III: Imposition of Constructive Trust

The Trustees assert that "[a]s one or more of the Estates holds an interest in the

Property,[148] the Court should immediately impose a constructive trust on the Property for the

benefit of the Estates while it remains in the hands or control of the Defendants." Amended

Complaint, Adv. Doc. No. 71, at ¶39. Through the imposition of a constructive trust, a court of

equity can order the transfer of title to the true owner.  *Great-West Life & Annuity Insurance Co.

v. Knudson,* 534 U.S. 204, 213 (2002). "The imposition of a constructive trust is governed by

applicable state law...."  *Skilled Nursing Professional Services v. Sacred Heart Hospital,* 175

B.R. 543, 554 (Bankr. E.D. Pa. 1994).

---

[147] In the Chapter 11 Trustee's fraudulent conveyance complaint against Dawn Prosser, which will be tried by the District Court, the Chapter 11 Trustee seeks imposition of a constructive trust on the Estate Shoys homes. *See* Adv. No. 08-3003, Adv. Doc. No. 1, at ¶¶67-71. In addition, the Chapter 11 Trustee identifies transfers which he asserts were fraudulent. The list includes, *inter alia*, funds paid to Banco Popular for the purchase of wines and liquors, payments to American Express for jewelry, payments to Scott Lindsay Interiors, various companies involved in the construction of the Estate Shoys main house, and Michael Connors. With respect to funds transferred out of New ICC, the Chapter 11 Trustee seeks to recover pursuant to §550 "each of [the] Transfers, the value thereof, or any and all proceeds, monies or properties attributable to same." *Id.* at ¶¶23, 30, 41, 50, 60, 65.

[148] The Trustees define "Property" as including (1) property acquired through Jeffrey Prosser's own funds or New ICC's funds and (2)  the real and personal property in possession of the Defendants for which Jeffrey Prosser directed New ICC to pay insurance premiums. Amended Complaint, Adv. Doc. No. 71, at ¶14.

"The law of constructive trusts draws upon the court's equitable powers to determine

whether a transfer of property should be held in trust by the transferee for the benefit of the

transferor. Restatement of Restitution § 166." *Estate of Millin v. Bryan*, Dist. Ct. Civ. No.

89-334, 1990 U.S. Dist. LEXIS 20092, at *4 (D.V.I. Oct. 9, 1990).

> "[A] plaintiff could seek restitution in equity, ordinarily in the form of a
> constructive trust or an equitable lien, where money or property identified as
> belonging in good conscience to the plaintiff could clearly be traced to particular
> funds or property in the defendant's possession." *Skretvedt v. E.I. DuPont De
> Nemours*, 372 F.3d 193, 211 (3d Cir. 2004). *See also* RESTATEMENT OF
> RESTITUTION § 160, Comment a, at 641-642. In the case of the constructive
> trust, a court of equity could then order a defendant to transfer title to the party
> who was, in the eyes of equity, the true owner. Id. See also RESTATEMENT OF
> RESTITUTION § 215, Comment a, at 867.
>
> Where a person holding title to property is subject to an equitable duty to
> convey it to another on the ground that he would be unjustly enriched if he were
> permitted to retain it, a constructive trust arises. *In re Pemaquid Underwriting
> Brokerage, Inc.*, 319 B.R. 824, 843 (Bankr. D.N.J. 2005) quoting
> RESTATEMENT (FIRST) OF RESTITUTION § 160 (1937). 'A constructive
> trust does not, like an express trust, arise because of the manifestation of an
> intention to create it, but it is imposed as a remedy to prevent unjust enrichment.'
> *In re Pemaquid*, 319 B.R. at 843 quoting RESTATEMENT (FIRST) OF
> RESTITUTION § 160 (1937)....

*In re Estate of Todman*, 48 V.I. 166, 179 (V.I. Super. Ct. 2006). "Importantly, a constructive trust

may be imposed against one who has been unjustly enriched, even though he is guilty of no

wrongdoing. *Qualchoice, Inc. v. Rowland*, 367 F.3d 638, 649 (6th Cir. 2004)." *Todman*, 48 V.I.

at 180.

*Imposition of a constructive trust in favor of the Chapter 11 estate is not warranted for the*

*reasons set forth herein:*

The Amended Complaint asserts that imposition of a constructive trust is appropriate as

the Defendants acquired the property at issue "through substantial overreaching and

unconscionable conduct, or a diversion of assets amounting to a breach of fiduciary duties[149]...."

Adv. Doc. No. 71, at ¶37. In his Brief in Support of Proposed Findings of Fact and Conclusions

of Law, the Chapter 11 Trustee specifically asserts that a constructive trust be imposed on Estate

Shoys and the West Palm Beach Condominium to prevent unjust enrichment. *See* Adv. Doc. No.

