# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## BANKRUPTCY DIVISION
## DIVISION OF ST. THOMAS AND ST. JOHN

IN RE

JEFFREY J. PROSSER,

    Debtor.

Bankruptcy No. 06-30009(JKF)

Chapter 7

STAN SPRINGEL, CHAPTER 11
TRUSTEE OF THE BANKRUPTCY
ESTATE OF INNOVATIVE
COMMUNICATION CORPORATION
AND JAMES P. CARROLL, CHAPTER 7
TRUSTEE OF THE BANKRUPTCY
ESTATE OF JEFFREY J.P. PROSSER,

    Plaintiffs,

v.

JEFFREY J. PROSSER, DAWN PROSSER,
JUSTIN PROSSER, MICHAEL PROSSER,
SYBIL G. PROSSER, MICHELLE
LaBENNETT, AND LYNDON A.
PROSSER,

    Defendants.

Adv. Pro. No. 07-03010 (JKF)

Related to DE No. 756

## MEMORANDUM OPINION[1]

    The matter before this court is the Chapter 7 Trustee's  Motion to Enforce Turnover

Order, for Contempt and for Sanctions.  Motion for Contempt and Sanctions, Adv. No. 07-

---

[1]The court's jurisdiction was not at issue.  This Memorandum Opinion constitutes our
findings of fact and conclusions of law.

1

03010, ECF No. 756, Aug. 4, 2011.  On February 1, 2012, and February 2, 2012, a trial took

place in the District Court of the Virgin Islands, Bankruptcy Division of St. Thomas/St. John, to

hear evidence on the motion.

**FACTS**

Jeffrey Prosser (hereafter "Debtor") is a debtor in the bankruptcy case styled *In re Jeffrey*

*J. Prosser*; Case No. 06-30009 (JKF), which is pending before this court. [2]  James P. Carroll, the

Chapter 7 Trustee (hereafter "Chapter 7 Trustee") was appointed chapter 7 trustee of Debtor's

estate on October 31, 2007.  Debtor and his wife, Dawn Prosser[3] (hereafter "Mrs. Prosser"), each

claimed an interest in Wines (hereafter the "Wines"), eventually valued at over two million

dollars, located at a number of locations including 252 El Bravo Way, Palm Beach, Florida

(hereafter the "Palm Beach Property"); the Shoys Estate, St. Croix, Plots 4, 4A, 5, 10A, and

10AA, Christiansted, St. Croix, USVI (hereafter the "Shoys Estate"); 89 Victor Herbert Road,

Lake Placid, New York (hereafter the "Lake Placid Property"); Park Avenue Liquor Shop, 292

Madison Avenue, New York, NY 10017 (hereafter "Park Avenue Liquor"); Zachy's Wine and

Liquor, Inc. (hereafter "Zachy's"); and a storage facility called The Store Room (hereafter "The

Store Room").

On December 11, 2007, the court entered an Order Granting Application for Preliminary

Injunction (hereafter the "Injunction"), which provided, in relevant part, that the Prossers "shall

---

[2]The Debtor was an officer and director of Innovative Communication Corporation, a
Chapter 11 Debtor in the bankruptcy case styled *In re Innovative Communication Corporation*,
Case No. 07-30012 (JKF).  Stan Springel is the court-appointed chapter 11 trustee (hereafter
"Chapter 11 Trustee") in the aforementioned chapter 11 bankruptcy case.

[3]For purposes of clarity, when discussing the Debtor and Mrs. Prosser together, this court
will refer to them as "the Prossers."

keep the [Wines] in secure locations and protect [them] from destruction, damage, modification,

theft, removal, or transfer, pending [their] turnover to the Trustees . . . ."  Order Granting

Application for Preliminary Injunction, Ex. 1, Adv. No. 07-03010, ECF No. 79, Dec. 11, 2007.

The Injunction further provided that the Prossers "shall not spend, consume, damage, dispose of,

sequester, abscond with, secrete, or transfer" the Wines "in any form whatsoever without prior,

written approval obtained from both Trustees,[4] pending further Order of the Court."  *Id.*  Debtor

understood that the Injunction was binding on him and is still binding on him.  Deposition

Transcript of Jeffery Prosser, Ex. 23, 15:10 - 17:3;  31:15 - 32:12.  Mrs. Prosser understood that

the Injunction was, and still is, binding on her.  Deposition Transcript of Dawn Prosser, Ex. 24,

6:23 - 8:14.

INITIAL INVENTORIES

**Palm Beach Wines**

After the Chapter 7 Trustee was appointed, he made efforts to determine the scope of the

assets that would be coming into the Chapter 7 Estate.  On January 16, 2008, the Chapter 7

Trustee traveled to the Prossers' Palm Beach residence, i.e., the Palm Beach Property.  He was

accompanied by Alan Barbee, a partner from the forensic accounting firm, Marcum LLP, which

the Chapter 7 Trustee hired to assist in taking inventories of the Debtor's personal property.  He

was also accompanied by employees of Christie's Inc., (hereafter "Christie's") an auction

company hired to sell property of the estate.  The purpose of the trip was to review the assets at

the Palm Beach Property.  Robert Craig, an attorney for the Debtor, and Michaela Crocker, an

---

[4]The Chapter 7 Trustee and the Chapter 11 Trustee.

3

attorney for the Chapter 11 Trustee, were also present at the Palm Beach Property on January 16,

2008. Although there was some debate as to who represented Mrs. Prosser at this time, the court

previously determined that Mr. Craig held himself out as representing Mrs. Prosser in January

2008.[5] The visit to the Palm Beach Property lasted the bulk of the day on January 16, 2008. The

Chapter 7 Trustee concluded that the Wines present at the Palm Beach Property on January 16,

2008, had a higher value than the Debtor listed on his bankruptcy schedules, and initiated an

inventory of the Wines.

The wine room in the Palm Beach Property was a self-contained room, accessible from

the garage or the kitchen, that was climate controlled with cedar-lined shelves inside. The

temperature in the wine room was maintained at a temperature significantly cooler than the rest

of the home. The Chapter 7 Trustee, Mr. Craig, Ms. Crocker, and the Christie's representatives

walked through the entire Palm Beach Property during the January 16, 2008, visit, including the

main house, the outbuildings, pool area, and garage. In addition to the wine room, there were

Wines located in a wine refrigerator in the kitchen of the Palm Beach Property. The Chapter 7

Trustee directed Mr. Barbee to conduct an inventory of the Wine at the Palm Beach Property on

January 16, 2008.