657, at 15-16.

It would not be appropriate in these circumstances to impose a constructive trust on

behalf of the Chapter 11 estate. For purposes of this turnover action only, the dispute regarding

the Chapter 11 Trustee's ability to sell, use, or lease property as required by §542 has been

resolved. New ICC treated the transfers to Jeffrey Prosser or for his benefit as distributions.

Although New ICC funds were used in the purchase or construction, maintenance, insurance, etc.

of the Estate Shoys properties and much of the other property at issue in this Adversary

Proceeding, they were attributed to Jeffrey Prosser and treated as such, except for certain

payments to AON Risk Services.

The payments for builder's risk insurance, which was obtained for the construction of the

main house on Estate Shoys, were actually expensed by New ICC as opposed to being treated as

---

[149] At trial on March 24, 2009, counsel for the Chapter 11 Trustee asserted that "there are claims, as well, independent of turnover in this lawsuit. If you look at Count 3, where we alleged breach of fiduciary duties, and we alleged unjust enrichment because of this money going out with no consideration was returned by any of these defendants." Transcript of 03/24/2009, Adv. Doc. No. 642-1, at 294. In the Amended Complaint, the Trustees set out as Count III "Imposition of Constructive Trust". We address herein whether a constructive trust is an appropriate remedy with respect to the turnover claims brought pursuant to §542. However, the Chapter 11 Trustee has not set out as a separate count an allegation of breach of fiduciary duties, and he requests imposition of a constructive trust based upon a cause of action which he did not bring. The Chapter 11 Trustee brought the cart before the horse.

contra equity transactions. The Chapter 11 Trustee has proven that these payments were to

provide insurance during the construction of the Estate Shoys main house, which was for the

benefit of Jeffrey and Dawn Prosser. The residences are currently in the possession of Jeffrey and

Dawn Prosser. Who has possession of the insurance premiums was not established. Although the

payments were not for a corporate purpose and did not benefit New ICC, those are not elements

of turnover.

*Imposition of a constructive trust in favor of the Chapter 7 estate is warranted as set forth
herein:*

The Chapter 7 Trustee has established that Jeffrey Prosser has an interest in certain items:

(1) wines, (2) cigars, (3) art work and furnishings either in the Prossers' homes or in storage for

use in the Prossers' homes, (4) Estate Shoys, and (5) the North Shore Real Estate Corporation.[150]

In accordance with the evidence presented, the cigars and wines have been established to be the

separate property of Jeffrey Prosser and the other enumerated items have been established to be

the joint property of Jeffrey and Dawn Prosser. Thus, Dawn Prosser would be unjustly enriched if

she were permitted to retain these items as her separate property. Turnover of the estate's interest

in these assets is required and a constructive trust in favor of the Chapter 7 estate is imposed to

protect the estate's interests while the assets remain in possession of Jeffrey and/or Dawn

Prosser.

A constructive trust is only appropriate where the person holding title to the property is

---

[150] Jeffrey Prosser admits to his interest in the Hermon Hill property in which he and
Dawn Prosser hold title as joint owners. The Chapter 7 Trustee clearly has an interest in the
property and a constructive trust is not necessary to protect that interest.

subject to an equitable duty to convey the property to another on the grounds of unjust

enrichment. *See Kirby v. Kirby,* 14 V.I. 601, 608 (V.I. Terr.Ct. 1978). In *Kirby*, where the court

was faced with the disposition of the marital abode in an action for divorce, the husband asserted

an entitlement to the property on the theory of either a constructive trust or resulting trust where

the property was titled solely in the wife's maiden name but he had contributed to construction.

*Id.* at 605-06. The court found that defendant contributed $8,500.00 to the construction, but there

was no basis to impose a constructive trust. *Id.* at 608. Rather, the court found that the best the

husband could expect was the imposition of an equitable lien to secure his contribution. *Id.* In

contrast to the facts presented here, the defendant wife in *Kirby* not only contributed to the

purchase and construction of the marital home, but contributed more than the plaintiff husband.

Here, Jeffrey Prosser contributed virtually all of the funds used to purchase, construct, and

maintain the properties.

As in *Kirby*, the property at issue, when purchased (with the exception of cigars and

wines determined to be the separate property of Jeffrey Prosser and jewelry determined to be the

separate property of Dawn Prosser), was purchased for the mutual benefit of the parties, i.e., the

art work, furnishings, and the construction and maintenance of the Estate Shoys homes. Jeffrey

Prosser contributed significant sums of money for the acquisition, maintenance, and insurance of

the property which he continued to possess, use, and enjoy. The property was for Jeffrey and

Dawn Prosser's mutual benefit. He was the source of funding, either through his own accounts or

contra equity, and he treated the property as his own.