The inventory was conducted as follows: Mr. Barbee and two employees working under

him sketched out a diagram of the wine room and labeled the shelves. The purpose of this

---

[5]"It is a fact that Bob Craig spoke on behalf of Dawn Prosser at many hearings." Trial
Tr. 167:1 - 167:4, Feb. 1, 2012; Case No. 06-30009, ECF No. 3670, Mar. 7, 2012. It is clear that
Mrs. Prosser did not hire Karin Bentz to represent her until after the January 2008 visit to the
Palm Beach Property, thus the court finds that Mr. Craig held himself out as representing Mrs.
Prosser at that time. Trial Tr. 167:11-168:1, Feb. 1, 2012; Case No. 06-30009, ECF No. 3670,
Mar. 7, 2012. .

system was to eliminate double counting and to enable the three people conducting the inventory

to cross-reference each other.  At the completion of the inventory it was determined that there

were 905 bottles of Wine at the Palm Beach Property on January 16, 2008.  Demonstrative

Summary of Damages, Ex. 30.[6]  Although the inventory was conducted by Mr. Barbee, Mr.

Craig

---

[6]Exhibit 30 is a demonstrative summary of damages submitted by the Chapter 7 Trustee.
See Trial Tr. 33:20 - 35:4; 42:23 - 42:25; 44:8 - 45:14, Feb. 2, 2012; Case No. 06-30009, ECF
No. 3674, Mar. 12, 2012.  It consists of two damage summaries and three spreadsheets.  *Id*.  The
spreadsheets contain data related to the Wines at the Palm Beach Property and at the Shoys
Estate.  *Id*.  One spreadsheet deals specifically with the Wines from the Palm Beach Property and
contains the original inventory taken by Alan Barbee of Marcum LLP on January 16, 2008, as
well as the inventory confirmation performed by Ms. Licamara of Marcum LLP on March 22,
2011.  *Id*.  The values of the Wines, as well as an estimate of damages, are supplied by the
Edgerton Appraisal, Christie's high/low estimates, and Christie's auction (or "Hammer") prices.
*Id*.  The other spreadsheets are related to the Wines at the Shoys Estate (one contains damages
for all the Wines, the other sheet lists only missing Wines).  *Id*.  Like the Palm Beach
spreadsheet, these contain an initial inventory, a confirmation inventory, values, and estimated
damages.  *Id*.  However, the initial inventory used in the Shoys Estate spreadsheets was not
completed by Marcum LLP.  *Id*.  The initial inventory on these spreadsheets is from the
Edgerton Appraisal.  *Id*.  The Edgerton Appraisal, created by William Edgerton (who was hired
by Mrs. Prosser to value the Wines), is based on the Global Inventory of the Wines at each of the
storage locations.  The Global Inventory included the initial inventory, taken on January 26,
2008, by the Chapter 7 Trustee and an employee of Christie's at the Shoys Estate.  *Id*.
        At trial, Exhibit 30 was admitted except as to the Debtor regarding information related to
the Edgerton Appraisal and Christie's "Hammer" prices.  The admissibility of these portions was
deferred, subject to further briefing by the parties.  The court now concludes that the portions of
Exhibit 30 related to the Edgerton Appraisal are admissible against the Debtor.  As will be
discussed in text, *infra*, the Edgerton Appraisal itself (Exhibit 28) is admissible against the
Debtor and thus any portion of Exhibit 30 that is based on the Edgerton Appraisal is admissible.
This court will use Exhibit 30 as an accurate summary of the number of Wines present during the
initial inventories, the number of Wines present during confirmation inventories, and the values
of the Wines (for which we will rely on the values provided in the Edgerton Appraisal).
Throughout this Opinion we will reference and cite to Exhibit 30 as a summary of the evidence
presented to this court through the Edgerton Appraisal, the testimony of Ms. Licamara of
Marcum and the testimony of the Chapter 7 Trustee.  When referring to Exhibit 30, we credit and
accept the underlying testimony and evidence reflected in this demonstrative exhibit.

was on site during the process and could have participated in the inventory or conducted his own.

**Shoys Estate Wines**

On January 25th and 26th of 2008, the Chapter 7 Trustee traveled to the Shoys Estate residence of the Prossers.  Christie's employee, Melissa Bernstein, was also there to assist with taking the inventory.  During the visit, Mr. Craig was present representing the Prossers on January 25, 2008; and Oakland Benta, an employee of the Debtor, was present on behalf of the Prossers on January 26, 2008.  The inventory at the Shoys Estate on January 26, 2008, lasted approximately four hours.

On January 26, 2008, the Wines at the Shoys Estate were stored in three separate locations.  A climate-controlled wine refrigerator inside the home held individual bottles of Wine.  A self-contained refrigerated wine storage location near the pool area, that had temperature and humidity controls and cedar-lined shelves, held individual bottles of Wine.[7]  An outbuilding,[8] (hereafter the "Outbuilding") maintained by two functioning air conditioning wall units, held cases and individual bottles of Wine.  The Wines in the Outbuilding were stored on the first floor, and there were fewer bottles there than in the wine storage location near the pool. The majority of the Wines in the Outbuilding were packed in the original crates, with the

---

[7]The temperature in the wine storage location near the pool was comfortable and cool and drastically different from the hot and humid weather in St. Croix.  This wine storage location was approximately the same size, but slightly smaller than the wine room at the Palm Beach Property.

[8]The Outbuilding served as construction headquarters for the home under construction at the Shoys Estate.

6

exception of a few bottles stacked in the corner.  The bottles that were loose did not appear to

have any label damage and there was no indication of any vermin or bug infestation.

The Chapter 7 Trustee[9] and Ms. Bernstein conducted an inventory of the Wines at the

Shoys Estate by counting them on a shelf-by-shelf or case-by-case basis.  Trial Tr. 36:13 -  37:5,

Feb. 1, 2012; Case No. 06-30009, ECF No. 3670, Mar. 7, 2012.  After the count was completed

at the Shoys Estate, the Chapter 7 Trustee and Ms. Bernstein reviewed each other's lists to make

sure there were not discrepancies.  There were 980 bottles of Wine counted at the Shoys Estate

on January 26, 2008.  *See* Demonstrative Summary of Damages, Ex. 30; Edgerton Appraisal, Ex.

28.

The inventory of all of the Prossers' Wines (hereafter the "Global Inventory")[10] was sent

to the Christie's wine department, which estimated a high and low value for each entry.  Trial Tr.