With respect to the real property at issue, two deeds relating to the Estate Shoys property

list only Dawn Prosser as the title owner. The warranty deed dated January 15, 1990, shows that

128

Plots No. 5 and 10A were conveyed to Dawn E. LaBennett, prior to her marriage to Jeffrey

Prosser. *See* TT127, at TT3 01317-19. The main house is the large unfinished building on plots 5

and 10A. Testimony of Dawn Prosser, Transcript of 02/09/2009, Adv. Doc. No. 631, at 50.

When Plot No. 5 and 10A were purchased there was a home on the property, but that home was

demolished to begin construction of the main house. Testimony of Dawn Prosser, Transcript of

02/09/2009, Adv. Doc. No. 631, at 51-53. Therefore, the plots of land separately owned by Dawn

Prosser still exist, but the appreciation in value by the addition of a new, very large and

expensive house, to which Jeffrey Prosser made substantial contributions, occurred during the

marriage for construction of what was intended to be the marital home. As for the property

described as Rem. Plot 4, Plot 4-A, and Plot 10-AA in the warranty deed dated August 31, 2005,

also in Dawn Prosser's name alone, that property was acquired during the marriage. *See* TT127,

at TT3 01297-01300. Jeffrey Prosser has been identified as the source of the funds of the

property and continues to use and enjoy the property. He has made substantial contributions

which have increased the value of the property, which Jeffrey and Dawn Prosser identify as their

primary residence. On several occasions, Jeffrey Prosser has identified the property as his own

and Dawn Prosser has represented having only a fifty percent interest. *See* discussion *supra* at

item 12. These facts support the conclusion that both Jeffrey and Dawn Prosser recognized

Jeffrey Prosser's interest in the property.[151]

As to the property at issue, Dawn Prosser would be unjustly enriched if she were

---

[151] We note that Jeffrey Prosser has identified the Virgin Islands as his domicile, i.e. his "true, fixed, principal, and permanent home, to which that person intends to return and remain even though currently residing elsewhere." Black's Law Dictionary (9th ed. 2009). *See* notes 121 and 123. The homes located on Estate Shoys are the only residences owned by the Prossers in the Virgin Islands.

129

permitted to retain possession of the property as sole owner. The source of funding and

maintenance for these items was generally Jeffrey Prosser, through his personal accounts or

through distributions to him out of New ICC. The inconsistent testimony of Jeffrey and Dawn

Prosser regarding gifting of property and ultimately ownership of property is not credible. It is

not supported by their conduct and representations outside of these proceedings. Therefore, as the

Chapter 7 estate has an interest in the art work, furnishings, and Estate Shoys homes, a

constructive trust protecting the estate's interest are imposed while the property remains in the

possession of Dawn and/or Jeffrey Prosser.


Count IV: Disallowance of Claims Asserted by the Defendants Pursuant to Bankruptcy Code
§502(d)

Section 502(d) provides for disallowance of "any claim of any entity from which property

is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer

avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless

such entity or transferee has paid the amount, or turned over any such property, for which such

entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title." The purpose

of §502(d) is to ensure compliance with judicial orders. *Logan v. Credit General Insurance Co.*,

331 B.R. 580, 587 (Bankr. D. Del. 2005). Application of §502(d) is not triggered until the

trustee successfully prosecutes an avoidance action. *Marketing Resources International Corp. v.

PTC Corp.,* 35 B.R. 353, 356 (Bankr. E.D. Pa. 1984). Then, if the party refuses to comply with

the judgment, the court must disallow the party's claim pursuant to §502(d). *Id.*

Although the Trustees state in the Amended Complaint that they are "entitled to entry of

an order disallowing any claim of the Defendants against the Estates pursuant to Bankruptcy

Code §502(d)[,]" the Trustees do not identify for the Court any claims filed by the Defendants.

Adv. Doc. No. 71, at ¶¶41-42.  This court's review of the claims register in the bankruptcy cases

of New ICC (Case No. 07-30012) and Jeffrey J. Prosser (Case No. 06-30009) did not reveal any

claims filed by the Defendants. The bar dates have passed, and there are no claims to disallow. In

the event that any Defendant attempts to file a claim, this ruling is without prejudice to being

raised by the Trustees at that time.


Conclusion

     All property in which the Chapter 7 Trustee holds an interest, as specifically identified in

this Memorandum Opinion, must be turned over to the Chapter 7 Trustee. The property is not of

inconsequential value to the estate. A constructive trust shall be imposed as provided herein,

protecting the interests of the Chapter 7 Trustee for the benefit of the Chapter 7 estate. This

Opinion preserves and reserves all rulings regarding fraudulent conveyances. The preliminary

injunction will be vacated as to certain property, and retained as to some property

and made permanent as to other property as provided herein.