131:18 - 132:16, Feb. 1, 2012; Case No. 06-30009, ECF No. 3670, Mar. 7, 2012.  Mr. Craig

received a copy of the Global Inventory, including the initial inventories of the Wines from the

Palm Beach Property and the Shoys Estate, on March 7, 2008.  Trial Tr. 38:6 - 38:8; 132:7 -

132:16, Feb. 1, 2012; Case No. 06-30009, ECF No. 3670, Mar. 7, 2012.  There were a total of

---

[9]The Chapter 7 Trustee is a certified public accountant and performed audits while he
was working in public accounting.  Trial Tr. 27:7 - 27:11, Feb 1, 2012.  He has been personally
involved with the inventory process while performing audits and in his capacity as an
accountant.  Trial Tr. 27:12 - 27:15, Feb. 1, 2012; Case No. 06-30009, ECF No. 3670, Mar. 7,
2012.

[10]The complete inventory of all the Prossers' Wines has been referred to by the parties,
and will be referred to throughout this opinion, as the "Global Inventory."  It includes
inventories of Wines from the Palm Beach Property, the Shoys Estate, the Lake Placid Property,
Park Avenue Liquor, Zachy's and The Store Room.

1,885 bottles of Wine counted at the Palm Beach Property and the Shoys Estate when the Global

Inventory was completed.  *See* Demonstrative Summary of Damages, Ex. 30.

ALLOCATION OF THE WINES

After establishing the Global Inventory, the Chapter 7 Trustee claimed that the Wines

were assets of the Chapter 7 Estate and that Mrs. Prosser had no cognizable legal interest in the

Wines.  Mrs. Prosser, however, asserted that she was the owner of 50%, if not 100%, of the

Wines.  The Chapter 7 Trustee, his counsel, the Chapter 11 Trustee's counsel and Mr. Craig had

conversations regarding allocating the Wines among the parties by splitting them based on their

location, but initially they could not come to a meeting of the minds.

On April 10, 2008, the Chapter 7 Trustee filed a Complaint seeking the entry of an order

and judgment against Mrs. Prosser granting the Chapter 7 Trustee authority to sell the Debtor's

and Mrs. Prosser's alleged interest in the Wines pursuant to section 363(h) of the Bankruptcy

Code.  Complaint, Adv. No. 08-03010, ECF No. 1, Apr. 10, 2008.  The Chapter 7 Trustee argued

that an equal allocation was not possible based on the potential disparity between the estimated

value of a given bottle and the actual price that bottle would garner at auction.  However,

following the filing of an Answer to the Complaint by Mrs. Prosser, Answer, Adv. No. 08-

03010, ECF No. 9, May 12, 2008, the court ordered counsel for Mrs. Prosser and the Chapter 7

Trustee to allocate the Wines on a bottle-by-bottle basis for a 50-50 split.  Stipulation and

Agreed Order between Chapter 7 Trustee and Dawn Prosser, Ex. 2; Adv. No. 08-03010, ECF

No. 44, Oct. 28, 2008.[11]

---

[11]Exhibit 2 was admitted at trial against Mrs. Prosser, only.

Attorney Karin Bentz was retained by Mrs. Prosser sometime in late March 2008 to handle the negotiations on the allocations.  The Chapter 7 Trustee provided copies of the Global Inventory to Ms. Bentz, per her request.  The values on the Global Inventory came from Christie's which assigned a high and low range of the estimated values per bottle and by case, to the extent there were cases of Wine.  Mrs. Prosser retained William Edgerton to create an additional valuation of the Wines (hereafter the "Edgerton Appraisal").  The Edgerton Appraisal, Ex. 28.[12]  The Chapter 7 Trustee received the Edgerton Appraisal from Mrs. Prosser's counsel, Ms. Bentz, as the proposed basis upon which to allocate the Wines.  Email Correspondence from Prosser's Counsel, Ex. 29.[13]  The Chapter 7 Trustee and Mrs. Prosser eventually agreed upon a 50-50 split.

INITIAL INVENTORY DISPUTE

The Prossers now dispute the number of Wines that the Chapter 7 Trustee asserts they owned in 2008 because they did not conduct their own inventory of the Wines.  They argue that there is no initial inventory which can be relied upon to determine whether or not the Prossers violated this court's orders.[14]  This argument is specious.  The Prossers were in sole possession

---

[12]The Edgerton Appraisal was admitted in its entirety against Mrs. Prosser at trial. However, the admissibility of the Edgerton Appraisal against the Debtor was questioned.  The court now determines that the document is admissible in its entirety against both Mrs. Prosser and the Debtor.  A discussion of the exhibit's admissibility will be detailed in text, *infra*.

[13]Exhibit 29 was not admitted for the truth of the contents of the matter asserted, but only to establish the fact that the correspondence took place.  Trial Tr. 45:24 - 46:5, Feb. 1, 2012; Case No. 06-30009, ECF No. 3670, Mar. 7, 2012.

[14]Prior to the Motion for Contempt, the Prossers did not complain about, or question, the inventories.

9

and control of the Palm Beach Property, the Shoys Estate and all of the Wines in question.  Thus,

they had every opportunity to count and re-count every bottle and case of wine, or to challenge

the Chapter 7 Trustee's inventories.  Indeed, Mrs. Prosser retained her own expert who, likewise,

could have counted the bottles.  They raised no issue and voiced no objection to the count that

was used to make the 50-50 split.  In addition, the Debtor personally purchased each bottle and

case of Wine.  If anyone had personal knowledge of the number of Wines, and their value, it was

the Debtor.

The court finds that Mrs. Prosser accepted the Global Inventory, as she retained Mr.

Edgerton, who could have counted the Wines prior to or during the negotiations of the allocation

the Chapter 7 Trustee and Mrs. Prosser eventually agreed upon.  The Edgerton Appraisal was

admitted as evidence against Mrs. Prosser at trial.  Trial Tr. 48:25 - 49:3, Feb. 1, 2012; Case No.

06-30009, ECF No. 3670, Mar. 7, 2012.

The Debtor argues that the Edgerton Appraisal, and any document based on the Edgerton

Appraisal, is inadmissible hearsay evidence against him.  This court disagrees.  Under Federal

Rule of Evidence 801(d)(2)(B), an exception to hearsay exists if a statement is offered against an

opposing party and is one "the party manifested that it adopted or believed to be true."  28

U.S.C. § 801(d)(2)(B).  "The law of evidence has long recognized 'adoptive admissions.'"