     The Emergency Motion to Stay will be denied.


Dated: February 9, 2011

*Judith K. Fitzgerald*
kdv

Judith K. Fitzgerald
United States Bankruptcy Judge

131

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**BANKRUPTCY DIVISION**
**DIVISION OF ST. THOMAS AND ST. JOHN**

IN RE

JEFFREY J. PROSSER,                          Bankruptcy No. 06-30009

     Debtor.                               Chapter 7

IN RE

INNOVATIVE COMMUNICATION                     Bankruptcy No. 07-30012
CORPORATION,
                                             Chapter 11
     Debtor.

STAN SPRINGEL, CHAPTER 11                     Adv. No. 07-3010
TRUSTEE OF THE ESTATE OF
INNOVATIVE COMMUNICATION                      Related to Doc. Nos. 71, 79, 704
CORPORATION, AND JAMES P.
CARROLL, AS CHAPTER 7
TRUSTEE OF THE ESTATE OF
JEFFREY J. PROSSER,

     Plaintiffs

v.

JEFFREY J. PROSSER, DAWN
PROSSER, JUSTIN PROSSER,
MICHAEL PROSSER,
SYBIL G. PROSSER, MICHELLE
LABENNETT, AND LYNDON A.
PROSSER,

     Defendants

**ORDER (1) REQUIRING TURNOVER OF CERTAIN PROPERTY TO THE**

1

**CHAPTER 7 TRUSTEE; (2) IMPOSING A CONSTRUCTIVE TRUST IN FAVOR OF
THE CHAPTER 7 TRUSTEE; (3) AMENDING THE TERMS OF THE INJUNCTION;
(4) SETTING A STATUS CONFERENCE; (5) DENYING TURNOVER RELIEF AS TO
THE CHAPTER 11 ESTATE; AND (6) DENYING EMERGENCY MOTION TO STAY**

**AND NOW**, this __9th___ day of __February_____, **2011,** for the reasons expressed in
the foregoing Memorandum Opinion, it is **ORDERED** that:

1. Defendants shall turnover the following property to the Chapter 7 Trustee:
(1) wines,
(2) cigars,
(3) Jeffrey Prosser's one-half interest in art work and furnishings either in the Prossers'
homes or in storage for use in the Prossers' homes,
(4) Jeffrey Prosser's one-half interest in Estate Shoys, and
(5) Jeffrey Prosser's one-half interest in North Shore Real Estate Corporation.

2. The preliminary injunction is hereby dissolved as to (1) the Cadillac in the possession
of Michael Prosser, (2) the Carden Beach condominium, (3) AMJ and its assets (including the
Schooner Bay condominium), and (4) Hermon Hill property.

3. The preliminary injunction is hereby made permanent and shall be kept in place until
the following property is turned over to the Chapter 7 Trustee, which shall be turned over
forthwith: (1) cigars and (2) wines.

4. The preliminary injunction will remain in place pending the outcome of the fraudulent
conveyance actions as to (1) the art work and furnishings in the Prossers' homes or in storage for
use in the Prossers' homes, (2) the Estate Shoys Property, (3) jewelry, (4) Mercedes, and (5)
Adrian Prosser's West Palm Beach condominium.

5. A constructive trust is hereby imposed in favor of the Chapter 7 Trustee for the benefit
of the Chapter 7 estate on:
(1) wines,
(2) cigars,
(3) art work and furnishings either in the Prossers' homes or in storage for use in the
Prossers' homes,
(4) Estate Shoys, and
(5) North Shore Real Estate Corporation.

6. The Trustee is authorized to administer, consistent with tenancy by the entireties law of
the Virgin Islands and the Bankruptcy Code, the Hermon Hill property.

7. A status conference regarding the characterization of the audio equipment as fixtures in
the Estate Shoys homes is scheduled to be held at the omnibus hearing on April 26, 2011 at 9:00

2

A.M. Prevailing Eastern Time in Courtroom A, 54th Floor, U.S. Steel Tower, 600 Grant Street,
Pittsburgh, PA 15219. Telephonic and video participation are permitted as provided in the Order
Scheduling 2011 Omnibus Hearing Dates and Corresponding Filing and Objection Deadlines.
Case No. 06-30009, Doc. No. 3008.

      8. Turnover to the Chapter 11 Estate is not warranted and is DENIED.

      9. The Emergency Motion to Stay is DENIED.

      It is **FURTHER ORDERED** that counsel for the Chapter 11 Trustee shall immediately
serve a copy of this Memorandum Opinion and Order on all parties in interest who do not receive
electronic notice and shall file a certificate of service forthwith.

_Judith K. Fitzgerald_
Judith K. Fitzgerald                 kdv
United States Bankruptcy Judge

3