*United States. v. Miller*, 478 F.3d 48, 51 (1st Cir. 2007).  The doctrine of "adoptive admissions,"

embodied in Rule 801(d)(2)(B), provides that in certain circumstances, a party's agreement with

a fact stated by another may be inferred from (or "adopted" by) silence.  *Id.*  "Such an inference

may arise when (i) a statement is made in a party's presence, (ii) the nature of the statement is

such that it normally would induce the party to respond, and (iii) the party nonetheless fails to

10

take exception." *Id*. When these elements are present, the statement, or in this case the document, "may be considered 'adopted' by virtue of the party's failure to respond." *Id*. The court finds that the Debtor, both personally and through counsel, was privy to the inventory and the valuation set forth in the Edgerton Appraisal, such that it constitutes a statement made in his presence.[15] Debtor was not only aware of the inventory and valuation being used by Mr. Edgerton, but he admitted to assisting Mr. Edgerton in dividing the Wines. Deposition Transcript of Jeffery Prosser, Ex. 23, 20:4 - 20:11. During his deposition, Debtor testified about what tasks Mr. Edgerton undertook in the valuation and allocation process (what he referred to as the "breakdown" of the Wines). *Id*. at 21:4 - 22:7. The court finds that the nature of the Edgerton Appraisal, which was commissioned by Mrs. Prosser and assigned monetary values to the various Wines in which the Prossers were claiming an interest and which Debtor helped to prepare, is one that would induce the Prossers to respond if they did not agree with its findings.[16]

---

[15]Mr. Craig, counsel of record for the Debtor, was copied on the emails between counsel to the Chapter 7 Trustee and Mrs. Prosser relating to the Edgerton Appraisal and the allocation of the Wines. See Email Correspondence from Prosser's Counsel, Ex. 29. Debtor "certainly remember[s] being involved with [Mr. Edgerton] . . . to assist in doing the division, coming up with a division, working with whomever to come up with a division of the wines." Deposition Transcript of Jeffery Prosser, Ex 23, 20:4 - 20:11.

[16]Additionally, Debtor had an obligation to ensure the court was accurately informed of the full extent of his assets and their value. The Bankruptcy Code requires a debtor to file a schedule of his assets. 11 U.S.C. § 521(a)(1)(B)(I). This court has acknowledged that "[h]e had an absolute unqualified obligation to disclose every bottle of wine that he owned in this collection and its value" Hearing Tr. 101:22 - 102:3, July 18, 2012, Adv. No. 07-03010, ECF No. 987, July 26, 2012. The Debtor significantly under-reported the collection's value in his bankruptcy schedule, a fact discovered by the Chapter 7 Trustee upon visiting the Palm Beach Property in 2008. An inventory of the collection was sent to Debtor's counsel on March 7, 2008. Trial Tr. 132:8 - 132:23, Feb. 1, 2012; Case No. 06-30009, ECF No. 3670, Mar. 7, 2012. However, Debtor did nothing to inform the court that the number in the inventory he received, or the number in the Edgerton Appraisal, was incorrect. Hearing Tr. 102:4 - 102:8, July 18, 2012,

(continued...)

Counsel for the Chapter 7 Trustee and the Prossers undertook a lengthy process to allocate

thousands of bottles of Wine based on estimates given by Christie's and Mr. Edgerton.  Because

the valuation of the Wines directly affected the Wines' allocation, and thus, the allocation to his

bankruptcy estate and that to his wife, Debtor would have been induced to respond if he

disagreed with either the inventory or the values within the Edgerton Appraisal.  As the Debtor

did not so respond, and also admitted to assisting Mr. Edgerton with ascertaining the values

necessary to allocation and the preparation of the document, the court concludes that he adopted

the Edgerton Appraisal and that the document is admissible against him under Federal Rule of

Evidence 801(d)(2)(B).  Likewise, the Debtor's objections to the portions of Exhibit 30 based on

the Edgerton Appraisal are overruled.

Thus, the Edgerton Appraisal is admissible against the Prossers and the data within it is a

valid initial inventory of the Wines in question.[17]  Any objections made by the Prossers regarding

their assertion that they had no opportunity to establish their own inventory, which the court

finds to be totally incredible, goes to the weight of the evidence and not to the admissibility.  The

court finds that the Prossers were represented during the creation of the initial inventories; there

is no evidence that the Prossers were prohibited from participating in the creation of such

---

[16](...continued)
Adv. No. 07-03010, ECF No. 987, July 26, 2012.

[17]In addition to the inventory in the Edgerton Appraisal, corresponding inventories of the Wines can be found throughout the evidence admitted at trial.  Exhibit 2 (admitted only against Mrs. Prosser) contains an initial inventory of the Wines from the Palm Beach Property and the Shoys Estate; Exhibit 6 (admitted at trial against the Prossers) contains an initial and confirmation inventory of the Wines at the Palm Beach Property; and Exhibit 30 (for a discussion of admissibility, see note 6, supra) demonstrates an initial and confirmation inventory of the Wines from the Palm Beach Property and the Shoys Estate.

inventories; and, it is clear that the Prossers had the opportunity to create their own inventory

had they desired to do so.  Further, inasmuch as the inventory was used to produce a 50-50 split,

both the Prossers and the Estate benefitted from an accurate assessment.  Thus, the Prossers

would have reason to speak up if the accuracy were in doubt.

RESTATEMENT OF INJUNCTION

After the initial inventory was taken, the requirements set forth in the Injunction were

restated by the court.  The court first reiterated the requirements in an Order approving a

Stipulation between Mrs. Prosser and the Chapter 7 Trustee on December 12, 2008 (hereafter the

"9019 Order"), then again enforcing the terms of the Injunction on February 9, 2011, in a

Memorandum Opinion and corresponding Order of Court.

**9019 Order**

On October 28, 2008, the Chapter 7 Trustee filed a Motion for Approval of a Stipulation

and Agreed Order Between Chapter 7 Trustee and Dawn Prosser: (A) Settling and Resolving

Adversary Proceeding, Without Prejudice to Certain Claims; and (B) Providing for the Division

and Sale of a Portion of Certain Fine Wines, Champagnes, Liquors and Other Spirits.  Motion to

Approve Compromise under Rule 9019, Adv. No. 08-03010, ECF No. 44, Oct. 28, 2008.

Attached to the Motion as Exhibit "A," was the Stipulation and Agreed Order between the

Chapter 7 Trustee and Mrs. Prosser (hereafter the "Stipulation").  *Id*; *see also* Stipulation, Ex. 2;

Adv. No. 08-03010, ECF No. 44, Oct. 28, 2008 (the Stipulation was admitted against Mrs.

Prosser at trial).  The Stipulation between the Chapter 7 Trustee and Mrs. Prosser set forth an

agreement "that the approximate market value for the Wines is between $2.15 and $2.28 million,

13

and that, for purposes of resolving the Adversary Proceeding, the Wines should be divided

evenly between the Chapter 7 Trustee (the "Estate Wines") and Mrs. Prosser (the "Dawn Prosser

Wines"),[18] so as to enable a sale of the Estate Wines pending resolution of the other Wine

Claims." Stipulation, Ex. 2; Adv. No. 08-03010, ECF No. 44, Oct. 28, 2008, at 5.[19]  In general,

the Chapter 7 Trustee was allocated the Wines located in storage facilities and Mrs. Prosser was

allocated the Wines located at the Prossers' residences, on the grounds that it would be less

expensive for Mrs. Prosser to keep the Wines located at the residences. *Id.*

On December 12, 2008, the court entered an Order Approving Stipulation and Agreed

Order between Chapter 7 Trustee and Dawn Prosser, the 9019 Order.  Order of Court, Ex. 3;

Adv. No. 08-03010, ECF No. 61, Dec. 12, 2008.  The 9019 Order specifies that "[t]he

Stipulation is approved in all respects," except for certain modifications made by the court as

detailed in the 9019 Order.  *Id.*  The court specifically modified the Stipulation to state:  "Dawn

Prosser shall continue to store, maintain and protect the Dawn Prosser Wines in continued

compliance with the Injunction.  Nothing in this Stipulation shall be deemed to constitute a

modification or alteration to in any way affect the continuing enforceability of the Injunction as

it relates to the Wines."[20]  *Id.* at 2.  During depositions, the Prossers testified that they understood

---

[18]The "Dawn Prosser Wines" was a defined term for the 50% share preliminarily allocated to Mrs. Prosser while her claim to ownership was litigated.

[19]The Stipulation included a Distribution Schedule which, for any given bottle of wine, included categories for the number of bottles or cases, the vintage, the brand and locations.  The distribution schedule stemmed from the Global Inventory, and included columns with values provided by Mr. Edgerton and Christie's.

[20]The 9019 Order also establishes that, "[t]his Court shall retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Stipulation, and
(continued...)

that the Stipulation did not relieve them of any of the responsibilities set forth in the Injunction. Deposition Transcript of Jeffery Prosser, Ex. 23, 31:15; Deposition Transcript of Dawn Prosser, Ex. 24, 18:19.

After the court issued the 9019 Order, the Wines that were allocated to the Chapter 7 Estate were auctioned off.  Report of Sale, Case No. 06-30009, ECF No. 2523, June 23, 2009. The Wines not allocated to the Chapter 7 Estate were in the care, custody and control of, and remained in the possession of, the Prossers until entry of the Turnover Order.

**Turnover Order**

On February 9, 2011, the court issued a Memorandum Opinion and entered an Order Requiring Turnover of Certain Property to the Chapter 7 Trustee (hereafter the "Turnover Order").  Turnover Opinion and Order, Ex. 4; Adv. No. 07-03010, ECF No. 728, Feb. 9, 2011. The Turnover Order determined, among other things, that the Wines allocated to, and in the possession of, Mrs. Prosser are property of the Chapter 7 Estate.  *Id*. at 2.  It required that the Prossers turn over the Wines to the Chapter 7 Trustee and ordered that the Injunction be made permanent and kept in place until the Wines were turned over to the Chapter 7 Trustee.  *Id*.  The Turnover Order did not change the terms of the Injunction previously entered by the court in relation to the Wines.  *Id*.

SECOND INVENTORY

---

[20](...continued)
to adjudicate, if necessary, any and all disputes concerning or relating to the transactions contemplated hereby."  Order of Court, Ex. 3; Adv. No. 08-03010, ECF No. 61, Dec. 12, 2008.

**Palm Beach Wines**

In March 2011, the Chapter 7 Trustee visited the Palm Beach Property for the dual
purpose of evaluating, packing and shipping the Wines for sale and determining how to store and
maintain the personal property that was within the home prior to the sale of the Palm Beach
Property.  The Chapter 7 Trustee was accompanied by Mr. Barbee and Teresa Licamara, an
accountant also employed by Marcum LLP, as well as Ms. Bernstein and three other members of
the Christie's wine department, and John Cronin from MYC auctioneers.  The three members of
the Christie's wine department were tasked with evaluating, packing and shipping the Wines for
sale and Mr. Cronin was present to review the personal property in the home in preparation for
its auction sale.

When the Chapter 7 Trustee entered the wine room, his first impression was that there
were significantly fewer Wines than when he visited in 2008.[21]   The Chapter 7 Trustee told the
Debtor that there seemed to be fewer bottles present at the Palm Beach Property than on his
previous visit in 2008 and asked if bottles were located anywhere else on the property.  The
Debtor responded that there had never been a confirmed initial inventory and therefore, nothing
to compare the current number of bottles against. Trial Tr. 65:1 - 65:21, Feb. 1, 2012; Case No.
06-30009, ECF No. 3670, Mar. 7, 2012.

Ms. Licamara from Marcum LLP used the original inventory from 2008 and compared it
against what was in the wine room in March 2011.  She used a numbering/lettering system to

---

[21]There was also a bottle or two in the wine refrigerator in the kitchen, but the Debtor
informed the Chapter 7 Trustee that this wine was purchased after the 2008 visit.

16

identify the various locations of the Wines in the room.  Marcum LLP created the

numbering/lettering system as part of the inventory.  For each vintage of wine present in 2008,

Marcum LLP confirmed how many bottles were still present in March 2011.  The result of the

comparison was that 471 of the bottles present in 2008 were missing from the wine room in

March 2011.  *See* Demonstrative Summary of Damages, Ex. 30.  The total number of Wines

present at the Palm Beach Property in 2008 was 905 and on March 22, 2011, there were only

434.  *Id*.  These remaining bottles were packed up and removed from the Palm Beach Property to

be sold.

**Shoys Estate Wines**

With the agreement of counsel for the Prossers, the Chapter 7 Trustee directed

representatives of Christie's to go to the Shoys Estate on July 29, 2011, to pick up and ship the

Wines stored there for sale.  Christie's reserved the right to physically inspect the Wines prior to

taking them for sale.[22]

Although the Christie's representatives went to the Shoys Estate for the purpose of

picking up and shipping the Wines, Christie's did not remove the Wines from the Shoys Estate.

Upon observing the condition of the bottles and their storage, as detailed below, it was

determined that the Wines would not be marketable through Christie's.  The Chapter 7 Trustee

spoke with Charles Antin, one of the Christie's representatives who visited the Shoys Estate on

---

[22]Prior to July 29, 2011, Christie's picked up and found suitable for sale Wines from
other locations, including Wines stored at Zachy's, Park Avenue Liquor, The Store Room and
the Palm Beach Property.  There were no instances in connection with this case in which
Christie's refused to pick up Wines prior to the July 29, 2011, visit to the Shoys Estate.

July 29, 2011, while he was still on the property that day.  Mr. Antin explained that based on the

conditions in which the Wines were stored as of July 29, 2011, the Wines were not marketable.

He expressed that the Wines were not sufficiently cooled, that one of the air conditioning units in

the Outbuilding was not functioning and was unplugged, and that the other "wasn't an effective

cooling device."[23]  Deposition Transcript of Charles Antin, Ex. D.10, 55:12 - 55:13.  Mr. Antin

felt some of the bottles of Wine in the Outbuilding and discovered that they were warm to touch.

---

[23]The Prossers raised arguments at trial, during closing arguments, and within their
pleadings regarding the temperature in the Outbuilding and the Prossers' knowledge of the
required temperature for wine storage.  *See* Jeffrey J. Prosser's Post-Trial Brief with Proposed
Findings of Fact and Conclusions of Law, Adv. No. 07-03010, ECF No. 970, at 5, June 18, 2012.
Although we recognize that the orders of this court did not specifically inform the Prossers that
Christie's required wines to be stored at a certain temperature, the Prossers were specifically
required to keep the Wines in the same condition as and from the time the orders were entered.
They did not do so.  We also find that the Debtor, as the purchaser and owner of a large
collection of fine wines, had a general understanding of the proper storage methods for such a
collection.  This conclusion is evidenced by the methods of storage used by the Prossers for the
rest of their collection in other locations, as well as the method of storing Wines at the Shoys
Estate as observed in 2008.  *See* Exhibit A attached to this opinion (containing sample
photographs from Ex. 5).

In 2008 the majority of the Wines at the Shoys Estate were stored in a temperature
controlled wine refrigerator which kept the Wines organized and cool.  This unit was no longer
being used when Mr. Antin visited the Shoys Estate in July 2011.  There is also no evidence that
the Wines stored in the Outbuilding in 2008 were being stored in a manner that would expose
them to heat, sunlight, insects or vermin.  The Chapter 7 Trustee and Ms. Bernstein, an employee
of Christie's, visited the Shoys Estate in 2008 and there is no evidence that they were concerned
about the storage conditions of the Wines.  At the time of the 2008 visit the Outbuilding was
sufficiently cool and the temperature was maintained by two functioning air conditioning units.
The Debtor asserts that the "wine rooms [were] no different [in December 2011] than they were
then [in January 2008] when people went through them" although he admits that "they may not
be as neat."  Deposition Transcript of Jeffrey Prosser, Ex. 23, 55:1 - 55:6.  Despite his assertion,
it is clear to this court that the storage conditions at the Shoys Estate changed from 2008 to 2011
and that such changes resulted in Christie's refusal to sell the Wines from that property.  The
photographs admitted as Exhibits clearly establish changed conditions.  *See infra* note 25.

Deposition Transcript of Charles Antin, Ex. D.10, 58:21 - 60:6.  He also determined that the air

being blown into the room was "tepid."[24]  *Id.*

Photographs of the Wines stored at the Shoys Estate were taken on July 29, 2011, and

admitted at trial as Exhibit 7.  Photos of Wines at Shoys Estate in July 2011, Ex. 7; *see also*

Exhibit B attached to this Opinion (containing a sample photograph from Ex. 7).  After

reviewing these photographs, the Chapter 7 Trustee determined, and we find, that the storage

conditions of the Wines at the Shoys Estate were completely different than they were in 2008.[25]

In 2011, all of the Wines at the Shoys Estate were located in the Outbuilding, having been

moved there by the Debtor and a yard worker earlier in the year.  Deposition Transcript of

Jeffery Prosser, Ex. 23, 8:10 - 9:16.  The Debtor testified that the refrigerated wine storage

location near the pool area stopped working which is why the Wines were moved to the

---

[24]We recognize that Mr. Antin's associate unplugged the one semi-functioning air
conditioner in the Outbuilding (which he believed was blowing tepid air) upon leaving the Shoys
Estate in July 2011.  Deposition Transcript of Charles Antin, Ex. D.10, 58:21 - 60:6.  Mr. Antin
testified that after his observations he instructed his associate to unplug the air conditioner and
he attributed this action to his being "green."  *Id.* at 33:12 - 34:6; 75:4 - 75:7.  Mr. Benta, an
employee of the Debtor, testified that he plugged the air conditioner back in after only 15
minutes.  Deposition Transcript of Oakland Benta, Ex. D.8, at 42:2 - 42:12.  Thus, although we
acknowledge that Mr. Antin and his associates should not have unplugged the air conditioner, we
find that no additional damage to the Wines was caused by the action.  The credible testimony of
the Chapter 7 Trustee's expert, Ms. Ewing-Mulligan, established that the lack of soundness in
the Wines could not have been caused by the air conditioner being unplugged for 15 minutes,
that the Wines must have "suffered bad storage for a few years."  Trial Tr. 157:18 - 158:11, Feb.
2, 2012; Case No. 06-30009, ECF No. 3674, Mar. 12, 2012.

[25]There were photographs of the Wines taken at the Shoys Estate in March of 2008, and
these photographs were also admitted into evidence at trial.  Photos of Wine at Shoys Estate in
2008, Ex. 5.  A comparison of the photographs from 2008 and 2011 shows the changes in the
storage conditions at the Shoys Estate, as well as the overall condition of the Wines stored there.
*Compare* Photos of Wine at Shoys Estate in 2008, Ex. 5 (sample attached to this Opinion as
Exhibit A), *with* Photos of Wine at Shoys Estate in July 2011, Ex. 7.  See also Exhibit B attached
to this Opinion (containing a sample photograph from Ex. 7).

Outbuilding.[26]  *Id*. at 8:13 - 20:12.  The July 2011 and December 2011 photographs showed non-functioning refrigeration units containing Wines stacked haphazardly, as well as Wines stacked sideways in cardboard boxes on the floor in no order.  Photos of Wines at Shoys Estate in July 2011, Ex. 7; Photos of Wines at Shoys Estate in December 2011, Ex. 20; *See also* Exhibit C attached to this Opinion (containing sample photographs from Ex. 20).

Ms. Licamara and two wine experts retained by the Chapter 7 Trustee, Mary Ewing-Mulligan[27] and Lisa Granik (hereafter the "Experts"), traveled to the Shoys Estate on December 15, 2011, to confirm the number of Wines present, as compared to the number present during the January 2008 visit, and to determine the marketability of the remaining Wines.  Counsel for Mrs. Prosser,[28] counsel for the Chapter 7 Trustee, and the United States Marshal's Service were also present during the December 15, 2011, visit.

Ms. Licamara used the Edgerton Appraisal to identify and compare the quantity of Wines present during the January 2008 visit to the quantity of Wines present on December 15, 2011.

---

[26]Neither the court, nor the Chapter 7 Trustee, was ever informed that the Prossers were having difficulty storing and maintaining the Wines, or that any of the Wines were missing. Trial Tr. 90:22 - 92:3, Feb. 1, 2012; Case No. 06-30009, ECF No. 3670, Mar. 7, 2012.

[27]Ms. Ewing-Mulligan was retained by the Chapter 7 Trustee to determine the soundness and marketability of the Wines at the Shoys Estate.  She testified at trial, was qualified as an expert and was permitted to give an opinion as to the marketability and quality of the Wines as well as to the condition of the storage of the Wines.  Trial Tr. 121:7 - 121:19, Feb. 2, 2012; Case No. 06-30009, ECF No. 3674, Mar. 12, 2012.

[28]Jeffrey Moorhead, Mrs. Prosser's counsel in these proceedings and Debtor's counsel in other matters, was present at the time of the December 15, 2011, visit.  Trial Tr. 63:3 - 63:9, Feb. 2, 2012; Case No. 06-30009, ECF No. 3674, Mar. 12, 2012.

She entered the numbers from the Edgerton Appraisal into an Excel spreadsheet,[29] which she

brought with her to the Shoys Estate.  Because the Wines were in such disarray, the Experts had

to assist in the inventory process by categorizing and organizing the Wines by vintage so they

could be counted.  Ms. Licamara, with the assistance of the Experts, went through each bottle of

Wine in the Outbuilding, organized it by name and vintage, and checked it against the Excel

spreadsheet she brought with her.  In December 2011, there were 527 bottles of Wine present at

the Shoys Estate, 453 less than the 980 bottles of Wine present during the initial inventory taken

in 2008.  *See* Demonstrative Summary of Damages, Ex. 30.

At the December 2011 visit to the Shoys Estate, it was determined that the Wines

remaining on the premises were in a state of deterioration from poor storage conditions.  As

mentioned above, all of the Wines were in the Outbuilding, where both cases and individual

bottles were stored near windows exposed to light and heat.  The state of the Outbuilding itself

had changed since January 2008 when it was in good condition with a functioning cooling

system.  In December 2011, the Outbuilding was in a state of disrepair, with peeling paint

outside and broken glass on the ground.[30]  Trial Tr. 182:21 - 183:2, Feb. 1, 2012; Case No. 06-

---

[29]Ms. Licamara cross-checked the numbers in the Edgerton Appraisal with the
Distribution Schedule attached to the Stipulation between the Chapter 7 Trustee and Mrs.
Prosser and determined that the names, vintages, and counts for the Wines were the same on
both documents.  Trial Tr. 31:18 - 32:5, Feb. 2, 2012; Case No. 06-30009, ECF No. 3674, Mar.
12, 2012.

[30]The Prossers have argued that they are concerned that a theft may have taken place at
the Shoys Estate.  Dawn E. Prosser's Post Trial Brief with Proposed Findings of Fact and
Conclusions of Law, Adv. No. 07-03010, ECF 971, at 3, June 18, 2012.  Mrs. Prosser testified in
her deposition that she did not know for sure that any Wines were stolen although she believed
someone had possibly broken in and destroyed or consumed some Wines and used the pool at
the Shoys Estate.  Deposition Transcript of Dawn Prosser, Ex. 24, 8:15 - 9:14.  First, with regard

(continued...)

30009, ECF No. 3670, Mar. 7, 2012.  As can be seen in the sample photographs attached to this

Opinion as Exhibits B and C , within the Outbuilding bottles of Wine were stacked in rows and

on top of each other in non-operating refrigerators such that the Wines needed to be taken out

and sorted in order to be counted.  The refrigerators' doors were open and the Wines that were

not stacked inside were scattered on the floor.  The refrigerators were dirty.  There were vermin

feces and insect residue present in the Outbuilding and evident on the labels of the Wines.  The

manner of storage led to scratched and damaged labels.[31]  Some of the labels were missing;

others had insect feces on them and some had been eaten by insects or vermin almost beyond

recognition.  Some labels were so damaged that the Experts had to identify the Wines by their

corks.  Photos of Wine at Shoys Estate in December 2011, Ex. 20.  Ms. Ewing-Mulligan testified

that based on the outward appearance of the bottles, alone, 75% of the Wines were not

marketable.  Trial Tr. 143:23 - 144:5, Feb. 2, 2012; Case No. 06-30009, ECF No. 3674, Mar. 12,

2012.

---

[30](...continued)
to this argument, the court finds that there is no sound evidence to prove that a break-in did in
fact occur at the Shoys Estate.  Secondly, the Prossers were specifically ordered to keep the
Wines "in secure locations and protect the [Wines] from destruction, damage, modification,
**theft**, removal, or transfer, pending its turnover to the Trustee."  Order Granting Application for
Preliminary Injunction, Ex. 1; Adv. No. 07-03010, ECF No. 79, Dec. 11, 2007 (emphasis added).
Failure to prevent a theft of the Wines is still a violation of this court's orders, and not an
appropriate defense.

[31]Certain types of Wines present in the Outbuilding, such as the *Chateau Mouton
Rothschild*, have particularly valuable labels, as every year a renowned artist is commissioned to
design artwork for the label.  Ms. Ewing-Mulligan explained that a purchaser of this bottle
would want the label to be pristine as the packaging gives the wine an added value beyond the
taste of the wine itself.  Trial Tr. 133:25 - 134:24, Feb. 2, 2012; Case No. 06-30009, ECF No.
3674, Mar. 12, 2012.

Even though the outward appearance of the Wines was telling, Ms. Ewing-Mulligan, intending to conduct a thorough investigation, opened six bottles of Wine for the purpose of tasting them.  The Wines she selected had the highest presumption of durability and best chances of being in good condition.  *Id*. at 143:9 - 143:20.  When she tried to open the six bottles, each cork broke for various reasons.  In some cases the cork was too soft and the corkscrew couldn't gain purchase on the inside of the cork.  In some cases, the cork was loose in the bottle and difficult to extract.  In some cases, the cork was dried out.  *Id*. at 149:9 - 149:22.  According to Ms. Ewing-Mulligan, the Wines were out of condition and once a wine falls out of condition it can never be restored to where it should be.  *Id*. at 152:6 - 152:19.  After testing the six bottles of the most durable Wines, and after considering their condition, Ms. Ewing-Mulligan testified that none of the Wines located at the Shoys Estate were marketable or had any sale value.  *Id*. at 153:16 - 153:24.  It was clear from her testimony, and we find, that she made a good faith effort to recover Wines that were marketable  but she was unable to find any such bottles due to the improper storage conditions and indicators of external damage to the Wines.  *Id*. at 140:18 - 141:5.  She determined that the storage conditions causing deterioration were environmental factors, such as insect damage, temperature, humidity and light exposure within the Outbuilding. *Id*. at 180:4 - 180:22.

Of the 527 remaining bottles of Wine at the Shoys Estate in December 2011 none was considered marketable by Ms. Ewing-Mulligan.

**LEGAL ANALYSIS**

This court has the authority to sanction the Prossers using its civil contempt powers, which reside in bankruptcy courts pursuant to 11 U.S.C. § 105(a), to remedy a violation of its orders. *In re Bartock*, 398 B.R. 135, 160 (Bkrtcy. W.D. Pa. 2008) (*citing In re Davitch*, 336 B.R. 241 (Bkrtcy. W.D. Pa. 2006)). In order to impose sanctions for civil contempt a court must find that a valid court order existed, the defendant had knowledge of that order, and the defendant disobeyed the order. *Davitch*, 336 B.R. at 251 (*citing Harris v. City of Phila.*, 47 F.3d 1311 (3d Cir. 1995)). A bankruptcy court has the authority to impose civil contempt to enforce compliance with a court order and to compensate a party damaged by a violation of that order. *In re Swanson*, 207 B.R. 76, 80 (Bankr. D.N.J. 1997). Because civil contempt serves a remedial purpose, proof of willfulness is not required for a sanction to be imposed. *Id.* Thus, it is not necessary to make a finding of bad faith to impose a civil contempt sanction. *See Bartock*, 398 B.R. at 160 (*citing In re Elias*, 98 B.R. 332, 337 (N.D. Ill. 1989)).

The court concludes that the elements necessary to find the Prossers in civil contempt of court and to sanction were established in this case. To protect property of the Chapter 7 Estate while issues concerning what was property of the Estate were litigated, this court entered three separate valid orders: the Injunction, the 9019 Order, and the Turnover Order. The court finds that since December 2007, when the Injunction was entered, the Prossers have been forbidden, by explicit Order of this court, from disposing of, consuming, damaging, or in any other way compromising the integrity of the Wines. The court finds that the Prossers had knowledge of the orders and flagrantly disobeyed them by dissipating (or permitting the dissipation of) approximately 52% of the inventoried 905 bottles of Wine at the Palm Beach Property, dissipating (or permitting the dissipation of) approximately 46% of the inventoried 980 bottles of

Wine at the Shoys Estate, and by failing to maintain (or to make reasonable efforts to maintain)

the remaining Wines at the Shoys Estate in a protected, light and temperature controlled

environment (as they were stored in 2008) such that they became unmarketable by Christie's.[32]

Thus, we find Jeffrey Prosser and Dawn Prosser in civil contempt of court.  Moreover, their

violation of three orders of the court is so egregious that sanctions are warranted.

**DAMAGES**

As discussed above, this court finds that the inventory and the valuation of the Wines

summarized in the Demonstrative Summary of Damages, Ex. 30, is admissible evidence against

the Prossers and provides an appropriate basis for measuring damages.

The court finds that the Chapter 7 Trustee established that the Chapter 7 Estate suffered

damages in the amount of the value of the missing and unmarketable Wines plus the fees and

cost of litigation, including the Chapter 7 Estate's retention of experts.  Regarding the value of

the Wines, the Prossers presented no credible evidence rebutting the Chapter 7 Trustee's

calculation of damages.  We will therefore use the calculation provided by the Chapter 7 Trustee

as summarized in the Demonstrative Summary of Damages, Ex. 30, which was established as

---

[32]Although the testimony is clear that the Wines at the Shoys Estate were unmarketable
through Christie's, the Prossers have argued that the Wines may still have some value remaining.
Thus, on July 18, 2012, the court instructed the Chapter 7 Trustee to set up an auction to attempt
to sell the remaining Wines from the Shoys Estate in order to determine whether or not the
Wines have any value.  Hearing Tr. 134:21 - 136:19, July 18, 2012, Adv. No. 07-03010, ECF
No. 987, July 26, 2012.  On September 10, 2012, this court issued an Order granting the
Trustee's motion to retain Auction America to sell property located at the Shoys Estate,
including the remaining Wines.  Order of Court, Case No. 06-30009, ECF No. 3893, Sept. 11,
2012.  Should the Wines sell for any amount, the net, after costs and expenses are subtracted,
will be deducted from the damages attributed to missing and unmarketable Wines.

reliable and accurate by testimony and evidence admitted at trial.  The values of the Wines this

court adopts are the values provided by Mrs. Prosser's expert, Mr. Edgerton.  As to the fees and

costs of litigation, further proceedings are needed.

At the Palm Beach Property, 471 bottles of Wine, with a value of $83,579.00, were

missing in March of 2011.[33]  *See* Demonstrative Summary of Damages, Ex. 30.  At the Shoys

Estate 453 bottles of Wine, with a value of $139,412.00, were missing in December of 2011.[34]

*Id*.  An additional 527 bottles of Wine worth $211,884 were considered unmarketable,[35] bringing

the amount of damages from the Shoys Estate to $351,296.00.  *Id*.  The court therefore finds that

the Debtor and Mrs. Prosser have violated the court's orders and are in civil contempt of court.

The Chapter 7 Estate is awarded sanctions against the Prossers, jointly and severally, in the

amount of $434,875.00, less any net proceeds recovered from the auction of the Wines from the

Shoys Estate, plus an as yet undetermined amount in fees and costs, for Trustee's counsel and

experts.

---

[33]There were additional Wines at the Palm Beach Property which were not present during
the initial inventory, but were present during the inventory confirmation in 2011.  *See*
Demonstrative Summary of Damages, Ex. 30.  These Wines were not considered as a factor in
the finding of civil contempt or in the calculation of damages.

[34]There were also additional Wines present at the Shoys Estate during the inventory
confirmation which were not present during the initial inventory.  *See* Demonstrative Summary
of Damages, Ex. 30; *See also* Trial Tr. 84:5 - 84:19, Feb. 2, 2012; Case No. 06-30009, ECF No.
3674, Mar. 12, 2012.  The court did not consider these Wines as a factor in the finding of civil
contempt or in the calculation of damages.

[35]Net proceeds, if any, from a sale of these Wines will be considered in the final
calculation of damages.  *See supra*, note 32.

An appropriate order will be entered.  Damages will be assessed in a Supplemental Order to be entered at a later date.

DATE:  September 18, 2012

Judith K Fitzgerald
United States Bankruptcy Judge